ACCEPTED
03-16-00203-CV
13816645
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/16/2016 9:25:40 AM
JEFFREY D. KYLE
CLERK

CASE NO.  03-16-00203-CV

THE COURT OF APPEALS
THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/16/2016 9:25:40 AM
JEFFREY D. KYLE
Clerk

VIOLANDA SOLEDAD,

Appellant

vs.

TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY,

Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On Appeal from the Burnet County Court

Burnet County, Texas

Trial Court Cause No.  C4358
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Appellant's Motion for Rehearing

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CHRIS JACKSON
ATTORNEY AT LAW
State Bar No. 10454600
1812 Center Creek Dr., Suite 275
Austin, Texas 78754
c_jackson@sbcglobal.net
512-478-1699 - Phone
512-821-2943 - Facsimile

JIM RODMAN
ATTORNEY AT LAW
State Bar No. 17139525
1515 W. 35th St., Suite C
Austin, Texas 78703
jimrodman@rodmanlawoffice.com
512-481-0400 - Phone
512-481-0500  - Facsimile

Counsel for Violanda Soledad

# Table of Contents

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Arguments and Authorities

A.     The Purpose of Relevant Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     1.     The Exclusive Remedy Provision.. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     2.     The UM Statute.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     3.     Additional Guides for Interpreting Insurance Policies. . . . . . . . . . . . 6

B.     The Appellant is Legally Entitled to Recover Damages from
     her Employer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.     *Valentine* is not Controlling Precedent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Appendix

# **Table of Authorities**

Cases

*Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663 (Tex. 1987). . . . . . . . . . . . . . . . 6, 8

*Briones v. State Farm Mut. Auto. Ins. Co.*,
    790 S.W.2d 70 (Tex. App. — San Antonio 1990, writ denied). . . . . . . 12, 13

*Casualty Reciprocal Exch. v. Demock*,
    130 S.W.3d 74 (Tex. App. — El Paso 2002, no pet.).. . . . . . . . . . . . . . . 7-8

*City of Corpus Christi v. Gomez*,
    141 S.W.3d 767 (Tex. App. — Corpus Christi 2004, no pet.). . . . . . . . . . . 7

*Employers Cas. Co. v. Dyess*,
    957 S.W. 2d 884 (Tex. App. — Amarillo 1997, pet. denied). . . . . . . . . . . 12

*Forbau v. Aetna Life Insurance Company*, 876 S.W.2d 132 (Tex 1994).. . . . . . 6, 7

*Liberty Mut. v. Kinser*,
    82 S.W.3d 71 (Tex. App. — San Antonio 2002, pet. w'drawn). . . . . . . . . . 8

*RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113 (Tex. 2015). . . . . . . . . . . . . . 6

*Resolution Oversight Corp. v. Garza*,
    03-08-00481-CV, 2009 WL 1981424 (Tex. App. — Austin,
    July 10 2009, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

*Soledad v. Texas Farm Bureau Mut. Ins. Co.*,
    03-16-00203-CV, 2016 WL 6575233 (Tex. App. — Austin Nov.
    2, 2016, n.p.h.) (not yet released for publication). . . . . . . . . . . . . . . . . . . 1

*Southern County Mut. Ins. Co. v. Smith*,
    529 S.W.2d 618 (Tex. Civ. App. — Tyler 1975, no writ). . . . . . . . . . . . . 6, 7

*Valentine vs Safeco Lloyds Ins. Co.*,
    928 S.W. 2d 639 (Tex. App. — Houston [1st Dist.] 1996,
    writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Western Indem. Ins. Co. v. American Physicians Ins. Exch.*,
    950 S.W.2d 185 (Tex. App. — Austin 1997, no pet.). . . . . . . . . . . . . . . . . . 6

Statutes

Tex. Ins. Code §§ 1952.101, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Tex. Labor Code §§ 408.001, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rules of Appellate Procedure

Tex. R. App. Pro. 9.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Now comes the Appellant, Violanda Soledad, and in support of her Motion for Rehearing, would respectfully show the Court as follows:

## Introduction

In an opinion issued on November 2, 2016, this Court denied the relief sought by the Appellant in this matter, ruling she was not entitled to assert a claim against the Uninsured/Underinsured Motorist coverage contained in her personal auto policy. *Soledad v. Texas Farm Bureau Mut. Ins. Co.*, 03-16-00203-CV, 2016 WL 6575233 (Tex. App. — Austin Nov. 2, 2016, n.p.h.) (not yet released for publication). The basis of this decision was the Court's determination that the Appellant was not entitled to recover damages from her employer an/or a co-employee because such a recovery was precluded by the Exclusive Remedy Provision of the Workers Compensation Act. Appellant respectfully submits that this determination was in error for the reasons hereinafter enumerated.

## Arguments and Authorities

A.    The Purpose of Relevant Statutes

This case requires an interpretation of two statutes: the Workers' Compensation Act, Tex. Labor Code §§ 408.001, *et seq.* and the Uninsured Motorist Statute, Tex. Ins. Code §§ 1952.101, *et seq.* It is well established that a statue is to be interpreted by the Courts so as to achieve the purpose intended by the Legislature.

1

1.	The Exclusive Remedy Provision

In the case of the Exclusive Remedy Provision of the Workers' Compensation Act, the intended purpose was to limit an injured employee's recovery from his or her employer (and co-employees) to those remedies provided by the Worker's Compensation Act. This provision would reduce the financial exposure of the employer and the workers' compensation insurance carrier, reducing the cost of doing business for each, and thus ultimately benefitting the consumer.

A secondary purpose of the Exclusive Remedy Provision is to prevent a windfall recovery by the employee by preventing the employee from recovering the same damages twice. Nowhere in the Workers' Compensation Act, however, is there any indication that an intended purpose of the Exclusive Remedy Provision was to protect the Uninsured Motorist coverage carrier from its own customers or to deprive the injured employee of a remedy against the UM coverage purchased at his or her own expense. The Court's invocation of the Exclusive Remedy Provision to bar Appellant's recovery from her own UM carrier is clearly not a purpose intended by the Legislature because the UM carrier was not an intended beneficiary of this legislation. The application of the Exclusive Remedy Provision to this claim is to extend its effect beyond the purpose intended by the Legislature. It should also be noted that permitting the Appellant to recover from her personal auto policy's UM

2

coverage would not result windfall or a double recovery for the Appellant, because the language of the UM provision limits the insured driver's recovery to damages not covered by workers' compensation.

Similarly, the Exclusive Remedy Provision does not bar claims against all parties. It bars only claims against an employer, an employer's agent and/or a co-employee, while preserving claims against third parties. Appellant's successful assertion of such a claim would not cost her employer or its worker's compensation carrier a single penny. Appellant's claim against her UM carrier is not a claim against her employer, employer's agent or a co-employee and it is not barred by a careful reading of the Exclusive Remedy Provision. It is well settled law that an injured employee can recover from his employer's UM coverage, subject to the subrogation claim of the employer's workers compensation carrier. If a claim against an employer's own UM coverage is a claim against a third party and thus not barred by the Exclusive Remedy Provision, then clearly an employee's claim against his or her own UM coverage must also be a third party claim and thus not barred by the Exclusive Remedy Provision. It is wholly inconsistent to permit such a claim against an employer's UM coverage and not to permit the same claim against an employee's own UM coverage when the coverage is purchased with the employee's own money.

Clearly, the Exclusive Remedy Provision was designed to protect only a finite and well-defined class of persons — the employer, co-employees, and agents of the employer — from the assertion of a claim for damages or benefits in excess of those provided by the Workers' Compensation Act. Any claim against any other person or entity (such as the Appellant's UM carrier) is a claim against a "third party," and is not barred by the Exclusive Remedy Provision. The purpose of the Exclusive Remedy Provision is not affected, reduced, or frustrated by permitting an injured worker to recover damages on a claim against his own UM coverage. In the context of the purpose of the Exclusive Remedy Provision, there is no reason to distinguish between a UM claim based on the negligence of a co-employee and a UM claim based on the negligence of someone outside the employment relationship, since neither claim adversely affects an employer, co-employee or workers' compensation carrier.

2.    The UM Statute

The intended purpose of the UM Statute is to permit a thoughtful and prudent motorist to protect himself or herself from other motorists who have no insurance or who have too little coverage. Such prudence is to be encouraged, because many times a person badly injured by an at-fault and uninsured motorist would become a burden on the State. The purpose of such coverage should consequently be encouraged by the State.

4

In this case, the Appellant was a prudent person and a truck driver with a good income. She realized: (1) her occupation put her at high risk for being injured in a motor vehicle accident while she was on the job; and (2) Workers' Compensation remedies were inadequate to protect her if she sustained a serious injury in such an accident. She purchased $100,000 in UM coverage to guard against precisely such an event. In making this purchase, she relied on her auto policy carrier's promise to pay all damages not covered by workers compensation.

The policy, of course, contains many exclusions from this coverage, among them: accidents caused intentionally, accidents occurring while committing a felony, injuries sustained while evading apprehension by law enforcement officials, etc. The policy does not contain an exception from coverage relating to injures caused by a co-employee. Thus, the UM carrier in this case, while admitting its policy promises to pay all damages not covered by workers' compensation, and while further admitting that the injury sustained by the Appellant does not fall within any exclusion contained in its policy, seeks to deny coverage because the accident was caused by the negligence of a co-employee.

This contention should not be permitted to prevail under the established rules for interpreting the scope of UM/UIM coverage. Stated simply, because the UM statute is remedial in nature, it is to be given a liberal interpretation in furtherance of

its public policy aims, which aim is to protect a prudent motorist who purchases the coverage. If the policy is given such a reading, the loss sustained by the Appellant will be determined a loss covered by Appellee's policy.

In summary, the interpretations of the two statues above considered urged by the Appellee are at cross purposes to the intended legislative purpose of each statute. The intended interpretations advanced by the Appellant are completely consistent with these intended purposes and Appellant's proposed interpretations should by adopted by this court.

3.    Additional Guides for Interpreting Insurance Policies

There are 3 additional recognized guides for interpreting insurance policies which are widely applied by Texas Courts:

—    the *Forbau* rule: the policy should be interpreted so as to give effect to the intention of the parties, *Forbau v. Aetna Life Insurance Company*, 876 S.W.2d 132 (Tex 1994), *accord, RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113 (Tex. 2015);

—    the *Southern County Mutual* rule: the expression of one thing is the exclusion of another, *Southern County Mut. Ins. Co. v. Smith*, 529 S.W.2d 618 (Tex. Civ. App. — Tyler 1975, no writ); and

—    the *Barnett* rule concerning ambiguity: any ambiguity in the insurance contract is construed against the insurance company that wrote the policy. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663 (Tex. 1987); *accord, Western Indem. Ins. Co. v. American Physicians Ins. Exch.*, 950 S.W.2d 185 (Tex. App. — Austin 1997, no pet.).

The *Forbau* rule requires the Court to interpret the policy so as to give effect to the intention of the parties. In this case, it was clearly the Appellant's intention to protect herself from the negligent acts or omissions of an uninsured or underinsured driver. This was a particular concern to her because her occupation put her at high risk for such an event, which is why she purchased UM/UIM coverage from the Appellee. Presumably it was the intention of the Appellant to protect her from such acts and omissions in exchange for her payment of premiums. If the *Forbau* rule is applied by the Court it will give effect to the intention of the parties by concluding that the UM/UIM coverage is applicable to this loss.

The *Southern County Mutual* rule provided that the expression of one thing or category is the exclusion of another. The policy enumerates several exclusions from UM/coverage. Its failure to exclude injuries sustained because of a co-workers' negligence along with the other policy exclusions is an indication that the policy was not written to exclude such injuries, and, in fact, other courts have recognized both the right to recover from personal UM coverage and that workers compensation insurance carriers have no right of subrogation from such recovery. *See, e.g., City of Corpus Christi v. Gomez*, 141 S.W.3d 767, 773 (Tex. App. — Corpus Christi 2004, no pet.); *Casualty Reciprocal Exch. v. Demock*, 130 S.W.3d 74, 76 (Tex. App. — El

Paso 2002, no pet.); *Liberty Mut. v. Kinser*, 82 S.W.3d 71, 78 (Tex. App. — San Antonio 2002, pet. w'drawn).

Finally, the *Barnett* rule says an ambiguity in a contract (including but not limited to an insurance contract) is construed against the party who drafted the contract. Although the language of an auto policy is, to some extent, uniform and governed by law, the Texas courts have attributed policy language to the insurance company and not to the consumer purchasing insurance. The policy provides unequivocally that it will pay "all covered damages not paid or payable under any workers' compensation law". Appellee, however contends the Appellant's damages exceeding the damages paid by workers' compensation are not covered by the policy. Appellant urges this Court to determine the Appellee is not "legally entitled to recover damages from her employer" because she can only recover from the employer's workers' compensation policy. To reach this conclusion, the Court must find that the term "damages" (as it is used in Part (C) Insuring Agreement (A) of the policy) does not include payments from a workers' compensation policy, while the term "damages" as the term is used in Part C, Limit of Liability (B) ("all covered damages not paid or payable by any workers' compensation law") does include payments from workers' compensation.

In order to find that the same term has different meanings in different parts of the same policy, the Court must first find the meaning of the term within the policy is ambiguous, that is susceptible to more than one interpretation or definition. Although Appellant does not believe the policy is ambiguous because term "damages" should have the same meaning throughout the policy, any ambiguity should be construed against the insurance carrier and the carrier should be required to pay Appellant all of her damages not paid by workers' compensation.

B.    The Appellant is Legally Entitled to Recover Damages from her Employer

Appellant respectfully submits that this Court was in error in determining that she is not "legally entitled to recover damages" from her employer and her co-employee as a result of this accident. In reaching this conclusion, the Court overlooks the damages paid and payable to the Appellant under the Workers' Compensation Act. The language of Appellant's auto policy states unequivocally that payments received from workers' compensation are "damages"; and, that the Appellee will pay "all damages not paid or payable" by workers' compensation. (Part C/ Limit of Liability /subparagraph B). As noted in this Court's opinion in *Resolution Oversight Corp. v. Garza*, 03-08-00481-CV, 2009 WL 1981424 (Tex. App. — Austin, July 10 2009, no pet.) (mem. op.), it is irrelevant that the damages paid to Appellant by worker's compensation were contractual in origin, and also irrelevant that the

9

damages sought by the Appellant will not paid directly by the tortfeasor, but rather by another "third party liable to pay damages".

C.  *Valentine* is Not Controlling Precedent

In denying the relief requested by the Appellant in this matter, the Court relied on the decision in *Valentine vs Safeco Lloyds Ins. Co.*, 928 S.W. 2d 639 (Tex. App. — Houston [1st Dist.] 1996, writ denied) as controlling authority.  Appellant respectfully submits that this was in error for the following reasons:

First, the reasoning of the First Court of Appeals in *Valentine* was rejected by this Court in *Resolution Oversight Corporation*. In *Valentine*, the First Court denied an injured workers' compensation claimant's recovery from his own UM coverage because the recovery sought from the UM coverage was not owed by the tortfeasor, who was the claimant's employer, and thus immune from any claim except workers' compensation.  In a case with similar facts, this Court held in *Resolution Oversight Corporation* that the Subrogation provision of the Act preserved claims against <u>any</u> third party liable to pay damages and that such viable claims were <u>not limited to claims against a tortfeasor</u>. Consequently, even though a claim against the employer, except for a workers' compensation claim, was barred by the Exclusive Remedy Provision,  the injured worker did have a valid claim against his own UM carrier, because this carrier was a "third party liable to pay damages" within the

10

meaning of the Subrogation provision of the Workers' Compensation Act. Also in the *Resolution Oversight Corporation* opinion, this Court rejected, as irrelevant, distinctions between damages of contractual origin and damages grounded in tort. If the reasoning of *Resolution Oversight Corporation* is applied to the facts of this case, the Appellant will be permitted to assert her claim against her own UM coverage.

Second, in the case at bar, this Court also adopted *Valentine*'s conclusion that, because a majority of jurisdictions outside of Texas barred a UM recovery under similar circumstances, Texas courts should deny such claims also. These opinions fail to consider three factors of overriding relevance: <u>First</u>, there is no showing that the language of the policies in other jurisdictions is identical to the polices in Texas; <u>Second</u>, there is no showing that the UM statutes in these other jurisdictions are identical to the Texas statue or that the purposes of the UM statues in those jurisdictions are identical to the purpose of the Texas UM statute; <u>Third</u>, there is no showing the Exclusive Remedy and Subrogation Provisions of the Workers' Compensation Act in these other jurisdictions are identical to the Texas statue in wording or in intent.

The degree of uniformity of auto insurance policies is now much less than when *Valentine* was written in 1996, but even more importantly, Workers'

11

Compensation laws and the intentions of the laws vary tremendously from one State to another. For instance, in Wisconsin, the Workers' Compensation Act provides for a maximum of 1,000 weeks compensation for temporary disability, while Texas only allows 106 weeks. In Georgia, the compensation carrier's right of subrogation is subject to the injured employee's right to be made whole from the third party recovery, which is not the case in Texas. Applying the standards of other jurisdiction to Texas is an approach which even Procrustes would have found inhumane and this approach should not be taken by this Court. The fallacy of the unexamined application of the standards other jurisdictions to Texas in this same context was explained by Justice Boyd in his opinion in *Employers Cas. Co. v. Dyess*, 957 S.W.2d 884 (Tex. App. — Amarillo 1997, pet. denied).

Finally, *Valentine* is not the only Texas case to consider this issue. In *Briones*, Mr. Briones was injured in a one vehicle accident as a result of his co-employee's negligence while he slept in the sleeping compartment of a tractor-trailer, almost exactly as Appellant was injured in this case. *Briones v. State Farm Mut. Auto. Ins. Co.*, 790 S.W.2d 70 (Tex. App. — San Antonio 1990, writ denied). The case is silent on whether Mr. Briones' employer was a subscriber to the Workers' Compensation Act but, as in our case, the UM carrier sought to avoid payment of his injury claim. In refusing to permit the denial of coverage, the San Antonio court observed:

... we conclude that under the facts of this case and the uncontroverted evidence that to deny Briones recovery under the uninsured motorist clause of his family policy frustrate the intent the legislature to provide protection for conscientious motorists from "financial loss caused by a negligent financially irresponsible motorists" as is mandated by the inclusion of uninsured and underinsured motorist coverage in the Texas Insurance Code.

*Briones*, 790 S.W.2d at 74.

In evaluating the applicability of the *Briones* case to the one at bar, we would ask that this Court take into account that in reaching its decision, it assumed that the vehicle in which the Appellant was riding was an "uninsured motor vehicle".

WHEREFORE, premises considered, Appellant requests a rehearing in this matter and such other relief to which she may be entitled at law or equity.

Respectfully submitted,

*/s/James Rodman*
JAMES RODMAN
ATTORNEY AT LAW
State Bar No. 17139525
1515 W. 35th Street, #C
Austin, TX 78703
jimrodman@rodmanlawoffice.com
512-481-0400 - Phone
512-481-0500 - Facsimile

*/s/Chris Jackson*
CHRIS JACKSON
ATTORNEY AT LAW
State Bar No. 10454600
1812 Centre Creek Drive, #275
Austin, Texas 78754
c_jackson@sbcglobal.net
512-478-1699 - Phone
512-821-2943 - Facsimile

Attorneys for Violanda Soledad

## Certificate of Compliance

I, Chris Jackson and Jim Rodman, the undersigned counsel for the Appellant, hereby certify that the total number of words in the portions of the document that are counted is 2,829, and that the text thereof is in 14 point Times New Roman font. In making this representation, we are relying on the accuracy of the computer program used to prepare the document as provided in Rule 9.4 TRAP.


*/s/Jim Rodman*
JIM RODMAN

/s/ Chris Jackson
CHRIS JACKSON

14

## Certificate of Service

By my signature above, I certify that a true and correct copy of the foregoing has been delivered electronically on the 16th day of November, 2016, to the following:

Wade C. Crosnoe                                    **VIA: ProDoc-Efile**
Sara B. Churchin                                    **VIA: ProDoc-Efile**
Thompson, Coe, Cousins & Irons, LLP
701 Brazos Street, Suite 1500
Austin, TX 78701
wcrosnoe@thompsoncoe.com
schurchin@thompsoncoe.com
888-708-8200 - Phone
512-708-8777 - Fax No.


Attorneys for Appellee Texas Farm Bureau Mutual Insurance Company

David Deaderick                                    **VIA: ProDoc-Efile**
707 W. 34th Street
Austin, TX 78705
WDDlaw@aol.com
512-499-8866 - Phone
512-466-8933 - Fax No.


Attorney for Defendant

By: *s/James Rodman*                          By: *s/Chris Jackson*
JAMES RODMAN                                 CHRIS JACKSON

CASE NO. 03-16-00203-CV

THE COURT OF APPEALS
THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

VIOLANDA SOLEDAD,

Appellant

vs.

TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY,

Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
On Appeal from the Burnet County Court

Burnet County, Texas

Trial Court Cause No. C4358
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# **Appellant's Appendix**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Appendix Table of Contents

*Barnett v. Aetna Life Ins. Co.*

*Briones v. State Farm Mut. Auto. Ins. Co.*

*Casualty Reciprocal Exch. v. Demock*

*City of Corpus Christi v. Gomez*

*Employers Cas. Co. v. Dyess*

*Forbau v. Aetna Life Insurance Company*

*Liberty Mut. v. Kinser*

*RSUI Indem. Co. v. The Lynd Co.*

*Resolution Oversight Corp. v. Garza*

*Soledad v. Texas Farm Bureau Mut. Ins. Co.*

*Southern County Mut. Ins. Co. v. Smith*

*Valentine vs Safeco Lloyds Ins. Co.*

*Western Indem. Ins. Co. v. American Physicians Ins. Exch.*

723 S.W.2d 663
Supreme Court of Texas.

Lacy D. BARNETT, Petitioner,
v.
AETNA LIFE INSURANCE COMPANY, Respondent.

No. C–5414.
|
Feb. 4, 1987.

Insured brought action challenging insurer's right to offset his Veterans Administration benefits against his long-term disability payments. The 164th District Court, Harris County, Peter S. Solito, J., rendered take nothing judgment for insurer. Insured appealed. The Houston Court of Appeals, First Supreme Judicial District, 708 S.W.2d 911, Cohen, J., affirmed. On appeal, the Supreme Court, Robertson, J., held that insurer could not offset benefits payable under Veteran's Benefits Act from long-term disability insurance payments under either contract construction rule of ejusdem generis, or rule which requires insurance policies to be construed strictly against drafter of document.

Reversed and remanded.

West Headnotes (5)

**[1]**    **Insurance** 🗝 Credits, Deductions and Offsets

Contract construction rule of ejusdem generis did not control so as to exclude benefits payable under Veteran's Benefits Act from those which may be deducted from long-term disability insurance payments, where policy made explicit examples, as benefits which could be offset, of benefits under Social Security Act Railroad Retirement Act, but also stated "or any similar act." 38 U.S.C.A. § 101 et seq.; Social Security Act, § 1 et seq., 42 U.S.C.A. § 301 et seq.; Railroad Retirement Act of 1974, § 1 et seq., 45 U.S.C.A. § 231 et seq.

22 Cases that cite this headnote

**[2]**    **Insurance** 🗝 Ambiguity, Uncertainty or Conflict

When language chosen by insurer in policy is susceptible of more than one construction, policy should be construed strictly against insurer and liberally in favor of insured.

214 Cases that cite this headnote

**[3]**    **Insurance** 🗝 Exceptions, Exclusions or Limitations

Where clause of insurance policy subject to dispute involves exception or limitation on insurer's liability under policy, even more stringent construction than usual is required.

111 Cases that cite this headnote

**[4]**    **Insurance** 🗝 Credits, Deductions and Offsets

Veterans Administration Act was not sufficiently similar to Social Security Act or Railroad Retirement Act, which were enumerated in long-term disability insurance policy as acts, benefits payable under which were subject to offset from long-term disability insurance payments, so as to include Veterans Administration Act within general language of offset provision; enumerated acts were both based on employment, whereas Veterans Administration Act benefits are completely unrelated to length of service, rank, or amount of pay. 38 U.S.C.A. § 101 et seq.; Social Security Act, § 1 et seq., 42 U.S.C.A. § 301 et seq.; Railroad Retirement Act of 1974, § 1 et seq., 45 U.S.C.A. § 231 et seq.

9 Cases that cite this headnote

[5] **Workers' Compensation** 🗝 Purpose of Legislation

Avowed purpose of workers' compensation is to compensate injured individuals for their loss of earning capacity, and act was not designed to compensate employee for his lost earnings or for injury itself; thus, in order to be eligible for workers' compensation benefits, claimant must be able to show not only disability, but also employment when injured and corresponding loss of earning capacity. Vernon's Ann.Texas Civ.St. art. 8306 et seq.

3 Cases that cite this headnote

**Attorneys and Law Firms**

*664 Maurice Amidei, Houston, for petitioner.

Larry D. Carlson, Baker & Botts, Dallas, for respondent.

**Opinion**

ROBERTSON, Justice.

This case involves whether an insurance company may offset benefits payable under the Veteran's Benefits Act from long term disability insurance payments. In response to issues submitted, the jury found that Barnett's date of disability under the VA did not begin until after the effective date of the Aetna policy, despite the fact that the actual injury occurred long before; that Aetna acted in good faith in taking the deductions; and, that Aetna's actions were not unconscionable. On the basis of these answers, the trial court entered judgment that Barnett take nothing. The court of appeals, 708 S.W.2d 911, affirmed, holding that the VA benefits were deductible under the policy.

In 1943, Lacy D. Barnett broke his right heel bone while serving aboard a U.S. naval vessel in the South Pacific. By virtue of the fact that his injury occurred during service, he became eligible for Veteran's Administration benefits. According to his testimony, he experienced pain and discomfort, and attempted on several occasions to apply for VA disability benefits. In 1946 his application was not processed because he did not have time to wait in line and could not afford to take time off for the mandatory hospital stay. On another occasion, he was told disability was unavailable because his files could not be located.

Through a succession of jobs, Barnett eventually ended up working for Amoco Oil Company. In 1967, Amoco began providing its employees with a noncontributory long-term disability insurance policy (i.e., employees were not required to contribute). In October 1977, Barnett suffered a permanently disabling injury to his right knee *665 while operating some heavy machinery. He underwent knee surgery in November of 1977 and began receiving long-term disability payments from Aetna each month. Due to the realignment of the leg, however, his prior heel injury became debilitating.

Thereafter, he again applied for VA benefits and this time the agency approved him for a 10 percent disability, which was later raised to 20 percent. This entitled him to $82 per month in disability payments from the VA to go along with his Aetna payments of $835.93. When Aetna learned that Barnett was receiving VA benefits, it began to offset those payments. Barnett challenged Aetna's right to reduce the benefits in question and sued Aetna for breach of contract, alleging illegal and unconscionable conduct.

The insurance policy in question provides (in pertinent parts) that Aetna may deduct:

> Any payment for a disability which commenced on or after the effective date of the employee's insurance under this policy, under the Federal Social Security Act or Railroad Retirement Act, or any similar act of any national government, or by any federal, state, provincial, municipal or other governmental agency or pursuant to any workmen's compensation law, compulsory benefit act or law, occupational disease law or any other legislation of similar purpose, or the maritime doctrine of maintenance, wages and cure.

To interpret the contract in question it is first necessary to determine exactly what is expressed in the provision. Here, the language provides that if disability occurs after the effective date of the policy, and such disability results in any payment of benefits, Aetna can make deductions from its monthly payment in the amount of those other benefits. Aetna can only deduct this "other income" if the benefits come from the following sources:

(1) Benefits under the Federal Social Security Act, Railroad Retirement Act, or any similar act of any national government or any federal, state, provincial, municipal or other governmental agency; or

(2) Benefits pursuant to any workmen's compensation law, compulsory benefit act or law, occupational disease law, or any other legislation of similar purpose; or

(3) Benefits under the Maritime Doctrine of Maintenance, Wages and Cure.

It is apparent that the policy does not specifically mention VA benefits, thus, if such deductions are to be allowed, it must be shown that VA benefits are included under the general language of the document. Barnett argues that the benefits are not included within the general language due to the contract construction rule of *ejusdem generis,* and the rule which requires insurance policies to be construed strictly against the drafter of the document. Aetna counters by asserting that rules of construction are not applicable when there is no ambiguity in the language used. While we agree with Aetna that *ejusdem generis* is not controlling, we hold that an ambiguity exists and that the clauses must therefore be construed against Aetna.

It is a fundamental rule of law that insurance policies are contracts and as such are controlled by rules of construction which are applicable to contracts generally. *See, e.g., General American Indem. Co. v. Pepper,* 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *Iowa Mut. Ins. Co. v. Faulkner,* 157 Tex. 183, 300 S.W.2d 639, 642 (1957); *Brown v. Palatine Ins. Co.,* 89 Tex. 590, 35 S.W. 1060, 1060 (1896). As pointed out by Aetna, however, if the insurance contract is expressed in plain and unambiguous language, a court cannot resort to the various rules of construction. *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984). Aetna argues that the general language clearly includes VA benefits, while Barnett argues that it manifestly does not. Although we agree that the language used is definite, the meaning and scope of the language is ambiguous. It has long been the law in this State that when language in a policy is susceptible to more than one reasonable construction, it is patently ambiguous. *Glover v. National Ins. Underwriters,* **\*666** 545 S.W.2d 755, 761 (Tex.1977). Both parties' interpretations are reasonable; therefore, we must resort to rules of construction to decide whether VA benefits are properly included under the general language in the policy.

The first rule of construction raised by Barnett is *ejusdem generis.* As said by this court:

> Where specific and particular enumerations of persons or things ... are followed by general words, the general words are not to be construed in their widest meaning or extent but are to be treated as limited and applying only to persons or things of the same kind or class as those expressly mentioned.

*Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 272 (1944);

 **[1]** Barnett contends that since Aetna explicitly mentioned the Social Security Act and the Railroad Retirement Act, those specific acts will provide the only possible offsets under the above theory. This argument, however, is without merit for several reasons. First, the provision in question does not seem to offend the general rule. Aetna did make specific examples of the Social Security Act and the Railroad Retirement Act in (1), but the general language in the provision reveals that *such* language applies only to that class of statutes which is similar to the specified examples. This is all that is required under *ejusdem generis.* The same reasoning applies to the general language contained in (2) of the provision as well. Furthermore, to adopt Barnett's reasoning on this issue would basically require us to ignore the general language clause completely. This is against the fundamental rule that each part of the contract should be given effect when it will not do violence to rules of law or construction. *General American Indem. Co. v. Pepper,* 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *National Security Life and Cas. Co. v. Davis,* 152 Tex. 316, 257 S.W.2d 943, 944 (1953); *see also First Nat. Bank v. Protective Life Ins. Co.,* 511 F.2d 731, 734 (5th Cir.1975) (Court must avoid construction of policy which does not give all portions of policy meaning and effect).

 **[2]** **[3]** **[4]** The second rule of construction urged by Barnett is the necessity of strictly interpreting the provision in his favor. Under normal circumstances, language and terms of an insurance policy are chosen by the insurance company. This being so, when the language chosen is susceptible of more than one construction, such policies should be construed strictly against the insurer and liberally in favor of the insured. *Glover v. National Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977); *Ramsay v. Maryland American General Ins. Co.,* 533 S.W.2d 344, 349 (Tex.1976); *Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 180 (Tex.1965). Furthermore, because this case involves an exception or limitation on Aetna's liability under the policy, an even more stringent construction is required. *Glover,* 545 S.W.2d at 761. Indeed, "we must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties intent." *Glover,* 545 S.W.2d at 761; *Continental Casualty Co. v. Warren,* 152 Tex. 164, 254 S.W.2d 762, 763 (1953). Keeping these rules of construction in mind, we turn to what must be considered the crucial question in this case: Is the VA Act sufficiently similar to any of the enumerated acts to be included within the general language of the offset provisions?

There is no doubt that similar *features* exist between the Social Security Act, the Workers' Compensation Act and the Veterans Benefits Act. For example, all are (1) governmental or legislative plans providing for (2) periodic payment (3) to qualified individuals (4) who have suffered a physical disability (5) without regard to fault. In addition, all provide death benefits, have anti-assignment clauses, and are administered by independent agencies. But the similarity of features of the acts are not the key ingredient, rather it is the objectives **\*667** for which they were created and the manner in which the acts are implemented.

The Social Security Act and Railroad Retirement Act are both based on *employment,* and were formed to deal with problems inherent to that area. The Veterans Benefits Act was created to help veterans who were disabled during active military service, and in no way relates to the employment of the claimant. The Social Security Act and Railroad Retirement Act benefits are an earned property right necessarily based on many factors including the amount of time one has worked, the amount of pay received and the amount contributed to the system. The VA benefits, on the other hand, are not an earned property right, require only that the claimant has been disabled while serving, and are completely unrelated to length of service, rank, or amount of pay. *See Ex parte Johnson,* 591 S.W.2d 453, 455 (Tex.1979). Under certain circumstances, both the Social Security Act and the Railroad Retirement Act systems do pay disability benefits

to individuals, but that does not make them inherently similar to the VA Act, for the dissimilarities greatly outweigh the resemblances. This is particularly true when we must construe the provisions strictly against Aetna.

 **[5]**    A much more difficult determination is whether the VA benefits are sufficiently similar to workers' compensation benefits. The avowed purpose of workers' compensation is to compensate injured individuals for their loss of earning capacity. *Bennight v. Western Auto Supply,* 670 S.W.2d 373, 379 (Tex.App.—Austin 1984, writ ref'd n.r.e.); *St. Paul Ins. Co. v. McPeak,* 641 S.W.2d 284, 286 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). It was not designed to compensate an employee for his lost earnings or for the injury itself. *See McPeak* at 286. Thus, it follows that in order to be eligible for workers' compensation benefits, the claimant must be able to show not only a disability, but also employment when injured and a corresponding loss of earning capacity. This is dissimilar to the situation in VA cases because the VA applicant need only show the disability, not that it is affecting his earning capacity, nor that he was employed on the day of the injury. These differences, when added to the rules which require strict construction against Aetna, mandate the holding that the VA Act is not sufficiently similar to Workers' Compensation Acts either.

We also point out that common sense supports such a holding. Millions of American citizens have served in the armed forces, and VA benefits are a vital and necessary service to thousands upon thousands of disabled veterans. We are not dealing with some obscure act against which no insurance company could reasonably provide. Benefits under the VA appear to be unique in character and scope, certainly important enough to warrant specific mention in an insurance policy if they are sought to be offset. This is especially true when the insurance company saw fit to explicitly mention the Railroad Retirement Act, which affects far fewer people on a day-to-day basis.

This decision is not to be construed to stand for the principle that VA benefits may never be offset under a long-term disability policy. For an insurance company to be authorized to deduct such benefits, it must plainly and unambiguously provide for such in the insurance contract.

With this decision made, we need only turn to Barnett's request for attorney's fees. The TEXAS CIVIL PRACTICE & REMEDIES CODE § 38.001 (Vernon 1986) (formerly art. 2226) provides that a person may recover reasonable attorney's fees if the claim is for an oral or written contract. Suits on insurance policies have been held to support the recovery of attorney's fees under this provision. *Texas Farmers Ins. Co. v. Hernandez,* 649 S.W.2d 121, 124 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.). Thus, the only question is to determine a reasonable fee for Barnett's attorney. This is easily done, as both parties entered into a stipulation which agreed that $14,500 would be a reasonable fee for taking this case through the entire judicial process.

 **\*668**  Therefore, we reverse the judgment of the court of appeals and remand to the trial court for a determination of the amount due Barnett consistent with this opinion.

**All Citations**

723 S.W.2d 663

        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

790 S.W.2d 70
Court of Appeals of Texas,
San Antonio.

Ruben L. **BRIONES**, Appellant,

v.

**STATE FARM** MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellee.

No. 04–89–00359–CV.
|
April 30, 1990.
|
Rehearing Denied June 18, 1990.

Insured brought action against insurer seeking recovery on family automobile policy under uninsured motorist clause. The 224th District Court, Bexar County, Carol Haberman, J., granted summary judgment for insurer, and insured appealed. The Court of Appeals, Stephens, J., (Retired), held that insured could recover for injuries which occurred while insured was passenger in uninsured truck owned by employer and driven by uninsured coemployee, even if insured's policy contained exclusion for vehicles regularly provided for insured's use.

Reversed and remanded.

West Headnotes (2)

**[1]**    **Insurance**  🔑  Persons Covered

**Insurance**  🔑  Uninsured Motorists or Vehicles

Insured who was involved in accident while passenger in uninsured motor vehicle owned by his employer and driven by uninsured coemployee was entitled to recover from insurer under his uninsured motorist policy, even though policy contained exclusion for vehicles "furnished for regular use" of insured; denying recovery under uninsured motorist clause of family policy would frustrate intent of legislature to provide protection for conscientious motorists from financial loss caused by negligent financially irresponsible motorists. V.A.T.S. Insurance Code, arts. 1.01 et seq., 5.06–1.

21 Cases that cite this headnote

**[2]**    **Insurance**  🔑  Regular or frequent use

**Insurance**  🔑  Uninsured Motorists or Vehicles

Policy exclusion of vehicles regularly furnished for use of insured is not necessarily condemned in all cases under uninsured motorist policies; determination will be made on case-to-case basis whether invocation of exclusion would, under circumstances of particular case, operate to deprive insured of protection required by state uninsured motorists statute. V.A.T.S. Insurance Code, arts. 1.01 et seq., 5.06–1.

18 Cases that cite this headnote

**Attorneys and Law Firms**

**\*71** David M. Adkisson, Southers & Lyons, Phil Watkins, Watkins & Brock, San Antonio, for appellant.

Richard W. Hunnicutt, III, Plunkett, Gibson & Allen, San Antonio, for appellee.

Before BUTTS, CARR and STEPHENS, [1] JJ.

OPINION

STEPHENS, Justice (Retired).

Ruben L. Briones appeals a take nothing summary judgment granted in his suit against State Farm Mutual Automobile Insurance Company seeking recovery on his family automobile insurance policy under the uninsured motorists clause, for bodily injuries suffered in a one vehicle automobile accident. In one point of error Briones contends that:

> The Trial Court erred in granting Defendant's Motion for Summary Judgment because there is a genuine issue as to material facts regarding the one remaining issue to be litigated by the parties, namely whether the tractor-trailer in which Briones was a passenger at the time of his bodily injuries was furnished or available for his regular use.

On or about November 5, 1985, Briones was a passenger in the sleeping compartment of a tractor-trailer owned by his employer, Cervantes Trucking Company, which, at the time of the accident, was being driven by another employee of Cervantes Trucking, one Mr. Juan Barbosa. The accident occurred in Arizona and involved only the one vehicle in which Briones was riding. Neither the truck nor its driver was covered by liability insurance at the time of the accident. Briones sought to recover under the uninsured clause of his family automobile insurance policy.

In the trial court the parties stipulated to all evidence and specifically that the only portion of the insurance contract applicable was the uninsured motorist clause which reads:

Uninsured motor vehicle does not include any vehicle or equipment:

> ... owned by or furnished or available for the regular use of you or any family member.

The parties further stipulated:

> The only question that will be litigated between us, whether it be by summary judgment or trial, will be whether the facts show that, at the time of the accident, the vehicle in which Mr. Briones was riding was one which was "furnished or available for the regular use of" Mr. Briones.

**[1]** **[2]** Briones argues that the summary judgment evidence at trial creates a genuine issue as to the material facts regarding whether or not the truck in which Briones was riding was furnished or available for his regular use. He relies upon general propositions of law to support his contentions. First he points out that the summary judgment proof must establish as a matter of law that there is no genuine issue of fact as to any of the essential elements of Plaintiff's cause of action, *Gibbs v. General Motors Corporation,* 450 S.W.2d 827, 828 (Tex.1970); and that summary judgment is only proper if the pleadings, depositions, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Gibbs, supra;* TEX.R.CIV.P. 166–A. Briones further argues that a fact is not considered established as a matter of law unless the evidence is such that the minds of reasonable men would not differ on the issues, citing **\*72** *North River Insurance Company v. O'Neal,* 521 S.W.2d 647, 650 (Tex.Civ.App.

—Tyler 1975, no writ); and that when a given set of facts is such that reasonable men may fairly differ upon the question, the determination of the matter is for the jury and hence summary judgment is inappropriate. *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 697–98 (1914).

Other cases hold that questions as to exclusions in insurance policies are generally questions of fact, not matters of law. *See, e.g., Farmer's Mutual Protective Association of Texas v. Wright,* 702 S.W.2d 295, 298 (Tex.App.—Eastland 1985, no writ); *Brown v. Tucker,* 652 S.W.2d 492, 496 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.); *Miles v. Royal Indemnity Co.,* 589 S.W.2d 725, 730 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

A review of the proof shows that Briones was an employee of Cervantes Trucking Company, the owner of the truck in question. His principal duty was to drive trucks assigned to him. He customarily used any one of the five vehicles owned by Cervantes, as and when assigned to him by Cervantes. He had driven the truck in question regularly for a period of four years, from 1981 to 1985. During the trip in question, as on other trips, Briones and his co-employee would take turns driving and sleeping.

In *Hall v. Southern Farm Bureau Casualty Insurance Co.,* 670 S.W.2d 775 (Tex.App.—Fort Worth 1984, no writ), it was shown that the plaintiff drove a truck for her employer. Her employer had a number of trucks which it used for several routes. The plaintiff was injured in an accident in a truck that was usually assigned to another employee, but on the date of the accident had been assigned to her. She brought suit against the carrier of her personal automobile insurance policy to recover medical expenses. The policy covered certain "owned" and "non-owned" vehicles. The court held:

> If an employee regularly drives a vehicle in his or her employment, and if the driving of such a motor vehicle constitutes the principal duty of the employment, and if a number of vehicles in a pool are available to that employee, subject either to random assignment or assignment based upon the nature of the job involved, or selection by the employee, then all vehicles in the pool are considered as a matter of law to be vehicles furnished for the employee's regular use. [emphasis added] 670 S.W.2d at 777.

In another Texas case with similar facts, *International Service Insurance Co. v. Walther,* 463 S.W.2d 774 (Tex.Civ.App.—Austin 1971, no writ), the plaintiff sought recovery under his medical payment insurance policy. The case was tried to a jury on the theory that his employer's vehicle was not furnished for his regular use. The jury found that the employer's vehicle was not furnished for his regular use. The proof showed that plaintiff was employed as a delivery man. His employer owned three trucks, which were randomly assigned to the drivers, governed by the load. The drivers were not permitted to use the trucks for personal use. The Court of Appeals, in reversing the trial court, held that the phrase "furnished for regular use" in the definition of non-owned automobiles was not limited to one specific vehicle. The court explained:

> It is the regular use of other automobiles which is excluded by the term, and if an employer assigns an employee a specific automobile or assigns him a number of automobiles, any one of which he may use for a particular trip, in either event that automobile is furnished "for regular use." 463 S.W.2d at 776.

From these cases it appears that Briones was occupying a vehicle regularly furnished for his use, however, we conclude that this case is governed by the recent case of *Stracener v. United Serv. Auto. Ass'n,* 777 S.W.2d 378 (Tex.1989), in which The Texas Supreme Court wrote at length on the uninsured and underinsured exclusions in insurance policies and their relationship to the Insurance Code, and its interpretation. We find the Court's language to be not only persuasive, but controlling in this case. The Court wrote:

> Article 5.06–1 of the Texas Insurance Code mandates the inclusion of uninsured **\*73** and underinsured motorist coverage in automobile liability insurance coverage....

.... The purpose of the statute as stated therein, is "the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles...." TEX.INS.CODE ANN. art. 5.06–1(1) (Vernon 1981)....

.... The legislature had as its initial objective the protection of conscientious motorists from "financial loss caused by negligent financially irresponsible motorists...." Act of Oct. 1, 1967, ch. 202 sec. 3, 1967 Tex. Gen. Laws 448, 449....

This court construed the policy statement of article 5.06–1(1), as originally enacted, in *American Liberty Insurance Co. v. Ranzau,* 481 S.W.2d 793 (Tex.1972)...

The Texas statute states its purposes to be the "protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles." These are its key words.... This was a contractual benefit for which premiums, presumably computed in the light of the respective risk exposures, were paid by the insureds in each instance; and to permit one policy, or the other, to be reduced or rendered ineffective by a liability limiting clause would be to frustrate the insurance benefits which the statute sought to guarantee and which were purchased by the respective insureds. *Ranzau,* 481 S.W.2d at 797 (emphasis in original and added).

\* \* \* \* \* \*

Moreover, under the misinterpretation of the statute by some courts of appeals, insureds can never ascertain what, if anything, they have purchased. The availability of underinsured motorist insurance would be contingent upon numerous uncertainties including not only the limits of the coverage but also the limits of the tort-feasor's liability insurance, the extent of damages suffered by any other persons who may have been involved in the same accident and the amount of any settlements made with the liability insurance carrier. We doubt whether most Texas motorists understand that the amount of the coverage for which they are paying is only recoverable depending upon the limits of the liability coverage carried by the negligent driver and the peculiar facts of the particular accident. Even if they did, we believe this is not the coverage mandated by statute.

By purchasing this coverage along with basic liability coverage, the insured has expressed an intent not only to protect others from his or her own negligence but also to protect that person's own family and guests from the negligence of others. This intent and the purpose of the statute are frustrated under the courts of appeals' construction of article 5.06–1. Accordingly, we disapprove of those decisions which have construed article 5.06–1(2)(b) and (5) in a manner inconsistent with this opinion. Those clauses in insurance policies which are not consistent with and do not further the purpose of article 5.06–1 are invalid. 777 S.W.2d at 381–84.

In *Stracener,* the Court consolidated two cases and although the question was primarily protection from underinsured motorists, it covered uninsured motorists as well. We believe that the language in the case:

> We doubt whether most Texas motorists understand that the amount of the coverage for which they are paying is only recoverable depending upon the limits of the liability coverage carried by the negligent driver and the peculiar facts of the particular accident. Even if they did, we believe this is not the coverage mandated by statute.

is particularly applicable in this case. It is doubtful that when the uninsured provision was purchased, Briones believed that he would not be protected if involved in an accident while a passenger in an uninsured motor vehicle owned by his employer, and driven by an uninsured co-employee.

We are further persuaded by the language of the federal court in *Stephens v. State Farm Mutual Automobile Ins. Co.,* 508 F.2d 1363 (5th Cir.1975):

**\*74** As we read Texas cases, there is one key to determining whether a particular exclusionary provision in an uninsured motorist policy is valid or invalid. This is whether the invocation of the exclusion would, under the circumstances of the particular case under consideration, operate to deprive an insured of the protection required by the Texas Uninsured Motorists Statute, TEX.INS.CODE art. 506–1, V.A.T.S. (Supp.1974). *Westchester Fire Insurance Co. v. Tucker,* 512 S.W.2d 679, 685 (Tex.1974).

\* \* \* \* \* \*

... In our view *Tucker* and [*American Motorists Ins. Co. v.*] *Briggs* [514 S.W.2d 233 (Tex.1974) ] quite clearly hold that exclusionary clauses are invalid restrictions on coverage when they excuse the policy for which a premium has been paid from providing the minimum coverage required by the Texas Uninsured Motorist Statute. It is immaterial whether the Stephens were covered by the Royal policy. The question is whether the exclusion in the State Farm policy, if invoked, would cause the coverage of that policy to be less than the minimum $10,000/$20,000. Here it clearly would. 508 F.2d at 1367 and 1368.

Finally, we consider the earlier case of *Bilbrey v. American Automobile Insurance Company,* 495 S.W.2d 375 (Tex.Civ.App.—Eastland 1973, no writ), on which Briones places much emphasis. In that case, the facts are similar. Bilbrey was an employee of the City of Abilene. At the time of the accident, he was occupying a vehicle regularly furnished him by the City. The defense interposed by the insurance carrier was very similar to the one in this case; that the automobile which Bilbrey was occupying at the time of the accident was furnished for his regular use and thus the exclusion, set out in the definition of "insured automobile" in the uninsured motorists clause prevailed. Summary judgment was granted by the trial court and reversed by the Court of Appeals, holding:

> Bilbrey paid a premium for the uninsured motorists endorsement. The exclusions and other provisions of the policy do not limit or abridge his coverage. 495 S.W.2d at 376.

It appears to us that although earlier Texas courts of appeal have upheld the exclusion of coverage when persons are injured in vehicles regularly furnished the insured by third parties from the uninsured motorists coverage, the case of *Stracener, supra,* has placed serious doubts on their validity. We are not prepared to condemn the exclusion of vehicles regularly furnished for the use of the insured in all cases, but believe the better posture is to adopt the position taken by the federal court in *Stephens v. State Farm Mutual Automobile Ins. Co.,* 508 F.2d 1363 (5th Cir.1975), taken from *Westchester Fire Insurance Co. v. Tucker,* 512 S.W.2d 679, 685 (Tex.1974), and determine on a case to case basis whether the invocation of the exclusion would, under the circumstances of the particular case under consideration, operate to deprive an insured of the protection required by the Texas Uninsured Motorists Statute.

Having taken this position, we conclude that under the facts of this case and the uncontroverted evidence, that to deny Briones recovery under the uninsured motorist clause of his family policy would be to frustrate the intent of the legislature to provide protection for conscientious motorists from "financial loss caused by negligent financially irresponsible motorists" as is mandated by the inclusion of uninsured and underinsured motorist coverage in the Texas Insurance Code.

The judgment of the trial court is reversed and this cause is remanded for judgment to be entered in favor of recovery by Briones in accordance with the stipulated evidence of damages.

**All Citations**

790 S.W.2d 70

Footnotes

1        The Honorable Bill J. Stephens, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

**End of Document**                                                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

130 S.W.3d 74
Court of Appeals of Texas,
El Paso.

CASUALTY RECIPROCAL EXCHANGE, Appellant,
v.
Julie Angela DEMOCK, Appellee.

No. 08–00–00206–CV.
|
Feb. 21, 2002.

**Synopsis**

**Background:** Employee's uninsured/<mark>underinsured</mark> <mark>motorist</mark> (UIM) insurance carrier filed interpleader action, and employee and employer's workers' compensation carrier filed cross-actions against each other. The 327th District Court of El Paso County, Philip R. Martinez, J., entered summary judgment in favor of employee, and workers' compensation carrier appealed.

**Holding:** The Court of Appeals, David Wellington Chew, J., held that carrier did not have statutory subrogation right against employee's UIM carrier.

Affirmed.

West Headnotes (1)

**[1]** **Workers' Compensation** 👉 Subrogation of or Assignment to Insurer

Employer's workers' compensation carrier did not have statutory subrogation right against employee's uninsured/<mark>underinsured</mark> <mark>motorist</mark> (UIM) insurance carrier after having recovered damages from third-party tortfeasor. V.T.C.A., Labor Code § 417.001.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*74** Peter R. Meeker, Austin, for appellant.

Robert L. Lovett, Lovett Law Firm, El Paso, for appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

***OPINION***

DAVID WELLINGTON CHEW, Justice.

Appellant Casualty Reciprocal Exchange ("Casualty") appeals from a grant of summary judgment in favor of Appellee Julie Angela Demock ("Demock"). The issue here is: Does a workers' compensation carrier have a statutory subrogation right against the employee's uninsured/underinsured motorist insurance carrier after having recovered damages from the third-party tortfeasor?

The facts are undisputed and taken from Casualty's brief. In the course and scope of her employment, Demock suffered severe injuries to her knee in a collision with **\*75** Enriqueta Adame. Demock elected to claim workers' compensation from Casualty, her employer's workers' compensation carrier, which paid her $41,182.68. Exercising its right of subrogation under TEX.LABOR CODE ANN. § 417.001(a), Casualty brought suit against Adame. Demock intervened in that suit. The parties settled the suit when Adame tendered her $20,000 insurance policy limit. The court in that suit ordered Demock receive $6,729.67 for attorney's fees and the remaining $13,270.33 to Casualty to offset the workers' compensation benefits paid to Demock.

Demock also had her own personal underinsured motorist insurance with Texas Farmers Insurance Company with a policy limit of $20,000. Texas Farmers filed a petition in interpleader to the 327th Judicial District Court of El Paso County because of Demock and Casualty's rival claim on Demock's $20,000 policy limit. Demock and Casualty filed cross-actions against each other. After Texas Farmers deposited the contested $20,000 into the court's registry, the trial court dismissed it from the suit. Demock and Casualty both moved for summary judgment, claiming entitlement to the $20,000, and the trial court granted summary judgment for Demock, awarding the entire $20,000 to "Demock and her attorney."

Under both the former and present law, a carrier like Casualty in this case has the right to reimbursement from benefits paid to the injured employee by a third-party tortfeasor, up to the amount of compensation paid, or recover the amount from the employee or the third-party tortfeasor. TEX.LAB.CODE ANN. § 417.001 (Vernon 1996 and Vernon Supp.2002); *Tex. Workers' Comp. Ins. Fund v. Serrano,* 962 S.W.2d 536, 538 (Tex.1998); *Watson v. Glens Falls Ins. Co.,* 505 S.W.2d 793, 795 (Tex.1974). Recently, however, the Texas Supreme Court has stated that "any third-party recovery is 'burdened by the right of the insurance carrier to recoup itself for *compensation paid,*' " without distinguishing recovery from a third-party tortfeasor. [Emphasis in orig.]. *Serrano,* 962 S.W.2d at 538 (Tex.1998), *citing Guillot v. Hix,* 838 S.W.2d 230, 232 (Tex.1992).

The emphasis of the interpretation of Section 417.001 of the Texas Labor Code is not only on a third-party's liability to an injured employee but the right of subrogation of a compensation carrier who has paid benefits to that employee. TEX.LAB.CODE ANN. § 417.001(b). The purpose is to " 'prevent overcompensation to the employee and to reduce the burden of insurance to the employer and to the public.' " *Granite State Ins. Co. v. Firebaugh,* 558 S.W.2d 550, 551 (Tex.Civ.App.-Eastland 1977, writ ref'd n.r.e.), *citing Capitol Aggregates, Inc. v. Great American Ins. Co.,* 408 S.W.2d 922 (Tex.1966). Although most cases interpreting the statute involve a third-party tortfeasor, the Amarillo Court of Appeals has held that the definition of "third-party" was not limited to third-party tortfeasors and could include an employer's uninsured motorist insurer. *Employers Cas. Co. v. Dyess,* 957 S.W.2d 884, 890–91 (Tex.App.-Amarillo 1997, writ denied). The Houston Court of Appeals followed *Dyess's* reasoning that if legislators meant to limit the definition of "third-party" to third-party tortfeasors, then they would have done so. *Tex. Workers' Comp. Ins. Facility v. Aetna Cas. & Sur. Co.,* 994 S.W.2d 923, 925–26 (Tex.App.-Houston [1st Dist.] 1999, no pet.). Both Courts found it important that the injured employee could have a double recovery of benefits. *See Dyess,* 957 S.W.2d at 890; *Aetna Cas. & Sur. Co.,* 994 S.W.2d at 926. Casualty primarily relies upon *Dyess* and *Aetna.*

We find, however, that *Dyess* and *Aetna* are factually distinguishable. In *Dyess* **\*76** and *Aetna,* the subrogated policies belonged to the employer, but here, the underinsured motorist ("UIM") policy was purchased by and belonged to Demock, the significance of which is that we have two competing public policies. The Legislature declared it to be the

public policy of this state to make uninsured motorist coverage a part of every liability insurance policy issued, with certain limited exceptions. *Francis v. Int'l Serv. Ins. Co.,* 533 S.W.2d 408, 410–11 (Tex.Civ.App.-Texarkana), *aff'd,* 546 S.W.2d 57 (Tex.1976). The purpose of the Uninsured or ==Underinsured== ==Motorist== Coverage Act is to protect an insured against negligent, financially irresponsible motorists by allowing the insured to collect damages for bodily injury. *Francis v. International Service Ins. Co.,* 546 S.W.2d 57, 60–1 (Tex.1976).

We fail to see how Demock's prudence in maintaining UIM coverage, which insurers are statutorily required to provide for the insured's benefit and for which she had paid a premium can be trumped by the subrogation provision. Indeed, construing the subrogation provision as if it stood alone would thwart the legislative intent and mandate that requires insurers to provide UIM motorist protection for persons such as Demock. We decline to do so.

We overrule the single issue and affirm the judgment of the trial court.

**All Citations**

130 S.W.3d 74

---

**End of Document** <span style="float:right">© 2016 Thomson Reuters. No claim to original U.S. Government Works.</span>

141 S.W.3d 767
Court of Appeals of Texas,
Corpus Christi–Edinburg.

CITY OF CORPUS CHRISTI, Appellant,

v.

Norberta GOMEZ, Appellee.

No. 13–02–198–CV.
|
July 22, 2004.

**Synopsis**
**Background:** City employee sought review of administrative decision of Workers' Compensation Commission that found that city had subrogation right to benefits paid to employee under employee's personal uninsured/<mark>underinsured</mark> <mark>motorist</mark> (UIM) insurance coverage. The 148th District Court, Nueces County, Rose Vela, J., granted summary judgment for employee and city appealed.

**[Holding:]** The Court of Appeals, Yañez, J., held that city, as self-insured entity that provided workers' compensation benefits to employee, did not have subrogation right to benefits paid to employee under employee's UIM coverage.

Affirmed.

West Headnotes (10)

**[1]** **Trial** 👈 Submission of Cause on Stipulation or Agreed Statement
Strict compliance with civil procedure rule on agreed cases is not prerequisite for agreed case. Vernon's Ann.Texas Rules Civ.Proc., Rule 263.

Cases that cite this headnote

**[2]** **Appeal and Error** 👈 Cases Submitted Below on Agreed Case or Statement
When case was submitted to trial court upon stipulated facts, Court of Appeals reviews trial court's order to determine whether trial court correctly applied law to stipulated facts. Vernon's Ann.Texas Rules Civ.Proc., Rule 263.

1 Cases that cite this headnote

**[3]** **Appeal and Error** 👈 Cases Submitted Below on Agreed Case or Statement
When reviewing case that was submitted to trial court upon stipulated facts, Court of Appeals limits its review to stipulated facts, unless other facts are necessarily implied from stipulated facts. Vernon's Ann.Texas Rules Civ.Proc., Rule 263.

1 Cases that cite this headnote

**[4]** **Appeal and Error** Cases Triable in Appellate Court

In appeal from agreed case, Court of Appeals reviews de novo whether trial court correctly applied law to admitted facts. Vernon's Ann.Texas Rules Civ.Proc., Rule 263.

1 Cases that cite this headnote

**[5]** **Appeal and Error** Cases Submitted Below on Agreed Case or Statement

Because trial court has no discretion in deciding law or its proper application, Court of Appeals defers less to trial court in appeal from agreed case than in ordinary reviews. Vernon's Ann.Texas Rules Civ.Proc., Rule 263.

Cases that cite this headnote

**[6]** **Appeal and Error** Cases Submitted Below on Agreed Case or Statement

In appeal of agreed case, there are no presumed findings in favor of judgment, and pleadings are immaterial. Vernon's Ann.Texas Rules Civ.Proc., Rule 263.

Cases that cite this headnote

**[7]** **Workers' Compensation** Subrogation of or Assignment to Insurer

Statute on workers' compensation carrier's subrogation rights was adopted to prevent overcompensation to employee, and to reduce burden of insurance to employers and public. V.T.C.A., Labor Code § 417.001.

2 Cases that cite this headnote

**[8]** **Workers' Compensation** Subrogation or Assignment in General

City, as self-insured entity that provided workers' compensation benefits to employee, did not have subrogation right to benefits paid to employee under employee's personal uninsured/**underinsured motorist** (UIM) coverage, where employee had paid for UIM coverage herself and collected benefits under UIM policy as first-party beneficiary, so that amounts paid by insurer under UIM policy were insurance benefits, and not "damages," within meaning of subrogation provision of Workers' Compensation Act. V.T.C.A., Labor Code § 417.001(a).

1 Cases that cite this headnote

**[9]** **Insurance** Third-Party Beneficiaries

**Insurance** Uninsured or **Underinsured Motorist** Coverage

Employer's uninsured/**underinsured motorist** (UIM) insurance coverage is intended to recoup those damages, as that term is used in Workers' Compensation Act, recoverable from third party who is liable to injured employee because third party committed tortious act against injured employee; such UIM coverage is result of insurance contract between employer and insurance company, and relationship of injured employee to that contract is that of third-party beneficiary. V.T.C.A., Labor Code § 417.001(a).

Cases that cite this headnote

**[10]**    **Insurance** 🔑 Relations Between Parties;Implied Terms

**Insurance** 🔑 Uninsured or **Underinsured** **Motorist** Coverage

Relationship between insured who purchases personal uninsured/**underinsured** **motorist** (UIM) insurance coverage and insurer is that of contracting parties and, in such relationship, insurer is obligated to pay insured benefits, not damages, when insured is entitled to them.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*768** David Neblett, Todd A. Hunter, Hunter & Handel, Corpus Christi, for appellant.

Daniel F. Horne, Stone & Stone, Corpus Christi, for appellee.

Before Justices HINOJOSA, YA#NEZ, and CASTILLO.

## OPINION

Opinion by Justice YA#NEZ.

Appellant, the City of Corpus Christi ("the City"), appeals from a summary judgment in favor of appellee, Norberta Gomez ("Gomez"). The sole issue is whether the City, a self-insured entity that provides workers' compensation benefits to its employees, has a subrogation right to benefits paid to an injured employee under the employee's personal uninsured/underinsured ("UIM") insurance coverage. Because we hold the City has no subrogation right in such circumstances, we affirm.

## Background

Gomez was struck and injured by a motor vehicle while engaged in the course and scope of her employment with the City as a school crossing guard. The City, a self-insured political subdivision of the State, paid in excess of $78,513.13 in medical and indemnity benefits to Gomez. Gomez later settled a UIM claim with her personal insurance company and received $20,000. The City contends it has a subrogation right to the benefits paid to Gomez under her personal UIM insurance coverage pursuant to section 417.001(b) of the Labor Code. [1]

**\*769** The Texas Workers' Compensation Commission issued an administrative decision in the City's favor and Gomez appealed to the trial court. *See* TEX. LAB.CODE ANN. § 410.251 (Vernon 1996) (party that has exhausted administrative remedies under statutory scheme entitled to judicial review). The parties agreed to submit the matter to the trial court on cross-motions for summary judgment based on an agreed statement of facts. [2] Gomez's motion for summary judgment contends there is "no support" for the City's position that it is entitled to subrogation. The trial court granted summary judgment in Gomez's favor.

We have summarized the following relevant facts included in the agreed statement of facts:

1) The City, as a political subdivision of the State of Texas, is self-insured and provides workers' compensation benefits to its employees through a third-party administrator.

2) While engaged in the course and scope of her employment with the City as a school crossing guard, Gomez suffered a compensable injury when she was struck by a motor vehicle driven by Manuel Garcia, Jr.

3) The City paid Gomez in excess of $73,513.13 in medical and indemnity benefits for her injuries as of the time of the trial.

4) Pursuant to chapter 417 of the labor code, as the worker's compensation carrier, the City is subrogated to the rights of its injured employee up to the amount of the benefits paid. This statutory lien may be enforced against the liability of a third party in the name of the injured employee. *See* TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2004).

5) Geico, Garcia's liability insurance carrier, settled Gomez's claim for $25,000 and those funds were paid over to the City.

6) For ten years prior to the accident, Gomez had maintained, at her personal expense, UIM motorist protection with State Farm Insurance Company, by paying an additional premium of $16.00 a month for such coverage.

7) Without informing the City, Gomez settled her UIM claim with State Farm for the sum of $20,000 and kept the money.

8) The City claims a subrogation interest in the $20,000 State Farm paid Gomez, contending it is a third-party recovery pursuant to section 417.001(b) of the labor code.

9) Gomez contends the UIM settlement is a benefit derived from her own private insurance, and thus constitutes a first-party recovery not subject to the provisions of section 417.001(b).

 **[1]**　Although the agreed statement of facts in the record is neither signed nor certified by the trial court as correct, we have previously held that strict compliance with rule 263 is not a prerequisite for an agreed case. *See Reed v. Valley Fed. Sav. & Loan Co.,* 655 S.W.2d 259, 264 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.) (if parties stipulate all facts, case may be treated as a submission on agreed statement and strict compliance with rule 263 is not required); *see also Abbott v. Blue Cross & Blue Shield of Tex., Inc.,* 113 S.W.3d 753, 758 (Tex.App.-Austin 2003, pet. filed) (same) (citing *Lambda Constr. Co. v. Chamberlin Waterproofing & Roofing Sys., Inc.,* 784 S.W.2d 122, 125 (Tex.App.-Austin 1990, writ denied)); *State* **\*770** *Farm Lloyds v. Kessler,* 932 S.W.2d 732, 735 (Tex.App.-Fort Worth 1996, writ denied) (same).

### Standard of Review

 **[2]**　**[3]**　**[4]**　**[5]**　**[6]**　This case was submitted to the trial court upon stipulated facts. Accordingly, we review the trial court's order to determine whether the trial court correctly applied the law to the stipulated facts. *See City of Harlingen v. Avila,* 942 S.W.2d 49, 51 (Tex.App.-Corpus Christi 1997, writ denied); *accord Thompson v. Cont'l Airlines,* 18 S.W.3d 701, 705 (Tex.App.-San Antonio 2000, no pet.); *Port Arthur I.S.D. v. Port Arthur Teachers Ass'n,* 990 S.W.2d 955, 957 (Tex.App.-Beaumont 1999, pet. denied); *Stewart v. Hardie,* 978 S.W.2d 203, 206 (Tex.App.-Fort Worth 1998, pet. denied). We limit our review to the stipulated facts unless other facts are necessarily implied from the stipulated facts. *Highlands Ins. Co. v. Kelley–Coppedge, Inc.,* 950 S.W.2d 415, 417 (Tex.App.-Fort Worth 1997), *rev'd on other grounds,* 980 S.W.2d 462 (Tex.1998). We review *de novo* whether the trial court correctly applied the law to the admitted facts. *Id.; see also Orange Cty. Appraisal Dist. v. Agape Neighborhood Improvement, Inc.,* 57 S.W.3d 597, 601 (Tex.App.-Beaumont 2001, pet. denied). Because a trial court has no discretion in deciding the law or its proper application, we defer less to the trial court than in ordinary reviews. *Highlands,* 950 S.W.2d at 417. In an appeal of an "agreed" case, there are no presumed findings in favor of the judgment, and the pleadings are immaterial. *Id.; Kessler,* 932 S.W.2d at 735.

**Applicable Law**

A workers' compensation carrier's rights to subrogation are set out in section 417.001 of the Labor Code. The statute provides, in pertinent part, as follows:

> (a) An employee or legal beneficiary may seek damages from a third party who is or becomes liable to pay damages for an injury or death that is compensable under this subtitle and may also pursue a claim for workers' compensation benefits under this subtitle.

> (b) If a benefit is claimed by an injured employee or a legal beneficiary of the employee, the insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the third party in the name of the injured employee or the legal beneficiary.

TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2004).

 **[7]**    The subrogation statute was adopted to prevent overcompensation to an employee and to reduce the burden of insurance to employers and the public. *See Capitol Aggregates, Inc. v. Great Am. Ins. Co.,* 408 S.W.2d 922, 924 (Tex.1966) (stating purpose of the predecessor statute to section 417.001). The City argues that a workers' compensation carrier is entitled to subrogation, regardless of whether a UIM claim brought by its employee is made against a policy paid for by the employer or a policy paid for by the employee.

In support, the City relies primarily on *Texas Workers' Comp. Ins. Facility v. Aetna Cas. & Sur. Co.,* 994 S.W.2d 923, 926 (Tex.App.-Houston [1st Dist.] 1999, no pet.) and *Employers Cas. Co. v. Dyess,* 957 S.W.2d 884, 890 (Tex.App.-Amarillo 1998, writ denied). Unlike the present case, however, *Aetna* and *Dyess* both involved UIM claims brought against policies paid for and maintained by the injured employee's employer. *See Aetna,* 994 S.W.2d at 925; *Dyess,* 957 S.W.2d at 885. Here, Gomez brought her claim against a personal **\*771**  UIM policy that she paid for and maintained for ten years.

The issue before us was first addressed by the Fifth Circuit in *Bogart v. Twin City Fire Ins. Co.,* 473 F.2d 619 (5th Cir.1973). In that case, TransAmerica Insurance Company, the workers' compensation carrier and intervenor in the suit, argued that because it had paid benefits to an employee, it had a right of subrogation to the judgment, or any part of it, that the employee might obtain against the *employee's* own UIM insurance carrier. *See Bogart,* 473 F.2d at 627.

TransAmerica based its argument on former article 8307, section 6a,[3] which essentially provided a workers' compensation carrier a subrogation right "in any recovery the employee may obtain against the third person who, because of the circumstances under which the accident occurred, has a legal liability to pay damages." *Id.* TransAmerica argued that the statute's reference to a person with a "legal liability" implied a class larger than only tortfeasors and therefore included uninsured motorists insurance carriers. *Id.* at 628.

The *Bogart* court disagreed, noting that the workers' compensation insurance carrier's rights were derived solely from the subrogation statute and had been recognized only in actions involving a tortfeasor. *See id.* (citing *Consolidated Underwriters v. Kirby Lumber Co.,* 267 S.W. 703, 706 (Tex.Com.App.1924)). The *Bogart* court cited several Texas cases limiting the statutory subrogation provisions to actual tortfeasors and noted that Bogart's recovery was not against a third-party tortfeasor. *See id.* at 629. In denying TransAmerica's claim, the court stated it recognized that the theory behind the subrogation statute is to reduce the burden of insurance to employers and the public, but noted that such a theory could not be used to create a subrogation right where none was available under the statute. *See id.*

The *Dyess* and *Aetna* courts disagreed with the holding of *Bogart. See Dyess,* 957 S.W.2d at 890; *Aetna,* 994 S.W.2d at 926. The *Dyess* court pointed out that although the Texas cases cited in *Bogart* involved subrogation claims by workers' compensation carriers against third-party tortfeasors, none of the cited cases specifically address whether subrogation

rights are *limited* to third-party tortfeasors. *See Dyess,* 957 S.W.2d at 890. In declining to follow *Bogart,* the *Dyess* court stated it was unaware of any Texas cases expressly holding that subrogation rights are effective *only* as to third-party tortfeasors, and not to other third parties. *See id.*

In *Dyess,* the employer's UIM carrier also asserted that the workers' compensation carrier had no subrogation rights **\*772** against it because of a provision in the UIM carrier's policy providing that coverage did "not apply directly or indirectly to benefit [ ] any insurer or self-insurer under any workers' compensation, disability benefits or similar law." *See id.* (omission in original). The *Dyess* court held the clause invalid because it attempted to "contractually abrogate [the workers' compensation carrier's] statutory right." *See id.* at 891. The *Dyess* court concluded that the right of subrogation applied to any *parties* liable for Dyess's injury, regardless of whether the liability arose in tort or contract. *See id.*

The question before the court in *Aetna* was whether a workers' compensation carrier, after paying benefits to an injured employee, had a subrogation right when the employee subsequently sued and collected from the employer's UIM insurance carrier. *See Aetna,* 994 S.W.2d at 925. The parties disagreed about the scope of the statutory term "third party." *See id.* Like the *Dyess* court, the *Aetna* court declined to follow *Bogart's* holding that third-party subrogation rights are limited to claims against third-party tortfeasors. *See id.* at 926. The *Aetna* court found *Bogart's* holding to be in conflict with the Texas statute. [4] The compensation carrier contended that the plain language of the statute with respect to the term "third party" extended its subrogation rights against *any* third person potentially liable to the benefits recipient. *Id.* at 925. Aetna (the employer's UIM carrier) argued, however, that subrogation rights were limited to claims against third party *tortfeasors. Id.* (emphasis in original). The *Aetna* court concluded that the purpose of the subrogation statute favors an expansive reading of "third party" and therefore held that a workers' compensation carrier's subrogation right extends to claims against a UIM carrier. *Id.* at 926.

The issue before this Court was recently addressed by the San Antonio Court of Appeals in *Liberty Mut. v. Kinser,* 82 S.W.3d 71, 72 (Tex.App.-San Antonio 2002, pet. withdrawn). [5] In a well-reasoned opinion by Chief Justice Hardberger, the *Kinser* court held that a workers' compensation carrier does not have a subrogation right to benefits paid to an injured employee under the *employee's* UIM coverage. *See id.* at 79. The *Kinser* court reasoned that extending subrogation rights to a workers' compensation carrier in such circumstances results in the injured employee subsidizing the insurance company. *See id.* The court concluded that neither law nor equity would be satisfied by such a result. *See id.* We agree.

**\*773** The facts in *Kinser* are similar to the present case. In *Kinser,* the workers' compensation carrier asserted a subrogation right to the UIM benefits payable to the employee under the employee's personal UIM insurance policy. *See id.* at 72.

The *Kinser* court noted that most jurisdictions resolve the issue of whether a workers' compensation carrier's rights extend to UIM benefits against the carrier. *See id.* at 76. The court also noted that the Texas Supreme Court has distinguished between damages awarded by a jury and benefits payable under a UIM policy. *See id.* at 79 (citing *Henson v. Southern Farm Bureau Cas. Ins. Co.,* 17 S.W.3d 652, 654 (Tex.2000)). In rejecting the workers' compensation carrier's right to subrogation benefits, the *Kinser* court held that "damages" as used in section 417.001(a) do not include UIM benefits under the claimant's personal insurance policy; rather, the term is limited to damages recovered from a third party who is liable to the injured employee because the third party breached a contract or committed a tortious act against the injured employee. *See id.* at 78.

**[8]** **[9]** In the present case, Gomez argues that unlike the circumstances in *Aetna* and *Dyess,* she collected benefits under her *personal* UIM policy and is therefore a first-party beneficiary. Gomez reasons that a person collecting under his or her *employer's* UIM insurance coverage is a third-party beneficiary because the employer pays the insurance premium. We agree. An employer's UIM coverage is intended to recoup those damages, as that term is used in section 417.001(a), recoverable from a third party who is liable to an injured employee because the third party committed a tortious act

against the injured employee. Such UIM coverage is the result of an insurance contract between the employer and the insurance company, and the relationship of the injured employee to that contract is that of a third-party beneficiary.

**[10]** Persons who are conscientious and thoughtful purchase their own UIM coverage to protect themselves against losses caused by negligent financially irresponsible motorists. *See Francis v. Int'l Serv. Ins. Co.,* 546 S.W.2d 57, 61 (Tex.1976) (purpose of the [UIM] Act is ... to protect the conscientious and thoughtful motorist against losses caused by negligent financially irresponsible motorists.) The relationship between an insured who purchases personal UIM insurance coverage and the insurer is that of contracting parties. *See Henson,* 17 S.W.3d at 653. In such a relationship, the insurer is obligated to pay the insured benefits, not damages, when the insured is entitled to them. *See id.* at 654.

We agree with the reasoning of our sister court in *Kinser. See Kinser,* 82 S.W.3d at 78–79. We hold that a workers' compensation insurance carrier does not have a subrogation right to benefits paid to an injured employee under the employee's UIM insurance policy. Accordingly, we hold that the trial court did not err in its interpretation of the statute.

The JUDGMENT of the trial court is AFFIRMED.

**All Citations**

141 S.W.3d 767

Footnotes

1    *See* TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2004). Although section 417.001 was amended in 2003, *see* Act of May 22, 1993, 73rd Leg., R.S. ch. 269 § 1, 1993 Tex. Sess. Law Serv. 1235 (amended 1997 and 2003) (current version at TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2004)), the amendments are unrelated to the issue here. Thus, we cite to the current version of the statute.
2    *See* TEX.R. CIV. P. 263.
3    Former article 8307 § 6a provided, in pertinent part:
    Where the injury for which compensation is payable under this law was caused under circumstances creating a legal liability in some person other than the subscriber to pay damages in respect thereto, the employee may proceed either at law against that person to recover damages or against the association for compensation under this law....
    If compensation be claimed under this law by the injured employee ... then the association shall be subrogated to the rights of the injured employee, and may enforce in the name of the injured employee ... the liability of said other person, and in case the recovery is for a sum greater than that paid or assumed by the association to the employee or his legal beneficiaries, then out of the sum so recovered the association shall reimburse itself and pay said costs and the excess so recovered shall be paid to the injured employee or his beneficiaries ....
    *See* Act of May 15, 1973, 63rd Leg., R.S., ch. 88, § 10, 1973 Tex. Gen. Laws 193, *repealed by* Act of Dec. 13, 1989, 71st Leg., 2nd C.S. ch. 1, § 16.01(1), 1989 Tex. Gen. Laws 114 (current version at TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2004)).
4    The subrogation statute at issue in *Aetna* stated, in pertinent part:
    (a) If a *third party* is or becomes *liable to pay damages* for an injury or death which is compensable under this Act, the employee or legal beneficiary may seek damages from the third party ...
    (b) If compensation is claimed under this Act by the injured employee or the employee's legal beneficiaries, the *insurance carrier* is subrogated to the rights of the injured employee and *may enforce* in the name of the injured employee or the legal beneficiaries *the liability of that other person* ...
    (emphasis added)
    Act of December 11, 1989, 71st Leg., 2d C. S., ch. 1, § 4.05, 1989 Tex. Gen. Laws 122, *repealed by* Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, sec. 417.001, 1993 Tex. Gen. Laws 1234 (current version at TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2004)).

5    The *Kinser* court noted that the El Paso court reached a similar decision in *Cas. Reciprocal Exch. v. Demock,* 130 S.W.3d 74 (Tex.App.-El Paso 2002, no pet.) (not designated for publication). *See Liberty Mut. v. Kinser,* 82 S.W.3d 71, 79 n. 1 (Tex.App.-San Antonio 2002, pet. withdrawn). The *Kinser* court did not rely on *Demock* as authority, and neither do we. *See id.*

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2016 Thomson Reuters. No claim to original U.S. Government Works.    8

957 S.W.2d 884
Court of Appeals of Texas,
Amarillo.

EMPLOYERS CASUALTY COMPANY, Appellant,

v.

Carl L. **DYESS**, Jr., Northbrook Property and Casualty Insurance Company
and Northbrook Indemnity Company and Felipe Mendoza, Appellees.

No. 07–96–0365–CV.
|
Nov. 7, 1997.

Workers' compensation insurer brought action against employee, employer's uninsured motorist (UM) carrier, and tortfeasor to recover subrogation. The 11th District Court, Harris County, Mark Davidson, J., entered summary judgment against insurer, and it appealed. The Court of Appeals, Boyd, C.J., held that: (1) insurer's statutory right of subrogation applied to carrier, and (2) exclusion of UM benefits for injuries covered by workers' compensation was invalid.

Reversed and remanded.

West Headnotes (7)

**[1]**    **Workers' Compensation**  Subrogation of or Assignment to Insurer

Separate, equitable right of subrogation by workers' compensation insurer is unnecessary since insurer has statutory right. Vernon's Ann.Texas Civ.St. art. 8307, § 6a (Repealed).

Cases that cite this headnote

**[2]**    **Workers' Compensation**  Subrogation of or Assignment to Insurer

Workers' compensation insurer's statutory right to subrogation against some person other than subscriber who has legal liability for the injury was not limited to third-party tort-feasors, but included employer's uninsured motorist (UM) carrier; injured employee received double recovery from insurer and carrier. Vernon's Ann.Texas Civ.St. art. 8307, §§ 6a, 6a(c) (Repealed).

8 Cases that cite this headnote

**[3]**    **Workers' Compensation**  Subrogation of or Assignment to Insurer

Avoiding double recovery is one purpose of workers' compensation insurer's statutory right of subrogation against some person other than subscriber who has legal liability for the injury. Vernon's Ann.Texas Civ.St. art. 8307, § 6a (Repealed).

2 Cases that cite this headnote

**[4]**    **Insurance**  Workers' Compensation

**Workers' Compensation**  Subrogation of or Assignment to Insurer

Exclusion stating the uninsured motorist (UM) coverage was inapplicable directly or indirectly to benefit any insurer or self-insurer under any workers' compensation, disability benefits, or similar law was invalid as conflicting with workers' compensation insurer's statutory right of subrogation against UM carrier. Vernon's Ann.Texas Civ.St. art. 8307, § 6a (Repealed).

5 Cases that cite this headnote

**[5]** **Workers' Compensation** Waiver or Loss by Employer or Insurer of Right to Sue

Although workers' compensation insurer may by contract waive statutory right to subrogation, it is not bound by contracts of others. Vernon's Ann.Texas Civ.St. art. 8307, § 6a (Repealed).

Cases that cite this headnote

**[6]** **Workers' Compensation** Subrogation of or Assignment to Insurer

Workers' compensation insurer's statutory right of subrogation against person other than subscriber who has legal liability for injury can apply to any parties liable for employee's injury, regardless of whether that liability arose in tort or contract. Vernon's Ann.Texas Civ.St. art. 8307, § 6a (Repealed).

1 Cases that cite this headnote

**[7]** **Insurance** Uninsured or Underinsured Motorist Coverage

**Workers' Compensation** Subrogation or Assignment in General

**Workers' Compensation** Subrogation of or Assignment to Insurer

Uninsured motorist (UM) carrier for employer was not bound by any contractual right of subrogation created between employer, employee, and workers' compensation insurer. Vernon's Ann.Texas Civ.St. art. 8307, § 6a (Repealed).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*885** Hughes, Watters & Askanase, Loren R. Smith, Houston, for appellant.

Daniel B. Nelson & Associates, Daniel B. Nelson, Thomas B." Tody" DuPont, Houston, for appellees.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

**Opinion**

BOYD, Chief Justice.

In this case, we are asked to address the subrogation rights of a workers' compensation carrier as they might apply to the employer's uninsured motorist coverage. Appellant, Employers Casualty Co. (Employers), challenges the granting of summary judgment in favor of appellees Carl L. Dyess, Jr. (Dyess), Northbrook Property and Casualty Co., Northbrook Indemnity Co. (collectively referred to as Northbrook), and Felipe Mendoza (Mendoza) denying Employers' subrogation claims. For reasons we later discuss, we reverse the judgment of the trial court.

A proper discussion of the question before us requires us to discuss in some detail the factual and procedural history of the proceeding. In 1990, appellee Dyess was an employee of Winn–Lange Electric, Inc. Employers was the workers' compensation carrier for Winn–Lange. Winn–Lange's automobile insurance policy, which included uninsured motorist coverage, was with Northbrook. On August 14, 1990, Dyess was driving a truck belonging to Winn–Lange in the course of his employment when he was struck by a vehicle operated by Mendoza. Mendoza was uninsured. Dyess sought and obtained workers' compensation benefits totaling $107,385.40 from Employers.

Some time before August 1991, Dyess brought a negligence suit against Mendoza. Employers filed a plea in intervention in February 1992, asserting its subrogation rights under Tex.Rev.Civ. Stat. Ann. Art. 8307, § 6a (repealed by Acts of December 13, 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(10), 1989 Tex.Gen.Laws 1, 114, effective January 1, 1991). In its plea, Employers named Mendoza's employer, Toni Martin, as an additional defendant, asserting that Mendoza was acting in the course and scope of his employment at the time of the collision. Dyess then added Northbrook as a defendant seeking to recover under the uninsured motorist coverage of Winn–Lange's automobile insurance policy with Northbrook. On May 11, 1992, the trial court rendered a no-answer default judgment against Mendoza on the issue of liability. Employers then amended its plea in intervention asserting a right of subrogation for any recovery Dyess might obtain from Northbrook. Northbrook answered, asserting it was entitled to an offset for any workers' compensation payments made to Dyess and specially excepted to Employers' plea in intervention. Northbrook also brought cross-claims against Mendoza and Martin.

On February 12, 1993, Northbrook moved for summary judgment against Employers on the basis that Employers lacked any subrogation right against Northbrook. On March 1, 1993, Dyess filed his own motion for summary judgment against Employers, asserting the same grounds urged by Northbrook. Both motions relied on a provision of the insurance contract which provided that uninsured motorist coverage "shall not apply directly or indirectly to benefit [ ] any insurer or selfinsurer under any workers' compensation, disability benefits or similar law." The movants also relied on *Bogart v. Twin City Fire Ins. Co.,* 473 F.2d 619 (5th Cir.1973), for the proposition that workers' compensation carrier's subrogation rights do not extend to uninsured motorist coverage. The trial court granted Northbrook's motion on March 30, 1993, and Dyess's motion the following September. The trial court also granted another motion for summary judgment by Dyess that Northbrook was not entitled to an offset for the payments made by Employers to Dyess.

After the trial court granted these motions, Dyess and Northbrook settled for $150,000, prompting Dyess's dismissal of his claims against Northbrook. Employers objected to the dismissal because the settlement agreement did not reflect its subrogation rights. The parties stipulated to the amount of workers' compensation benefits **\*886** Employers had paid to Dyess and the action proceeded to trial on July 10, 1995. At the conclusion of the trial, the jury found Mendoza was solely responsible for the accident, but that he was not acting in the course and scope of his employment with Martin and found Dyess's damages were $400 for medical care. In its judgment, the trial court denied Employers' request for subrogation, and ordered that Dyess recover $400 from Mendoza but take nothing from Martin. It also taxed costs against Dyess and Employers.

In this appeal, Employers presents five points of asserted error. In its first three points, it claims the summary judgments were erroneous because they violate Employers' 1) statutory right of subrogation, 2) its contractual subrogation right, and 3) its equitable subrogation right. In its fourth point, Employers challenges the trial court's failure to award it recovery of the amount for which the jury found Mendoza liable to Dyess. In its fifth point, it assigns error to the trial court's refusal to charge the court costs to Mendoza.

## STANDARD OF REVIEW

A summary judgment is only proper when a movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); Tex.R. Civ. P.

166a(c). In deciding whether there is a material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true and every reasonable inference resolved in its favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Where, as here, the trial court's order granting summary judgment does not specify the ground or grounds relied upon, the judgment is to be affirmed if any of the theories advanced by the movant are meritorious. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996); *State Farm Fire & Cas. Co. v. S.S. & G.W.,* 858 S.W.2d 374, 380 (Tex.1993); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). Parenthetically, we have not failed to note the changes made in the summary judgment practice by the rather extensive amendments to the Rules of Civil Procedure effective September 1, 1997. However, not only was this appeal perfected prior to the effective date of those changes, with regard to the questions before us, the summary judgment requirements would be the same.

Subrogation has been defined as the right of one who has paid an obligation which another should have paid to be indemnified by the other. BLACK'S LAW DICTIONARY, 1427 (6th ed.1990). The legislature first provided for a workers' compensation carrier's subrogation rights in 1917. Act of March 28, 1917, 35th Leg., R.S., ch. 103, 1917 Tex. Gen. Laws 268, 285. As initially written, and in relevant part, the subrogation statute provided:

> Where the injury for which compensation is payable under this law was caused under circumstances creating a legal liability in some person other than the subscriber to pay damages in respect thereof, the employee may at his option proceed either at law against that person to recover damages or against the association for compensation under this law, but not against both, and if he elects to proceed at law against the person other than the subscriber, then he shall not be entitled to compensation under this law. If compensation be claimed under this law by the injured employee or his legal beneficiaries, then the association shall be subrogated to the rights of the injured employee....

*Id.* Under this language, our courts held that an employee's action against a third party tortfeasor precluded subsequent recovery of workers' compensation benefits, but receipt of workers' compensation payments would not necessarily prevent the employee's subsequent action against the third party tortfeasor. *Hart v. Traders & General Ins. Co.,* 144 Tex. 146, 189 S.W.2d 493, 494 (1945) (citing *Employers' Indemnity Corp. v. Felter,* 277 S.W. 376 (Tex.Com.App.1925)). The court subsequently held that an injured employee has standing to pursue a third-party claim after obtaining a compensation award whether or not the compensation carrier refuses to do so. *Watson v. Glens Falls Ins. Co.,* 505 S.W.2d 793, 796 (Tex.1974).

In *Campbell v. Sonford Chem. Co.,* 486 S.W.2d 932 (Tex.1972), the court noted a circumstance in which this statute would **\*887** leave an injured employee with no remedy. This would occur when the employee sought compensation benefits, but the claim was denied more than two years after his cause of action accrued. In that event, the employee's claim against the third party would be barred by limitations. If the employee filed suit before the running of limitations, section 6a would preclude recovery of compensation benefits. *Id.* at 934. In 1973, and in apparent response to *Campbell,* the legislature amended the subrogation statute [1] to provide that an employee's action against a third party would not preclude recovery of workers' compensation benefits. The statute in effect at the time of Dyess's injury provided:

> If the injury for which compensation is payable under this law was caused under circumstances creating a legal liability in some person other than the subscriber to pay damages in respect thereof, the employee may proceed either at law against that person to recover damages or against the association for compensation under this law, and if he proceeds at law against the person other than the subscriber, then he shall not be held to have waived his rights to compensation under this law. [ ] If compensation be claimed under this law by the injured employee or his legal beneficiaries, then the association shall be subrogated to the rights of the injured employee, and may enforce in the name of the injured employee or of his legal beneficiaries the liability of said other person, and in case the recovery is for a sum greater than that paid or assumed by the association to the employee or his legal beneficiaries, then out of the sum so recovered the

association shall reimburse itself and pay said costs and the excess so recovered shall be paid to the injured employee or his beneficiaries. [ ]

Repealed and recodified as Tex. Labor Code Ann. § 417.001, by Act of December 13, 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(10), 1989 Tex. Gen. Laws 1, 114, effective January 1, 1991. [2]

From this history, it appears clear that the 1973 amendment changed the law applicable when an injured employee seeks compensation benefits after bringing an action against a third party. However, that is not the issue presented by this case. The question before us is the subrogation right of a workers' compensation carrier after it paid benefits to an injured employee who subsequently brought suit against potentially liable third parties. Our courts have recognized an injured employee's ability to bring such suits, at least as to third party tortfeasors, since 1925. *See Employers' Indemnity Corp., supra.*

In considering the effect of a compensation carrier's right of subrogation on an injured employee's claim against others, our courts have used a variety of descriptions. Most have held that after compensation benefits have been paid, the employee has a cause of action against the third party, but it is subject to, or burdened by, the workers' compensation carrier's right of reimbursement. *See, e.g., Guillot v. Hix,* 838 S.W.2d 230, 232 (Tex.1992); *Traders & General Ins. Co. v. West Texas Utilities,* 140 Tex. 57, 165 S.W.2d 713, 716 (1942); *Travelers Ins. v. Seidel,* 705 S.W.2d 278 (Tex.App. —San Antonio 1986, writ dism's w.o.j.). In *Fort Worth Lloyds v. Haygood,* 151 Tex. 149, 246 S.W.2d 865 (1952), our supreme court held that an injured employee has no cause of action against a third party except to the degree his damages exceed the workers' compensation recovery. *Id.* 246 S.W.2d at 868, 869. In **\*888** *Yeary v. Hinojosa,* 307 S.W.2d 325 (Tex.Civ.App.—Houston 1957, writ ref'd n.r.e.), the court held that the cause of action against the third party was "in effect" owned jointly by the employee and the compensation carrier. *Id.* at 331. In *Capitol Aggregates, Inc. v. Great Am. Ins. Co.,* 408 S.W.2d 922 (Tex.1966), the court reaffirmed a workers' compensation carrier's right to the first money recovered by the employee from a third person for the injuries for which the compensation was paid. *Id.* at 923. *See also Autry v. Dearman,* 933 S.W.2d 182, 188 (Tex.App.—Houston [14th Dist.] 1996, writ denied).

When an injured employee, or their representative, has attempted to enter into a settlement agreement with the third party, without providing for reimbursement of the workers' compensation carrier, our courts have declared such agreements unlawful as contrary to the purpose of the subrogation statute. *See Travelers Ins. v. Seidel,* 705 S.W.2d at 281; *Capitol Aggregates,* 408 S.W.2d at 924. In *Capitol Aggregates,* the court went on to hold that Section 6a of Article 8307 was adopted to prevent overcompensation to the employee and to reduce the burden of insurance to the employer and to the public which purposes would be frustrated if the employee were permitted to retain both the compensation benefits and the settlement proceeds. *Id.* at 922 (citing *Consolidated Underwriters v. Kirby Lumber Co.,* 267 S.W. 703 (Tex. Comm'n App.1924)).

Subsection c of section 6a provides that an employee's recovery from a third person shall be applied to reimburse the compensation carrier. *See e.g., Travelers Ins. v. Seidel,* 705 S.W.2d at 281 (carrier entitled to recover from employee's heir); *Home Indemnity Co. v. Thompson,* 407 S.W.2d 530 (Tex.Civ.App.—Texarkana 1966, no writ). This is so even when the carrier did not participate in the employee's suit against the third party. *Houston Gas & Fuel v. Perry,* 127 Tex. 102, 91 S.W.2d 1052 (1936). On at least one occasion, an appellate court held that a workers' compensation carrier could recover payments from a third party tortfeasor even though the payment had been made before any workers' compensation payments had been made. *See Home Indemnity Co.,* 407 S.W.2d at 530.

As we have noted, both motions for summary judgment contained the same two grounds: first, that Northbrook's contractual liability expressly precluded recovery by a workers' compensation carrier, and second, that the statutory right of subrogation was inapplicable to uninsured motorist coverage. Thus, the motions did not involve any equitable right of subrogation that might be possessed by Employers. Therefore, if such a right exists, the summary judgments were improper. For this reason, we initially address Employers' third point.

Employers cites *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480 (Tex.1992), and *Ortiz v. Great Southern Fire & Cas. Ins. Co.,* 597 S.W.2d 342 (Tex.1980), as support for its position that it has an equitable right of subrogation. However, neither case concerned the subrogation rights of a workers' compensation carrier. In *American,* the court was presented with the question of an excess liability carrier's equitable subrogation rights against a primary insurer. The court held that an excess carrier liable for claims is subrogated to the rights of the insured as against the primary insurer. *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d at 482. *See G. A. Stowers Furniture Co. v. American Indemnity Co.,* 15 S.W.2d 544 (Tex.Com.App.1929) (recognizing insurer's duty to insured in settlement of claims). In doing so, the court reasoned that without such a remedy, the primary insurer would have little incentive to settle within the primary policy's limits. *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d at 483.

*Ortiz* involved the intervention of a homeowner's insurance carrier in an action by the homeowner against a third party tortfeasor responsible for a fire. It was undisputed that the homeowner had suffered $15,000 in damages to the home and its contents as a result of the fire. Because the policy did not cover the home's contents, the insurance company paid only $4,000 for damage to the structure. The insured settled with the third party for $10,000. The trial court granted summary judgment in favor of the insurance company for $4,000 and was affirmed by the court of appeals. When appealed to the supreme **\*889** court, with the observation that "the right of equitable subrogation is granted to an insurer [is] to prevent the insured from receiving a double recovery," that court recognized the existence of an equitable right of subrogation. However, even so, the supreme court held summary judgment should not have been granted in favor of the insurance company because the record did not show "if any portion of the $10,000 settlement was intended as compensation for damage to the insured real property in that particular case" thus, "there is no indication that the Ortizes have to any extent received a double recovery." *Ortiz v. Great Southern Fire & Cas. Ins. Co.,* 597 S.W.2d at 343, 344.

 **[1]**    In this case, as we have noted, the question before us is the effect of Article 8307, section 6a establishing a statutory right of subrogation in workers' compensation cases. *American* and *Ortiz* are distinguishable because that question was not before either court. With the existence of a statutory right, there is no need for courts to recognize a separate, equitable right of subrogation. For example, in *Johnson v. Second Injury Fund,* 688 S.W.2d 107, 108 (Tex.1985), our supreme court noted and cited with approval cases holding that a workers' compensation carrier's subrogation rights arise solely from the statute. That rationale, in part at least, springs from *Fidelity Union v. Texas Power,* 35 S.W.2d 782 (Tex.Civ.App.—Dallas 1931, writ ref'd), in which the court observed that prior to section 6a, our courts had held that a workers' compensation carrier had no equitable right of subrogation. *Id.* at 783. *See also Evans v. Venglar,* 429 S.W.2d 673, 675 (Tex.Civ.App.—Corpus Christi 1968, no writ). Because these authorities are relevant and dispositive of the point, we overrule Employers' third point.

 **[2]**    In its first point, Employers argues the trial court erred in granting summary judgment in favor of Dyess and Northbrook on its statutory subrogation claims. In responding to this argument, Northbrook acknowledges Employers' general right of statutory subrogation but posits that 1) the right of subrogation only applies to third party tortfeasors, not to one whose potential liability is only contractual, and 2) even if Employers' subrogation rights extended to it, Northbrook could have no liability to Employers under the terms of the insurance contract.

As noted above, section 6a provides a compensation carrier subrogation rights against "some person other than the subscriber" who has a "legal liability" for the injury. In support of its first proposition, Northbrook argues the phrase "some person" in the statute applies only to third party tortfeasors. Because resolution of this argument requires that we determine the meaning of statutory language, we must apply the standards applicable to statutory construction.

Section 311.023 of the Government Code provides that in construing a statute, a court may, but is not required to, consider several factors including 1) the object sought to be obtained; 2) circumstances under which the statute was enacted; 3) legislative history; 4) common law or previous statutes; and 5) consequences of particular construction. Tex. Govt.Code Ann. § 311.023 (Vernon 1988). However, when the statutory language is clear and unambiguous, such extrinsic aids and rules of statutory construction are unnecessary and the statute should be given its plain meaning. *Clark*

*v. Texas Home Health Inc.,* 940 S.W.2d 835, 841 (Tex.App.—Amarillo 1997, writ granted); *City of Dallas v. Cornerstone Bank,* 879 S.W.2d 264, 270 (Tex.App.—Dallas 1994, no writ). Here, neither party argues that the language is ambiguous and we find no ambiguity in the statute. The statute does not limit the scope of persons with legal liability for the injury against whom a compensation carriers' subrogation interest is effective. That being true, the clear wording of the statute does not support Northbrook's position that Employers is only subrogated to Dyess's rights against third party tortfeasors.

Even so, Northbrook cites and primarily relies upon *Bogart v. Twin City Fire Ins. Co.,* 473 F.2d at 619 as definitive authority for its proposition that Employers' subrogation rights are limited to third party tortfeasors. In that case, an employee was covered by workers' compensation insurance as well as uninsured motorist insurance he purchased on his own automobile. While traveling in his car, and in the scope of his employment, he was killed by an uninsured driver. **\*890** The compensation carrier paid $16,150.30 in benefits to the Bogarts and they subsequently brought suit against Twin City to recover under the uninsured motorist coverage issued by it. The compensation carrier intervened in the suit seeking subrogation rights because of its compensation payments. *Id.* at 627. Because of a provision in the Twin City policy that uninsured motorist benefits could not inure to the benefits of any workers' compensation carrier, the trial court denied Twin City's intervention. In doing so, it reasoned the subrogation statute only applied to third party tortfeasors. *Id.*

In affirming the trial court's judgment, the appellate court wrote: "Under this section the right [of subrogation] has been recognized only in actions involving tort-feasors." *Id.* at 628. The court then goes on to say, "[t]his limitation of the section (6a) to actions against the actual tort-feasor has been followed by other Texas courts." It then cites several Texas cases which it says establish such a limitation. However, while each of the Texas cases which the *Bogart* court cites in reaching that conclusion do involve subrogation claims by workers' compensation carriers against third party tortfeasors and recognize that right, in none of them was the question actually presented as to whether that right of subrogation was *limited* to third party tortfeasors.[3] Consequently, we do not believe the typical references in those cases to third party tortfeasors amount to holdings that workers' compensation subrogation actions are limited to such parties.[4] Northbrook additionally cites *Watson,* 505 S.W.2d at 795, and *Tolar v. Caterpillar Tractor Co.,* 793 F.2d 654 (5th Cir.1986) in support of its contention. Again, *Watson, Tolar,* as well as other cases not cited by Northbrook, use the third party tortfeasors language phrase without any discussion of subrogation rights against third parties whose liability is contractual or vicarious.

In sum, Employers has not cited, and our research has failed to disclose, any Texas case expressly holding that the only third parties against whom a compensation carriers' subrogation rights are effective are tortfeasors. Because we find it in conflict with the plain language of the statute, we decline to follow the holding in *Bogart.*

 **[3]** Both parties have cited numerous opinions from courts of other jurisdictions in support of their respective positions. However, because the issue before us turns on the construction of a Texas statute, the decisions of courts of other states applying different statutes are not relevant to resolution of that question. Parenthetically, many of the cases cited by appellees, including *Bogart,* cited the absence of a double recovery as a factor supporting their decision. Here, in contrast, the evidence shows Dyess has received a double recovery. Avoidance of double recoveries is one of the purposes for which the subrogation statute was created. *Capitol Aggregates, Inc.,* 408 S.W.2d at 924; *Hartford Cas. Ins. Co. v. Albertsons Grocery Stores,* 931 S.W.2d 729, 734 (Tex.App.—Fort Worth 1996, no writ).

 **[4]** Northbrook additionally argues that, even if Employers' statutory subrogation rights extend to non-tortfeasors, as to Employers, Northbrook has no liability. This is so, it urges, because of a clause in the policy providing that coverage under the policy "shall not apply directly or indirectly to benefit [ ] any insurer or self-insurer under any workers' compensation, disability benefits or similar law." Employers responds that this provision is void as contrary to the subrogation statute and public policy.

**\*891** In *American Liberty Insurance Company v. Ranzau,* 481 S.W.2d 793 (Tex.1972), our supreme court examined the validity of an insurance policy clause that limited uninsured/underinsured motorist coverage based on the applicability of other insurance. The court held the "other insurance" clause invalid because it conflicted with Article 5.06–1 of the Insurance Code prescribing the minimum uninsured/underinsured motorist coverage for policies issued in this state. In reaching its conclusion, the court held that it was irrelevant that the policy form was promulgated by the State Board of Insurance "because the board may not act contrary to but only consistent with" the statute. *Id.* at 796–97. The court has reaffirmed this holding on more than one occasion. *See also Stracener v. United Services Automobile Assoc.,* 777 S.W.2d 378 (Tex.1989); *Westchester Fire Insurance Company v. Tucker,* 512 S.W.2d 679 (Tex.1974).

At least two cases have applied *Ranzau* to invalidate clauses designed to reduce coverage based on receipt of workers' compensation benefits. *Hamaker v. American States Ins. Co.,* 493 S.W.2d 893, 898 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *Fidelity & Casualty Company of New York v. McMahon,* 487 S.W.2d 371 (Tex.Civ.App.— Beaumont 1972, writ ref'd n.r.e.). McMahon had received $3,930 in workers' compensation benefits for injuries arising out of an automobile accident caused by an uninsured driver. He then obtained a judgment for $1,500 and sought to recover under the uninsured motorist coverage applicable to the vehicle he was driving. The policy contained a provision reducing coverage under the policy by any workers' compensation benefits. *Id.* at 371. Although the form containing this limitation was promulgated by the State Board of Insurance, the court refused to give effect to the provision, noting the holding in *Ranzau* and commenting that "[t]he language and logic of this decision (*Ranzau)* clearly seem determinative of the question here presented." *Id.* at 372.

In *Huse v. Fidelity Interstate Life Ins. Co.,* 605 S.W.2d 351, 352 (Tex.Civ.App.—Eastland 1980, no writ), the court was presented with a challenge to a clause in a life insurance policy excluding coverage for "injury for which compensation is payable under any Workmen's Compensation Law." *Id.* at 352, fn. 1. The court upheld the provision and distinguished the *Ranzau* line of cases with the comment that "[i] n this case, there is no statute prohibiting the exclusion, and the parties are free to contract for an accidental injury policy which excludes coverage for accidents, fatal or nonfatal, caused by an injury for which worker's compensation benefits are payable." *Id.* at 352. The issue of breadth of the workers' compensation carrier's right of subrogation was not presented nor addressed in that case. *Huse* is also distinguishable on the ground that the challenged clause was in a life insurance policy and did not involve statutory subrogation rights.

 **[5]**    The parties do not argue that the clause at issue reduced the coverage afforded to Dyess. Consequently, it does not violate article 5.06–1 of the Insurance Code as did the provision in the *Ranzau* line of cases. Even so, because Northbrook was liable within the meaning of section 6a, the clause had the effect of limiting Employers' right of subrogation established by that statute. As a result, the clause is an attempt to contractually abrogate a statutory right. Although Employers could waive its statutory right by contract, with an exception not applicable here, it is not bound by the contracts of others. *Standard Oil Co. of Tex. v. Donald,* 321 S.W.2d 602, 606 (Tex.Civ.App.—Fort Worth 1959, writ ref'd n.r.e.). Because it conflicts with Employers' statutory right of subrogation, the clause is invalid.

 **[6]**    Finding that Employers' right of subrogation can apply to any parties liable for Dyess's injury, regardless of whether that liability arose in tort or contract, and further finding the clause in Northbrook's uninsured motorist policy ineffective to bar Employers' recovery, we sustain Employers' first point of error. We therefore reverse the summary judgments granted in favor of Northbrook and Dyess denying Employers' rights of subrogation.

 **[7]**    Employers' second point assigns error to the trial court's orders as violative of its contractual right of subrogation. Our disposition of its first point obviates the necessity  **\*892**  to address this point. It is worth noting, however, that just as Employers' rights cannot be altered by the contract between Winn–Lange and Northbrook, Northbrook is not bound by any contractual right of subrogation created between Employers, Winn–Lange, and Dyess.

By its fourth point, Employers assigns error to the trial court's failure to provide for its subrogation rights in the final judgment granting Dyess's recovery against Mendoza. The court's judgment reflects the existence of a stipulation of the

amount of Employers' "workers' compensation lien." Dyess presents no response to Employers' fourth point. We find the supreme court's discussion in *Capitol Aggregates* dispositive of this point. There the court wrote:

> Under the terms of this statute, the compensation carrier is entitled to the first money paid to or recovered by the employee [ ] by reason of the asserted liability of a third person for his injuries, and the employee or his representatives have no right to any of such funds until the carrier is paid in full. *See Fort Worth Lloyds v. Haygood,* 151 Tex. 149, 246 S.W.2d 865; *Traders & General Ins. Co. v. West Texas Utilities Co.,* 140 Tex. 57, 165 S.W.2d 713.

*Capitol Aggregates, Inc.,* 408 S.W.2d at 923. In conformity with our disposition of Employers' first point and the quoted portion of *Capitol Aggregates,* we sustain Employers' fourth point.

In its fifth and final point, Employers challenges the trial court's failure to award costs against Mendoza and failed to state on the record good cause for not so awarding costs. However, our disposition of Employers' first and fourth points requires reversal of the trial court's judgment and remand of this cause to that court for further proceedings. Because remand is required, resolution of Employers' fifth point is not necessary to disposition of this appeal.

For the reasons discussed above, the judgment of the trial court is reversed and the cause remanded to that court for further proceedings consistent with this opinion.

## All Citations

957 S.W.2d 884

Footnotes

1    Act of May 10, 1973, 63rd Leg. R.S., ch. 88, § 10, 1973 Tex. Gen. Laws 187, 193 (repealed 1989).

2    Currently the subrogation statute is codified as Sections 417.001 and .002 of the Labor Code. Section 417.001 provides:
     (a) An employee or legal beneficiary may seek damages from a third party who is or becomes liable to pay damages for an injury or death that is compensable under this subtitle and may also pursue a claim for workers' compensation benefits under this subtitle.
     (b) If a benefit is claimed by an injured employee or a legal beneficiary of the employee, the insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the third party in the name of the injured employee or the legal beneficiary. [ ] Section 417.002 provides:
     (a) The net amount recovered by a claimant in a third-party action shall be used to reimburse the insurance carrier for benefits, including medical benefits, that have been paid for the compensable injury.

3    The case most factually similar to the one before us is *Foster v. Truck Ins. Exchange,* 933 S.W.2d 207 (Tex.App.—Dallas 1996, writ denied). However the compensation carrier's rights of subrogation against the employer-purchased underinsured motorist coverage was not at issue there.

4    Those cases are: *Fort Worth Lloyds,* 246 S.W.2d at 868 (compensation carrier intervened in suit by employee against tortfeasor); *Traders & General Ins. Co.,* 165 S.W.2d at 714 (compensation carrier intervened in suit by employee against tortfeasor); *Evans* (employee's failure to assert mandatory counterclaim against asserted third party tortfeasor barred employee and compensation carrier from bringing separate action); *Yeary* (after carrier brought action against tortfeasor, employee was substituted as plaintiff. Carrier then asserted subrogation rights to portion of employee's judgment against tortfeasor).

End of Document                                                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

876 S.W.2d 132
Supreme Court of Texas.

Edwadine FORBAU, as Next Friend of Amy Miller, Petitioner,

v.

AETNA LIFE INSURANCE COMPANY, Respondent.

No. D–1235.
|
Jan. 5, 1994.
|
Supplemental Dissenting Opinion on Motion for Rehearing Jan. 5, 1994.
|
Dissenting Opinion on Motion for Rehearing May 5, 1993. [*]

Insured under group health policy brought action against insurer, alleging posttermination coverage. The 140th Judicial District Court, Lubbock County, William R. Shaver, J., held for insured, and cross appeals were taken. The Amarillo Court of Appeals, 808 S.W.2d 664, Poff, J., reversed and rendered, and insured sought writ of error. The Supreme Court, Cornyn, J., held that, under group health policy, expenses "incurred" and thus covered were limited to medical supplies for services furnished before policy was terminated.

Affirmed.

Doggett, J., dissented and filed both opinion and supplemental opinion in which Hightower and Gammage, JJ., joined.

West Headnotes (6)

[1]     **Labor and Employment** 🔑 Damages

ERISA remedies are exclusive, and do not include extracontractual compensatory or punitive damages. Employee Retirement Income Security Act of 1974, § 502(a)(3), as amended, 29 U.S.C.A. § 1132(a)(3).

5 Cases that cite this headnote

[2]     **Insurance** 🔑 Application of rules of contract construction

Interpretation of insurance contracts in Texas is governed by same rules as interpretation of other contracts.

134 Cases that cite this headnote

[3]     **Contracts** 🔑 Intention of Parties

**Contracts** 🔑 Construing whole contract together

When construing contract, court's primary concern is to give effect to written expression of parties' intent; contract must be considered as a whole and each part of contract should be given effect.

200 Cases that cite this headnote

**[4]**     Contracts  🔑  General and specific words and clauses

When contract provision makes general statement of coverage, and another provision specifically states time limit for such coverage, more specific provision will control.

76 Cases that cite this headnote

**[5]**     Insurance  🔑  Group Insurance

Under group health policy, expenses "incurred" and thus covered were limited to medical supplies for services furnished before policy was terminated; policy was devoid of any language which obligated insurer to pay medical expenses incurred after termination of policy for injuries sustained prior to termination.

3 Cases that cite this headnote

**[6]**     Contracts  🔑  Existence of ambiguity

              Insurance  🔑  Ambiguity in general

Not every difference in interpretation of contract or insurance policy amounts to ambiguity.

238 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*132** Alton R. Griffin, Ralph H. Brock, Lubbock, C.L. Ray, Charles B. Lord, Law Offices of C.L. Ray, Austin, for petitioner.

John P. LeVick, Jeffrey B. Jones, Jones Flygare Galey Brown & Wharton, Lubbock, for respondent.

**Opinion**

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, ENOCH, and SPECTOR, Justices, join.

Petitioner's motion for rehearing is overruled. We withdraw our opinion of May 5, 1993, and substitute the following opinion in its place.

 **[1]**    In this case we are called upon to determine whether the insurance policy at issue created a vested right in unlimited lifetime benefits, or restricted benefits to the recovery of medical expenses incurred while the policy was in effect. The trial court rendered judgment on a jury's verdict in **\*133** favor of Petitioner, Edwadine Forbau, as next friend of Amy Miller. The court of appeals reversed the trial court's judgment, holding that under the unambiguous terms of the policy, Petitioner's recovery was limited to those medical expenses incurred while Aetna's policy was in effect. 808 S.W.2d 664. We agree that Aetna's policy is unambiguous and does not afford the coverage claimed by Petitioner. We thus affirm the judgment of the court of appeals. [1]

I.

In March of 1983 fourteen-year old Amy Miller suffered serious, permanent, and disabling injuries as a result of a motor vehicle accident. At the time, Amy's father, Mike Miller, was insured under an Aetna group insurance policy (Group Policy) issued to Affiliated Foods, Inc., a cooperative of grocery stores of which his employer, E Triple M, Inc., was a member. Miller's premiums and those of his dependents, including Amy's, were paid by E Triple M. Miller was eligible as an "individual" under the plan, defined as an "employee of any store owner who is a participant under this plan;" Amy was eligible for dependent coverage as an "individual's unmarried child under nineteen years of age." Group Policy at 1500, 1550.

After Amy's accident, Aetna paid her medical expenses as incurred until April 30, 1985, when Affiliated terminated the group contract with Aetna. Aetna continued to pay benefits until May 1, 1986, under the policy's one-year extension of benefits clause. After that date, Petitioner submitted claims to Safeco Life Insurance Company as Aetna's successor insurer for Affiliated's members. A dispute eventually arose between Petitioner and Safeco, which resulted in a lawsuit and settlement.

After settling with Safeco, Petitioner filed this lawsuit against Aetna, alleging breach of contract and of fiduciary duty, and violations of the Texas Deceptive Trade Practices–Consumer Protection Act and the Insurance Code. Only the breach of contract claims were submitted to the jury. In accordance with the jury's verdict, the trial court awarded Amy $238,000 in past damages, $2.5 million in future damages, and $500,000 in attorneys' fees.

## II.

 **[2]**    Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts. *Upshaw v. Trinity Cos.,* 842 S.W.2d 631, 633 (Tex.1992); *Western Reserve Life Ins. Co. v. Meadows,* 152 Tex. 559, 261 S.W.2d 554, 557 (1953).

 **[3]**    **[4]**    When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *Ideal Lease Serv., Inc. v. Amoco Prod. Co.,* 662 S.W.2d 951, 953 (Tex.1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk,* 596 S.W.2d 517, 518 (Tex.1980). This court is bound to read all parts of a contract together to ascertain the agreement of the parties. *See Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 180 (Tex.1965); *Pan Am. Life Ins. Co. v. Andrews,* 161 Tex. 391, 340 S.W.2d 787 (1960). The contract must be considered as a whole. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). Moreover, each part of the contract should be given effect. *See Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex.1987). For example, when a contract provision makes a general statement of coverage, and another provision specifically **\*134**  states the time limit for such coverage, the more specific provision will control. *See* 3 ARTHUR L. CORBIN, CONTRACTS §§ 545–54 (1960). This is but an application of our long-established rule that "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Guardian Trust Co. v. Bauereisen,* 132 Tex. 396, 121 S.W.2d 579, 583 (1938); *see also Wynnewood State Bank v. Embrey,* 451 S.W.2d 930, 932 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.).

## III.

 **[5]**    The operative language in this policy states that Aetna will pay for "covered medical expenses *incurred during a calendar year for treatment of a covered family member."* Group Policy at 6210 (emphasis added). Under the contract, Aetna is obligated only to a covered family member, that is, a covered individual or dependent. A person ceases to be a covered individual when the policy has been discontinued or the individual is no longer employed by the policy's sponsor. When this occurs, dependent coverage also terminates. [2]

The policy also states that "[t]his policy does not provide insurance for any of the following: Charges incurred while he is not a covered family member." Under the unambiguous language of the contract, Aetna's obligation to pay benefits under the contract terminated upon the discontinuance of Affiliated's policy, unless some other provision of the policy extended coverage. As the contract contains such a provision, [3] which extended Petitioner's benefits for one additional year, she was entitled to the additional benefits Aetna paid for this time period only. [4] Under basic tenets of contract law, these provisions must be read together with the other sections of the contract to comprehensively address the rights and obligations of all parties to the insurance contract.

 **[6]**  Petitioner urges that the policy afforded her a right to receive payment for all future medical services related to any accident occurring during the policy period. That interpretation is based on the following clause:

> If any benefit ceases to apply to an individual or a dependent, coverage for that benefit will cease immediately but without prejudice to any rights under the benefit established by this person while the coverage was in force.

Group Policy at 1850. Petitioner further urges that even if this clause does not explicitly provide her with coverage, it at least creates an ambiguity which must be interpreted in favor of coverage. However, not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity. *See Preston Ridge Fin. Servs. v. Tyler,* 796 S.W.2d 772, 777 (Tex.App.—Dallas 1990, writ denied); *Medical Towers v. St. Luke's Epis. Hosp.,* 750 S.W.2d 820, 822 (Tex.App.—Houston [14th Dist.] 1988, writ denied). The "without prejudice" clause by its own terms preserves the right to benefits "established ... while the coverage was in force." It does not create new rights or benefits beyond those afforded by the other provisions of the policy. And it is undisputed that Aetna paid the benefits to which Petitioner was entitled—payment of charges incurred while she was a covered dependent and for the one-year extension.

 **\*135**  Accordingly, we affirm the judgment of the court of appeals.

DOGGETT, Justice, joined by HIGHTOWER and GAMMAGE, Justices, delivered this Supplemental Dissenting Opinion on Petitioner's Motion for Rehearing.

[January 5, 1994]

In again rejecting Amy's plea for relief, the majority leaves all Texans without the security that should be at very core of health insurance.

At least today's substituted opinion has abandoned footnote five of the majority's prior writing, which suggested that ambiguities are not to be resolved against the insurer in an ERISA plan. *See* 36 Tex.Sup.Ct.J. 860, 864 n. 5. I have previously explained the reasons for rejecting this regressive rule. *See* 36 Tex.Sup.Ct.J. 860, 865–66, 869 (Doggett, J., dissenting).

However, the decision announced today remains wrong now for the other reasons it was wrong before, specifically the same "sweeping anti-consumer alteration of our longstanding method for interpreting insurance policies." *Id.* at 866. For this reason, I continue to dissent.

### DISSENTING OPINION ON MOTION FOR REHEARING

[May 5, 1993. [*] ]

DOGGETT, Justice, dissenting.

With the switch of a vote on rehearing, the law announced in this case a short while ago is no longer the law. Continuing to believe that this court's prior decision was correct, I incorporate it fully in this opinion. [1] *See* Appendix A.

The new majority opinion rejects our recent determination in *Gorman v. Life Ins. Co. of North Am.,* 811 S.W.2d 542, 547–48 (Tex.1991), and a substantial body of federal law [2] in refusing to treat Amy Miller's breach of contract pleading as a claim for benefits due under ERISA. *See* 36 Tex.Sup.Ct.J. 860, 863–864. This misapplication of the doctrine of federal preemption [3] is sufficient to achieve an Aetna victory and to create considerable injustice for Amy and others like her who have already secured judgments based on determinations that they have been illegally denied health care benefits. Unfortunately this is not enough for the majority when even more mischief can be accomplished by reaching out to address state law issues totally unnecessary to this judgment. First, in dicta it embraces the minority view that ambiguities in ERISA plans are not construed in favor of coverage. *See id.* at 864–865 n. 5. Despite then having two independent bases upon which to render judgment for Aetna, the majority then moves on to enact a sweeping anti-consumer alteration of our longstanding method for interpreting insurance policies.

Contrary to the repeated writings of this court in *Balderama v. Western Casualty Life Ins. Co.,* 825 S.W.2d 432, 434 (Tex.1991); *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); **\*136** *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex.1987); and many others, ambiguities will now be construed against the insurer only after the court attempts to remove any ambiguity through manipulation of general rules of contract interpretation. 36 Tex.Sup.Ct.J. at 864–865 n. 5. While it has never been, nor should it be, the law of Texas that an insured creates an ambiguity merely by filing suit, any policy subject to reasonable, conflicting interpretations had, until today, been considered ambiguous. But now the majority declares that, if the insurer creates an ambiguity by taking away in specific fine print most of the rights accorded the policyholder in the big print, the fine print will control. If courts always look to the *whole* document and must read even directly conflicting provisions together "to ascertain the agreement between the parties," 36 Tex.Sup.Ct.J. at 864, no insurance policy will ever be held ambiguous, and individual provisions that could reasonably be read to provide coverage will be uniformly ignored.

Amy Miller, a young quadriplegic, now leaves this court with nothing—without any of the means that a judge and jury in Lubbock, Texas thought essential to meeting her lifetime medical needs over the course of her now bleak future. But even more far-reaching is today's evisceration of previously well established state law designed to provide reasonable protection to insurance policyholders. The impact of today's opinion is potentially devastating to the rights of Texans who rightly expect their premiums to pay for more than the paper on which their policies are written. I dissent.

HIGHTOWER, GAMMAGE and SPECTOR, JJ., join in this opinion.

### APPENDIX A [**]

We consider whether cancellation of a comprehensive group accident and health insurance policy, subject to the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 (1988), terminates a plan participant's right to obtain payment of particular medical expenses resulting from a permanently disabling injury

suffered during the policy term. Under the policy provisions applicable here, the insurer remains obligated to cover medical expenses resulting from that injury that are already being provided at the time of termination.

## I.

In March 1985, fourteen year-old Amy Miller suffered serious accidental injuries that required extensive medical treatment, including lengthy hospital and rehabilitation clinic stays. She was left a permanently disabled, spastic quadriplegic, in need of twenty-four hour supervision. When injured, Amy was insured under a "Group Life and Accident Health Insurance Policy" with Aetna Life Insurance Company, obtained through E Triple M, Inc., a grocery store operated by Amy's father, Michael. Aetna continued paying her health care expenses until May 1986, one year after being succeeded as the group carrier by Safeco Life Insurance Company. At that time Safeco commenced payment of benefits, under its group policy, which was later converted to an individual policy for Amy. Safeco's subsequent non-payment resulted in litigation that has been separately resolved.

This action was brought against Aetna on behalf of Amy by her mother, Edwadine Forbau, [1] alleging breach of contract, bad faith, and violations of the Deceptive Trade Practices Act, Tex.Bus. & Com.Code §§ 17.41—17.826, and of the Insurance Code. Tex.Ins.Code art. 21.21. The trial court granted Aetna's motion for instructed verdict on all of Amy's claims except breach of contract. Based upon a jury verdict finding damages of $283,000 for medical expenses in the past and $2,500,000 for the future, as well as $500,000 in attorney's fees, the trial court rendered judgment for Amy. The court of appeals **\*137** reversed and rendered a take nothing judgment. 808 S.W.2d 664.

## II.

Aetna contends that ERISA preempts Amy's breach of contract action under state law and that because she did not plead ERISA, her action is totally barred. ERISA preempts state law actions that "relate to any employee benefit plan," a term that encompasses both pension plans and those providing insurance. See 29 U.S.C. §§ 1144(a), 1002(3), 1002(1). By paying a part of the premiums of its employees to Aetna, E Triple M maintained an employee welfare benefit plan under the terms of ERISA, *see Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 242 (5th Cir.1990), and Amy's claim is preempted as "relating to" this plan governed by federal statute. *See Cathey v. Metropolitan Life Ins. Co.,* 805 S.W.2d 387, 389–90 (Tex.1991); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39, 46 (1987); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983).

ERISA's civil enforcement section authorizes a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). State courts have concurrent jurisdiction with federal courts over such actions. *Id.* § 1132(e). The effect of applying ERISA was considered in *Gorman v. Life Ins. Co. of North Am.,* 811 S.W.2d 542, 548 (Tex.1991), where Justice Gonzalez wrote for a unanimous court that a "breach of contract claim ... may be characterized as a claim for benefits due under the terms of the plan," and that

> the fact that the claim is alleged in terms of state law does not preclude the court from adjudicating the case under the provisions of ERISA if state law is found to be preempted.

*Gorman,* 811 S.W.2d at 548. This conclusion is consistent with that of a number of federal courts that have authorized state law actions to proceed as claims under ERISA, despite preemption. *See Kuntz v. Reese,* 760 F.2d 926, 935 (9th Cir.1985), *vacated on other grounds,* 785 F.2d 1410 (9th Cir.) (per curiam), *cert. denied,* 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986); *Kelly v. Pan–Am. Life Ins. Co.,* 765 F.Supp. 1406, 1408 (W.D.Mo.1991); *Powell v. Bob Downes Chrysler–Plymouth, Inc.,* 763 F.Supp. 1023, 1027 (E.D.Mo.1991); *Davis v. John Alden Life Ins. Co.,* 746 F.Supp. 44, 49

(D.Kan.1990); *Board of Trustees of Cedar Rapids Pediatric Clinic, P.A., Pension Plan v. Continental Assurance Co.,* 690 F.Supp. 792, 795 (W.D.Ark.1988). In claiming that Aetna was prejudiced because Amy asked for damages for breach of contract rather than "benefits due" under ERISA, the dissent ignores these federal authorities which have approved essentially the same approach that we adopted in *Gorman.* While the preemptive effects of ERISA are farreaching, we are not inevitably compelled, as the dissent urges, to construe the law in every case against whomever seeks benefits due. We therefore address the merits of Amy's claim in the context of ERISA.

## III.

While the federal common law of contracts must be applied in interpreting policy terms for purposes of ERISA, *see Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987), we do so by drawing from state law to the extent it is consistent with the purposes and policies underlying ERISA. *See Woodfork v. Marine Cooks & Stewards Union,* 642 F.2d 966, 973 (5th Cir.1981) (allowing interpretation under federal common law of pension plan's terms in light of a worker's pre-ERISA state law rights); *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown,* 897 F.2d 275, 281 (7th Cir.), *cert. denied,* 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990) (federal common law rules properly developed from state law "consistent with the policies underlying the federal statute at issue") (citation omitted); *Building Serv. Employees Pension Trust v. American Bldg. Maintenance Co.,* 828 F.2d 576, 578 (9th Cir.1987) (applying California contracts principles as federal **\*138** law). Accordingly, we look to the law of Texas in applying federal common law to resolve whether cancellation of a comprehensive group accident and health insurance policy terminates a plan participant's right to obtain payment of particular medical expenses resulting from a permanently disabling injury suffered during the policy term.

Amy contends that Aetna's responsibility to pay certain nursing care vested at the time she was injured, and that its contractual commitment would therefore extend to all such resulting expenses regardless of whether the group policy had been terminated. Aetna maintains that Amy's right to recover medical expenses accrues as these are incurred, and that its obligation extends only to those health care services actually received during the stated period of coverage. Resolution of this dispute requires careful review of the actual terms of the policy—if plain and unambiguous, they must be given effect; if susceptible to more than one reasonable interpretation, resort must be had to rules of construction. *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987); *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984); *Glover v. National Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977).

This contract, entitled a "Group Life and Accident and Health Insurance Policy," provides "Comprehensive Medical Expense Benefits." [2] By choosing these descriptive terms, Aetna has itself identified this as a comprehensive accident policy, rather than as the less extensive incurrence-of-expense policy now urged. Likewise, in the "Application for Group Coverage" prepared by it, Aetna depicted coverage for "comprehensive medical expenses" as "unlimited." Such an unlimited, comprehensive accident policy is subject to a reasonable construction that all expenses resulting from an injury occurring while the policy is in force are covered, regardless of when incurred. [3]

Largely ignoring the foregoing, the court of appeals concluded that Aetna provided an incurrence-of-expense policy with no post-termination coverage by relying instead on a number of unconnected clauses:

On page 4100, "COMPREHENSIVE MEDICAL EXPENSE BENEFITS" are explained: "If Covered Medical Expenses are *incurred ...* for treatment of a *covered family member,* Aetna will pay ..." (*emphasis added* ).

On page 3500, "Incurred Charge" is defined as: "The charge for a service or supply is considered to be incurred on the date it is furnished."

Page 4800 includes the "GENERAL EXCLUSIONS" which state that the "policy does not provide insurance for ... [c]harges incurred as to a person while he is not a covered family member."

On page 6000, a "TERMINATION OF COVERAGE" clause outlines that "[c]overage of an individual will terminate upon ... [d]iscontinuance of this policy as to such coverage."

808 S.W.2d at 666.

These four provisions provide little guidance. The first does not explain or otherwise define "Comprehensive Medical Expense Benefits." Rather, as a prelude to listing particular covered medical expenses, it indicates that if these are "incurred during a calendar year, for treatment of a covered family member, Aetna will pay a benefit...." [4] Neither the definition of "incurred **\*139** charge" as one considered to be "incurred on the date it is furnished," nor any other contractual provision explicitly limits payments to those "incurred" as there defined. [5] Similarly, the phrase "covered family member" in the third provision is nowhere defined, although Amy presumably would be included, since it is undisputed that she was a covered dependent. If the policy provides comprehensive and unlimited coverage to such family members, vesting when the injury occurs, there is no reason why Amy cannot be seen as still "covered" beyond termination. Finally, although the termination provision stops coverage "upon ... [d]iscontinuance of [the] policy," it is not clear whether coverage ceases for future injuries or rather for future expenses resulting from injuries that have already been covered. [6]

These disparate sections of the policy do not combine to create an exclusion. It is incumbent on the insurer that any "intent to exclude coverage must be expressed in clear and unambiguous language." *National Union Fire Ins. Co.,* 811 S.W.2d at 555. *See also Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 737 (Tex.1990). This Texas rule of construction furthers the Congressional purpose of "protect[ing] interstate commerce and the interests of participants in employee benefit plans and their beneficiaries ...," 29 U.S.C. § 1001(b). This same rule of construing ambiguities against the insurer is part of the federal common law for purposes of interpreting an ERISA plan. *See Masella v. Blue Cross & Blue Shield of Conn.,* 936 F.2d 98, 107 (2d Cir.1991); *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 538–41 (9th Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990); *Phillips v. Lincoln Nat'l Life Ins. Co.,* 774 F.Supp. 495, 498 (N.D.Ill.1991); *Emter v. Columbia Health Services,* [63 Wash.App. 378], 819 P.2d 390, 392–93 (Wash.Ct.App.1991); *see also Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1286 (11th Cir.), *cert. denied,* [498] U.S. [890], 111 S.Ct. 232, 112 L.Ed.2d 192 (1990). *But see Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150 (8th Cir.1990); [7] *McGee v. Equicor–Equitable HCA Corp.,* 953 F.2d 1192, 1200 n. 11 (10th Cir.1992) (noting federal circuit split regarding application of this rule to an ERISA case, but declining to reach the question). The dissent demands uniformity when only disagreement exists among the federal circuits. 36 Tex.Sup.Ct.J. 140, 148–149 (Cornyn, J., dissenting). In this situation, our responsibility as an independent state court is to assist the federal judiciary in shaping ERISA law. The dissent would deprive Texas a voice in that basic process.

Exclusions must be explicit to ensure that a policyholder's reasonable expectation of coverage is not thwarted. *See Kulubis v. Texas Farm Bureau Underwriters Ins. Co.,* 706 S.W.2d 953, 955 (Tex.1986); *Kelly Assocs., Ltd. v. Aetna Casualty & Sur. Co.,* 681 S.W.2d 593, 596 (Tex.1984); *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 347 (Tex.1976). Texas has traditionally construed terms in insurance contracts "from **\*140** the viewpoint of the insured." *Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 557 (Tex.1976); *see also Commonwealth Bonding & Casualty Ins. Co. v. Bryant* [113 Tex. 21], 240 S.W. 893, 894 (1922) (considering the insured's reasonable belief as to coverage in interpreting policy language). Where an insurer has not "clearly limited benefits," "the reasonable understanding of employees" is an appropriate consideration under ERISA, a purpose of which is "protecting the reasonable expectations of plan participants." *Henglein v. Informal Plan* [974 F.2d 391, 400], Nos. 91–3379, 91–3413, 1992 WL 215935, at \*6–7 (3d Cir. Sept. 8, 1992). [8]

In the language of the subject policy, we find no clear intention to avoid responsibility for legitimate medical expenses arising from an injury that occurred prior to termination. The policy, read as a whole, at the very least could reasonably be construed to afford comprehensive accident insurance rather than coverage limited to expenses incurred during the policy term. The court of appeals nonetheless found the policy to be "clear, unambiguous and susceptible of only one meaning which leaves nothing to be construed." 808 S.W.2d at 667. In concluding that no additional contractual benefit was accorded by the "plain language" of the contract, the court of appeals also focused on the following clause:

> If any benefit ceases to apply to an individual or a dependent, coverage for that benefit will cease immediately for that person but *without prejudice* to any rights under the benefit [sic] established by the person while the coverage was in force.

*Id.* at 666 (emphasis added). The court explained:

> This clause would only be pertinent if the policy was in effect, and a covered individual was receiving a particular *benefit* at a time when that benefit was going to cease to be a [sic] provided by the policy. In such a case, which is not before us, cessation of the benefit would not accrue to the detriment of the individual who was receiving that particular benefit and who would continue to be covered by the remainder of the policy.

*Id.* n. 4.

Under an alternative reading, Amy alleges that her right to benefits vested "while the coverage was in force," and that this right therefore could not be "prejudiced" upon termination. Lacking a definition of "benefit," **\*141** the policy contains no controlling term that precludes Amy's interpretation of her coverage. A "benefit" is "a payment or service provided for under an ... insurance policy." *Webster's Ninth New Collegiate Dictionary* 144 (1989). In construing such a term, we are charged with using its plain or "popular" meaning. *Ramsay,* 533 S.W.2d at 346. The word benefit as used in the "without prejudice" clause could mean that any medical payment or service already being provided would not cease upon termination.

The policy does contain a second "without prejudice" clause that appears to comport more closely with the meaning ascribed to the first clause by the court of appeals. It is, however, worded differently:

> If coverage for a family member *under a benefit section* terminates while he is totally disabled, any benefit provided by the section for that family member only will continue to be available for expenses incurred while he continues to be totally disabled, but not after 3 months from the termination date. [9]

Under this language, particular payments under a "benefit section" will continue if the policy is altered or terminated or if the family member is for any other reason no longer covered. This second provision seems to discuss the ongoing receipt of the limited and *"particular benefits"* contemplated by the court of appeals. 808 S.W.2d at 664 n. 4. Aetna should not be presumed to intend the same meaning in two provisions when it uses different language in each—"*any* benefit" rather than "any benefit provided *by the section* for that family member." (emphasis added). Furthermore, the second "without prejudice" clause contains an explicit limitation on the duration of coverage. Because no such limitation exists in the first clause, we must presume that it was intentionally excluded from that clause. Such an alternative reading would avoid duplicative readings of differently worded provisions.

This reasonable interpretation, in conflict with that of the court of appeals, indicates an ambiguity. [10] Not only is the first without prejudice clause unclear, but even the court of appeals' reading of this contractual language is susceptible to a second meaning:

[T]he clause "would only be pertinent if the policy was in effect [as it was here], and a covered individual [Amy] was receiving a particular *benefit* [payment for home nursing care] at a time when that benefit was going to cease [when the policy was cancelled] to be a [sic] provided by the policy." [11]

With such ambiguity present, the policy must be strictly construed "in favor of coverage." *Balderama v. Western Casualty Life Ins. Co.,* 825 S.W.2d 432, 434 (Tex.1991) (citing *Barnett,* 723 S.W.2d at 666); *see also National Union Fire Ins. Co.,* 811 S.W.2d at 555. Here Amy's contractual interpretation appears to be the more plausible alternative, but even if this were not true, we would be required to:

> [A]dopt the construction of an exclusionary clause urged by the insured so long as that construction is not [itself] unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.

*National Union Fire Ins. Co.,* 811 S.W.2d at 555; *see also Glover,* 545 S.W.2d at 761; *Barnett,* 723 S.W.2d at 666; *Continental Cas. Co. v. Warren,* [152 Tex. 164], 254 S.W.2d 762, 763 (Tex.1953). [12] Read in conjunction with the first "without prejudice" clause, the policy can certainly be interpreted reasonably to contemplate coverage for a health care benefit already being received prior to termination.

**\*142** A reasonable expectation of coverage finds support even in the direct testimony of Aetna's own legal officer regarding the company's other policies that include a dollar limitation on total payments. She explained that under those policies coverage extends to any medical expenses resulting from an accident "*regardless if the policy is terminated or not.*" Since the total amount of bills paid in no way affects the *duration* of coverage in Amy's policy, this testimony supports construing any ambiguity in favor of coverage for her.

While we have not before been confronted specifically with whether benefits may extend beyond termination of a policy, many Texas courts have already resolved the question in favor of the policyholder. *See, e.g., Washer v. Continental Casualty Co.,* 418 S.W.2d 900, 903 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.); *American Bankers Ins. Co. v. McDonald,* 369 S.W.2d 688 (Tex.Civ.App.—Austin 1963, writ dism'd); *Drinkard v. Group Hospital Serv., Inc.,* 366 S.W.2d 637 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.); *Maryland Casualty Co. v. Thomas,* 289 S.W.2d 652 (Tex.Civ.App.—Amarillo 1956, writ ref'd n.r.e.); *American Benefit Assoc. v. Russell,* 278 S.W.2d 316, 318 (Tex.Civ.App.—Amarillo 1954, writ dism'd); *Nat'l Life & Accident Ins. Co. v. Dove,* 167 S.W.2d 257 (Tex.Civ.App.—Beaumont 1942), *aff'd on other grounds* [141 Tex. 464], 174 S.W.2d 245 (Tex.1943); *American Casualty Co. v. Horton,* 152 S.W.2d 395, 399 (Tex.Civ.App.—Dallas 1941, writ ref'd n.r.e.).

In *Drinkard,* an insured was entitled to medical benefits under two group policies. 366 S.W.2d at 637–38. After contracting cancer, she received payment for more than one year from the insurers for resulting medical expenses. Two months after ceasing her monthly premium payments, however, she suffered a recurrence, for which additional treatment was required. Refusing to pay any of those later expenses, the insurers contended, as does Aetna here, that the contingency insured against was the incurring of expenses, not the physical condition that produced them. *Id.* at 638. This argument was rejected with the conclusion that "the event or contingency insured against having occurred during the life of the policies, the refusal of the companies to pay the expenses incurred *after termination* would have constituted a breach of the contracts." *Id.* at 639 (emphasis added). Since the pertinent provisions in *Drinkard* were no more ambiguous than the "without prejudice" clause involved here, we find that case to be particularly instructive. [13]

Similarly, in *Thomas,* where the insurance policy provided that the insurer would "pay all reasonable expenses incurred within one year from the date of the accident," 289 S.W.2d at 653, the court interpreted the word "incurred" as covering:

> [A]ll reasonable expenses ... for the repairs of [the insured's] injuries caused by the accident whether the services correcting them have or have not been performed within one year from the date of the accident.

*Id.* at 655. Thus, "incurred" was given its ordinary meaning of incurring liability rather than expenses. [14]

**\*143** These Texas authorities are in accord with the nationwide majority approach. [15] Much of this body of law holds that an accident or injury vests liability beyond termination based on the interpretation of the policy itself. [16] At least three times, the Texas appellate decision in *Horton,* 152 S.W.2d 395, has been relied upon by another state's supreme court in upholding benefit continuation after policy termination. *See Loesekan v. Benefit Trust Life Ins. Co.* [37 Colo.App. 493], 552 P.2d 36, 37 (Colo.1976); *Service Life Ins. Co. v. Branscum* [234 Ark. 463], 352 S.W.2d 586, 588 (Ark.1962); *Intercoast Mutual Life Ins. Co. v. Andersen* [75 Nev. 457], 345 P.2d 762, 764 (Nev.1959). Indeed, the language at issue in Nevada was similar to the instant "without prejudice" clause and was construed to establish an accident policy that provided benefits beyond termination. *Andersen,* 345 P.2d at 764 (considering language that "termination shall be without prejudice to any claim originating prior thereto"). Among those few states that appear to have adopted the minority incurrence-of-expense approach, we are unaware of any case that is not distinguishable. [17]

Commentators have also recognized that cancellation of a group accident policy does not relieve the insurer of responsibility for injuries sustained during the life of the policy. As one leading source long ago indicated:

> Where an accident policy is in full force and effect when [an] insured sustains an accidental injury, his cause of action arises immediately, *regardless of whether the policy is kept alive by subsequent payments of premiums,* and he is entitled to recover the full amount of indemnity provided.

45 C.J.S. *Insurance,* § 897, at 977 (1946) (emphasis added) (citing *Horton,* 152 S.W.2d 395. *See also* Annotation, *Cancellation or Modification of Master Policy as Termination of Coverage under Group Policy,* 68 A.L.R.2d 249, § 17[a], at 279 (1959). This rule remains the same today. *See* 1 John A. Appleman, *Insurance Law and Practice,* § 46, at 163–64 (1981) ("where the insured was disabled or hospitalized" prior to termination of the policy, "any rights [already] accrued ... will be protected by the courts"); 44 Am.Jur.2d *Insurance,* § 1869, at 865–66 (1982). *See also* 19 *Couch on Insurance* 2d, § 82:121, at 864 (Rev. ed. 1983) ("Since rights vest upon a loss, a cancellation of the [group] policy cannot destroy liability which has already attached for prior disability or death").

To limit its liability, an insurer must make explicit that it is offering only a limited coverage, **\*144** incurrence-of-expense policy that excludes payment for any service of any type rendered after the policy ends. *See National Union Fire Ins. Co.,* 811 S.W.2d at 555. Such clarity helps to ensure that no party to the contract is misled. Aetna failed to limit its coverage unambiguously, and therefore it is obligated under ERISA to compensate Amy for medical expenses arising from the injury she suffered during the policy term. [18]

## IV.

Although the parties have not briefed the issue, we must address the trial court's judgment for future medical expenses. The provision in ERISA allowing for declaratory or injunctive relief "to clarify [a beneficiary's] rights to future benefits under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B), may implicitly negate the possibility of recovering those expenses as damages. Accordingly, the trial court should reform the judgment to order that Aetna pay Amy's future medical expenses as they occur. While Amy's pleadings did not expressly request injunctive or declaratory relief, her prayer for future medical expenses can be characterized as a request for declaratory relief under ERISA. Such relief accords with

*Gorman* and the general rule that "the petition will be construed as favorably as possible for the pleader." 811 S.W.2d at 548 n. 9 (quoting *Gulf, Colo. & Santa Fe Ry. v. Bliss,* 368 S.W.2d 594, 599 (Tex.1963)).

### V.

We also consider whether the trial court erred in failing to award Amy prejudgment interest. The Aetna policy itself does not set out a measure of interest, but under ERISA Amy was entitled to prejudgment interest as a matter of federal common law. *See Rivera v. Benefit Trust Life Ins. Co.,* 921 F.2d 692, 696 (7th Cir.1991) (under federal common law, "prejudgment interest should be *presumptively* available to victims of federal [ERISA] law violations") (emphasis in original); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1219 (8th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981) (prejudgment interest necessary to accomplish ERISA's remedial purposes). The trial court lacks discretion to deny an award of prejudgment interest in ERISA cases. *Short v. Central States, Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 576 (8th Cir.1984) (district court erred as a matter of law in denying prejudgment interest as to ERISA claim); *Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson Co.,* 896 F.2d 228 (7th Cir.1990) (prejudgment interest presumptively allowed); *see also Sweet v. Consolidated Aluminum Corp.,* 913 F.2d 268, 270 (6th Cir.1990) (citing *Short* in upholding district court's grant of prejudgment interest). The trial court thus erred in failing to award such interest, and we remand to allow it to compute interest according to Texas law. *See Dependahl,* 653 F.2d at 1219–20 (applying state statutory interest rate as federal common law). Because the sum payable is not ascertainable from the contract, the rate of equitable prejudgment interest should be determined by the statutorily specified rate. *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930 (Tex.1988); *see* Tex.Rev.Civ.Stat. art. 5069–1.05 (Vernon Supp.1992).

### VI.

We find the other points raised by Aetna to the court of appeals to be without merit. [19] **\*145** We reverse the judgment of that court and remand the cause to the trial court to compute prejudgment interest, to render judgment as to past "benefits due" and attorney's fees, and to reform the judgment to provide Amy declaratory relief ordering that Aetna pay future expenses as they occur, in accordance with this opinion.

**All Citations**

876 S.W.2d 132, 17 Employee Benefits Cas. 2163

Footnotes

\*  Editor's Note: The court's May 5, 1993 Opinion on Motion for Rehearing was withdrawn and substituted January 5, 1994. Justice Doggett's May 5, 1993 Dissenting Opinion stands as delivered.

1   We also agree with the court of appeals that the issue of whether the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 (1988) (ERISA), preempts Petitioner's state law claims in this case is "immaterial." 808 S.W.2d at 665 n. 2.
    We do note, however, that although the result—a judgment favorable to Aetna—would be the same in this case under ERISA and state contract law, we disapprove of the court of appeals' statement to the extent that it suggests that the remedies under ERISA are identical to those available under a state law contract action. The remedies available under ERISA are a declaratory judgment on entitlement to benefits, an injunction against a plan administrator's improper refusal to pay benefits, removal of the fiduciary, and an award of benefits due and attorneys' fees. 29 U.S.C. § 1132(a)(3). ERISA's remedies are exclusive, and do not include extracontractual compensatory or punitive damages. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 53, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987).

2   Coverage of an individual terminates when the policy is discontinued or when the individual's employment terminates. Group Policy at 6000. "Any Dependant Coverage of an individual will terminate ... when the individual ceases to be in a class of individuals eligible for such Dependant Coverage." Group Policy at 6010.

3 The policy provides:

> If coverage for a family member ... terminates while he is totally disabled, any benefit provided ... for that family member will continue to be available for expenses incurred while he continues to be totally disabled but not beyond 12 months from the termination date. Group Policy at 6210.

This section applies only to claims made under the Major Medical, Comprehensive Dental, or Comprehensive Benefit sections of the contract.

4 From May 1, 1985, until April 30, 1986, Aetna paid claims for medical benefits and nursing care under the policy's one-year extension of coverage. After that year passed, Petitioner submitted no further proofs of loss to Aetna.

* Editor's Note: The court's May 5, 1993 Opinion on Motion for Rehearing was withdrawn and substituted January 5, 1994. Justice Doggett's May 5, 1993 Dissenting Opinion stands as delivered.

1 This is the approach employed by then Justice Calvert when he experienced a similar change on rehearing. *See Pan Am. Life Ins. Co. v. Andrews,* 161 Tex. 391, 340 S.W.2d 787, 796 (1960) (Calvert, J., dissenting) ("My views of the case and concerning a proper decision ... remain the same as when they were expressed as the views of the majority in the attached opinion, and I accordingly now file the opinion as a dissent."). My prior opinion makes reference to Justice Cornyn's original dissent, which is found at 36 Tex.S.Ct.J. 148 (Nov. 6, 1992).

2 *See* Appendix A, *infra* at 136.

3 Overly expansive interpretation of the preemptive scope of the Employees' Retirement Income Security Act (ERISA), has substantially barred the application of state law to group insurance policies. *See Cathey v. Metropolitan Life Ins. Co.,* 805 S.W.2d 387, 394 (Tex.1991) (Doggett, J., concurring) ("ERISA has become 'quicksand' that 'will continue to expand and to preempt everything in its meandering path' ") (quoting *Jordan v. Reliable Ins. Co.,* 694 F.Supp. 822, 835 (N.D.Ala.1988)).

** Editor's Note: The court's original opinion was filed November 4, 1992 and subsequently withdrawn and substituted on rehearing May 5, 1993. The court's May 5, 1993 opinion on rehearing was withdrawn and substituted on rehearing by opinion filed January 5, 1994, published herein.

1 Not at issue in this appeal is the trial court's summary judgment in favor of another defendant, Affiliated Foods, a cooperative through which E Triple M obtained the Aetna group policy.

2 Group Life and Accident and Health Insurance Policy at 1012–13 [hereinafter "Group Policy"].

3 Although unable to explain away this policy language, the dissent disparages it as mere "captions." 36 Tex.Sup.Ct.J. 140 at 150 (Cornyn, J., dissenting). But captions or headings that are "repugnant or misleading as to the requirements or coverage in the policy," *Mosby v. Mutual Life Ins. Co. of N. Y.* [405 Ill. 599], 92 N.E.2d 103, 107 (Ill.1950), create an ambiguity which must be resolved in favor of the insured. *See Wise v. Westchester Fire Ins. Co.,* 463 F.2d 386, 389–90 (10th Cir.1972) ("the language of this caption as well as all other policy provisions ... should be interpreted as meaning what a reasonable person in the position of the insured would understand it to mean"); *see also Johnson v. Lincoln Nat'l Life Ins. Co.,* [69 Ohio App.3d 249], 590 N.E.2d 761, 765 (Ohio Ct.App.1990); *Mohan v. Union Fidelity Life Ins. Co.* [207 Pa.Super. 205], 216 A.2d 342, 348 (Pa.Super.Ct.1966).

4 Group Policy at 4100.

5 Counsel for Aetna conceded at oral argument that the exact term "incurred charge" appears in no "pertinent benefit section."

6 Another section not discussed by the court of appeals is an extension of benefits clause providing that when coverage "under a benefit" terminates while a covered person is totally disabled, any benefit will be available for up to one year beyond cancellation. Group Policy at 6210. While appearing to contemplate that *all* benefits would continue for a year, meaning full coverage, this section does not clarify whether other specific benefits already being received could be continued beyond that year.

7 The dissent favors the minority view that under ERISA any disputed plan language must be construed "without deferring to *either* party's interpretation." *Brewer,* 921 F.2d at 153. Incredibly, this assertion is based on *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112, 109 S.Ct. 948 [955], 103 L.Ed.2d 80, 93 (1989), which explicitly rejected an employer's attempts to "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted", and further noted that "[a]ctions challenging an employer's denial of benefits before the enactment of ERISA were governed by principles of contract law." 489 U.S. at 112–14 [109 S.Ct. at 955–56].

> Today we follow a rule of insurance policy construction adopted throughout this nation. Application of this rule is fully consistent with the *Firestone* holding that, in exercising *de novo* review of a plan administrator's denial of benefits, courts must not defer to the administrator's interpretation of the plan. 489 U.S. at 112 [109 S.Ct. at 955].

8 The concept of considering the policyholder's reasonable expectations is a cause of great consternation for the dissent. As at least one of its cited commentators indicates, there is a difference between reliance on reasonable expectations as a factor in the interpretation of *ambiguous* provisions and in their use to disregard *unambiguous* provisions. *See* Roger Henderson, "The Doctrine of Reasonable Expectations in Insurance Law After Two Decades" 51 OHIO ST. L.J. 823, 827 (1991). The

insured's expectations are frequently considered in the interpretation of inexact policy language. *See Simon v. Continental Ins. Co.,* 724 S.W.2d 210, 212 (Ky.1987) (policyholder's expectations are an "essential tool in deciding whether an insurance policy is ambiguous, and consequently should be interpreted in favor of the insured"); *Sparks v. Republic Nat'l Life Ins. Co.* [132 Ariz. 529], 647 P.2d 1127, 1135 (Ariz.1982) (policy "language should be viewed from the standpoint of the average layman who is untrained in the law or insurance"); *Myers v. Kitsap Physicians Serv.* [78 Wash.2d 286], 474 P.2d 109, 111 (Wash.1970) (considering interpretation of "average man purchasing insurance"); *Brown v. City of Laconia* [118 N.H. 376], 386 A.2d 1276, 1277 (N.H.1978) ("insurance policies are interpreted from the standpoint of the average layman"); *Gowing v. Great Plains Mut. Ins. Co.* [207 Kan. 78], 483 P.2d 1072, 1075 (Kan.1971) (in construing ambiguous provisions, "we must ascertain that meaning of the contract which the insured would reasonably expect") (quoting *Gray v. Zurich Ins. Co.* [65 Cal.2d 263, 54 Cal.Rptr. 104], 419 P.2d 168, 171 (Cal.1966)). Disregarding these authorities and this distinction, the dissent misattributes the latter approach about which it comments at length on concerns in no way raised by today's writing. *See* 36 Tex.Sup.Ct.J. at 152, 153 (Cornyn, J., dissenting). The dissent would have been better advised to rely upon the conclusion of its own source:

> No insurance system can be fair and equitable where would-be insureds are deprived of the opportunity to participate intelligently in the system because of some obfuscating factor that is beyond their control. The principle of reasonable expectations emerged in recognition of the need to eliminate these barriers to intelligent participation. It has evolved over the past two decades into a doctrine that balances the needs of insureds against those of insurers....

Henderson, *supra,* at 853.

Group Policy at 6200 (emphasis added).

The dissent is correct that "it has never been the law of Texas" that an insured can create an ambiguity in an otherwise unambiguous policy by simply challenging the insurer's interpretation. 36 Tex.Sup.Ct.J. at 151 (Cornyn, J., dissenting). A policy is ambiguous only when susceptible to more than one *reasonable* interpretation.

Motion for Rehearing of Application for Writ of Error at 7 (quoting 808 S.W.2d at 666 n. 4).

This is true even where the one provision that may reasonably be interpreted to assure coverage for the insured is in conflict with other provisions of the contract.

Contractual language that "for the purpose of benefits under this Rider, a subsequent diagnosis of cancer shall be considered a continuation of the previous cancer," was relied upon in *Drinkard* to determine that what otherwise appeared to be an incurrence-of-expense policy was really an accident policy. 366 S.W.2d at 638–39. *Drinkard* certainly cannot be disregarded, as it was by the court of appeals, solely on the grounds that an ambiguity was present in that case but not here. 808 S.W.2d at 667.

The court of appeals distinguished *Thomas* because the policy in that case failed to define "incurred." 808 S.W.2d at 667. Indeed, a result contrary to *Thomas* was reached in two other cases in which the policy did contain such a definition. *Riverside Ins. Co. of Am. v. Cargill,* 570 S.W.2d 455 (Tex.Civ.App.—Amarillo 1978, no writ); *Northwestern Nat'l Life Ins. Co. v. Glenn,* 568 S.W.2d 693 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.). The *Cargill* court reached a conclusion contrary from that of the earlier Amarillo court in *Thomas* in a case involving the same policy language. In both *Cargill* and *Glenn,* however, the entirety of the policy was apparently found to be unambiguous, and no other provision in the policy was brought to the court's attention that indicated the possibility of continued coverage, as opposed to the present policy and its "without prejudice" clause. These two cases are limited to the unambiguous contracts before those courts, and do not apply to an ambiguous policy. *See Riverside,* 570 S.W.2d at 456 (limiting its holding to "the same or similar policy provisions as before us").

*See* C.T. Dreschler, *Time of Disability or Death with Regard to Termination of Coverage under Group Policy,* 68 A.L.R.2d 150, § 2, at 156–57 (1959). *See also* C.T. Dreschler, Annotation, *Insurer's Liability under Accident Policy which Terminated after Accidental Injury but Prior to Completion of Medical Treatment, Hospitalization, and the Like,* 75 A.L.R.2d 876, § 1[a], at 877 (1961).

*See, e.g., Faruque v. Provident Life & Accident Ins. Co.* [31 Ohio St.3d 34], 508 N.E.2d 949 (Ohio 1987); *Lutsky v. Blue Cross Hosp. Serv., Inc. of Missouri,* 695 S.W.2d 870 (Mo.1985); *Sparks v. Republic National Life Ins. Co.* [132 Ariz. 529], 647 P.2d 1127 (Ariz.1982), *cert. denied,* 459 U.S. 1070 [103 S.Ct. 490, 74 L.Ed.2d 632]; *Myers v. Kitsap Physicians Serv.* [78 Wash.2d 286], 474 P.2d 109 (Wash.1970); *Mote v. State Farm Mutual Automobile Ins. Co.,* 550 N.E.2d 1354 (Ind.App.1990); *Greenspan v. Travelers Ins. Co.* [98 Misc.2d 43], 412 N.Y.S.[2d] 1009 (N.Y.App.Div.1979); *Blue Cross–Blue Shield of Alabama v. Turner* [43 Ala.App. 542], 195 So.2d 807 (Ala.App.1966); *Erwin v. United Beneficial Life Ins. Co.* [70 N.M. 138], 371 P.2d 791 (N.M.1962). *See also Fields v. Blue Shield of California* [163 Cal.App.3d 570], 209 Cal.Rptr. 781 (Cal.App.1985); *Danzig v. Dikman* [78 A.D.2d 303], 434 N.Y.S.2d 217 (N.Y.App.Div.1980), *aff'd* [53 N.Y.2d 926, 440 N.Y.S.2d 925] 423 N.E.2d 403 [402] (N.Y.1981) (benefits extend beyond modification of a policy).

For example, *Jefferson v. State Farm Ins. Co.* [380 Pa.Super. 167], 551 A.2d 283 (Pa.1988), involved a contract containing a "without prejudice" provision that was construed as an incurrence-of-expense policy. Unlike the disputed provision here, however, any ambiguity was eliminated by including a specific end date to the continuation of benefits in the "without

prejudice" clause. Likewise, in a number of other cases holding that contracts were incurrence-of-expense policies, there was no ambiguity present. *See, e.g., Wulffenstein v. Desert [DeSeret] Mutual Benefit Ass'n,* 611 P.2d 360 (Utah 1980); *Hein v. American Family Mutual Ins. Co.,* 166 N.W.2d 363, 369 (Iowa 1969).

In demanding that Amy receive nothing since she failed to submit any proof of loss after May 1, 1986, 36 Tex.Sup.Ct.J. at 152 (Cornyn, J., dissenting), the dissent ignores testimony by Michael Miller that Aetna would not provide further coverage after that date. "[A] denial by [the insurer] of liability under the policy is a waiver of proof of loss enabling the insured to maintain a suit on the policy without furnishing such proof." *Sanders v. Aetna Life Ins. Co.* [146 Tex. 169], 205 S.W.2d 43, 45 (Tex.1947); *see also Womack v. Allstate Ins. Co.* [156 Tex. 467], 296 S.W.2d 233, 236–37 (Tex.1957). Because this testimony that Aetna denied coverage was uncontroverted, no jury finding was necessary. *See Sanders,* 205 S.W.2d at 44–45; *American Teachers Life Ins. Co. v. Brugette,* 728 S.W.2d 763, 764 (Tex.1987); *First Southwest Lloyds Ins. Co. v. MacDowell,* 769 S.W.2d 954 (Tex.App. —Texarkana 1989, writ denied); *see also Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 568 (Tex.1990) (Hecht, J., concurring) ("an insurer's denial of a claim before the deadline for presenting the required proof of loss waives that requirement as a matter of law").

Among them is Aetna's contention that trial should have been to the court without a jury. Although some decisions have held that litigants bringing an ERISA action in federal court have no right to a jury trial, *see, e.g., In re Vorpahl,* 695 F.2d 318 (8th Cir.1982), many courts have reached a contrary result after *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112–14, 109 S.Ct. 948 [955–56], 103 L.Ed.2d 841 [80] (1989), which required de novo review of denials of benefit claims under ERISA. *See, e.g., McDonald v. Artcraft Elec. Supply Co.,* 774 F.Supp. 29 (D.D.C.1991); *Steeples v. Time Ins. Co.,* 139 F.R.D. 688 (N.D.Okl.1991); *Vicinanzo v. Brunschwig & Fils, Inc.,* 739 F.Supp. 882 (S.D.N.Y.1990); *Rhodes v. Piggly Wiggly Ala. Dist. Co.,* 741 F.Supp. 1542 (N.D.Ala.1990). In exercising concurrent jurisdiction, state courts must apply the substantive federal law of ERISA; however, they remain free to apply their own rules of procedure. While the right to trial by jury is a substantive liberty guarantee of fundamental importance, it has been considered a procedural right in the context of state enforcement of federal rights. *See Overcash v. Blue Cross & Blue Shield* [94 N.C.App. 602], 381 S.E.2d 330, 338–39 (N.C.Ct.App.1989) (state right to jury trial applicable to ERISA civil enforcement action). Because Amy's right to trial by jury is clearly established under Texas law, the trial court did not err in affording her that right.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

82 S.W.3d 71
Court of Appeals of Texas,
San Antonio.

LIBERTY MUTUAL, Appellant,

v.

Michael KINSER, Appellee.

No. 04–01–00507–CV.
|
April 10, 2002.

Worker's compensation insurance carrier sued injured employee alleging it was subrogated to employee's right to underinsured motorist (UIM) benefits from employee's personal automobile insurer. Employee moved for summary judgment. The 407th Judicial District Court, Bexar County, Pat Priest, J., granted judgment to employee. Insurer appealed. The Court of Appeals, Phil Hardberger, C.J., held that: (1) worker's compensation insurance carrier was not subrogated to injured employee's right to UIM benefits from his personal automobile insurer, and (2) carrier's claim that employee converted UIM benefits lacked merit.

Affirmed.

West Headnotes (6)

**[1]    Workers' Compensation** 🔑 Subrogation or assignment in general

Underinsured motorist (UIM) benefits were not "damages" pursuant to worker's compensation subrogation statute, and thus, worker's compensation insurance carrier was not subrogated to injured employee's right to underinsured motorist (UIM) benefits from his personal automobile insurer; statute authorizing subrogation for damages from third-party implied that third-party was tortfeasor. V.T.C.A., Labor Code § 417.001(a, b).

5 Cases that cite this headnote

**[2]    Damages** 🔑 Nature and theory of pecuniary reparation

Actual damages are those that are recoverable at common law.

Cases that cite this headnote

**[3]    Damages** 🔑 Nature and theory of compensation

An award of "damages" is defined as the sum of money the law awards as pecuniary compensation, recompense, or satisfaction for an injury done or a wrong sustained as a consequence of a breach of a contractual obligation or a tortious act.

Cases that cite this headnote

**[4]    Workers' Compensation** 🔑 Subrogation or assignment in general

Workers' compensation insurance carrier's claim that injured employee converted funds underinsured motorist (UIM) benefits paid by employee's personal automobile insurer when insurer paid benefits directly to employee lacked merit, where insurer had no right of subrogation to the benefits under workers' compensation statute governing subrogation rights. V.T.C.A., Labor Code § 417.001.

5 Cases that cite this headnote

**[5]**  **Conversion and Civil Theft**  👈 In general;nature and elements

Conversion is established by proving: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused plaintiff's demand for the return of the property.

Cases that cite this headnote

**[6]**  **Conversion and Civil Theft**  👈 Purchase or other taking of property from person other than owner

An employee who is wrongfully paid money that belongs to a workers' compensation carrier is liable for conversion.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*72** Clifford A. Lawrence, Jr., James E. Simmons, Simmons & Lawrence, P.C., Houston, for Appellant.

Katherine M. Willis, Robert A. Allen, Allen, Stein & Durbin, P.C., Richard E. Price, Frank R. Rivas & Associations, San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice and SANDEE BRYAN MARION, Justice.

**Opinion**

Opinion by PHIL HARDBERGER, Chief Justice.

The issue presented in this appeal is whether a workers' compensation carrier, who has paid benefits to an employee for injuries suffered in an automobile accident, has a subrogation right to benefits paid the employee under the employee's personal uninsured/underinsured insurance coverage. Because we agree with the trial court that the workers' compensation carrier does not have a subrogation right to such benefits, we affirm the trial court's judgment.

## BACKGROUND

In September of 1999, Michael Kinser ("Kinser") was injured in an automobile accident while in the course and scope of his employment for Southwestern Bell Telephone Company ("Southwestern Bell"). Southwestern Bell's workers' compensation carrier, Liberty Mutual, began paying Kinser's medical bills.

The driver of the other vehicle involved in the accident was at fault, and his insurance carrier, Farmers, issued a check for its policy limits of $25,000 jointly payable to Kinser and Liberty Mutual. Kinser endorsed the check over to Liberty Mutual.

Kinser had personal uninsured/underinsured motorist ("UIM") coverage through State Farm Mutual Automobile Insurance Company ("State Farm") with policy limits of $50,000. Kinser and Liberty Mutual disagreed regarding whether Liberty Mutual had a subrogation right to the UIM benefits. By on or about September 25, 2000, Liberty Mutual had paid Kinser $36,067.57 in workers' compensation benefits. Because Liberty Mutual had received $25,000 from Farmers, Liberty Mutual's outstanding lien was $11,067.57.

In view of the rival claims, State Farm interpled $11,067.57 into the court's registry and paid the balance of its policy limits, $38,932.43, to Kinser. Kinser filed an answer and a cross-claim against Liberty Mutual, asserting that the UIM benefits were the sole property of Kinser. Liberty Mutual also filed an answer and a cross-claim against Kinser, asserting that Liberty **\*73** Mutual was solely entitled to the UIM benefits paid into the registry and that State Farm and Kinser had converted the UIM benefits that State Farm paid directly to Kinser.

State Farm's motion for discharge was granted as to the funds interpled into the court's registry, and the conversion claim against State Farm was abated pending the resolution of the claims between Liberty Mutual and Kinser. Kinser filed a motion for summary judgment, contending Liberty Mutual had no rights to the UIM benefits interpled into the registry and that Kinser was not liable for conversion because Liberty Mutual did not have a right or ownership interest in the UIM benefits paid to Kinser. Liberty Mutual also moved for partial summary judgment, attaching evidence that Liberty Mutual had paid $49,469.57 in workers' compensation benefits. After crediting the $25,000 received from Farmers, Liberty Mutual had an outstanding lien of $24,469.57. Liberty Mutual's motion only addressed the right to the UIM benefits interpled into the court's registry and did not address Liberty Mutual's conversion claim.

The trial court granted Kinser's motion and denied Liberty Mutual's motion. The trial court ordered that Liberty Mutual take nothing from Kinser and ordered that the funds interpled into the court's registry be paid to Kinser. The trial court then severed the claims between Liberty Mutual and Kinser from the claims pending against State Farm, making the judgment final for purposes of appeal. Liberty Mutual timely filed this appeal.

## STANDARD OF REVIEW

To prevail on a motion for summary judgment, a movant must establish that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). Where both parties move for summary judgment, we review the summary judgment evidence presented by both sides. *Commissioners Court v. Agan,* 940 S.W.2d 77, 81 (Tex.1997). When the trial court grants one party's motion and denies the other's, the non-prevailing party can appeal both the summary judgment rendered against it, and the denial of its own motion. *Holmes v. Morales,* 924 S.W.2d 920, 922 (Tex.1996). The court of appeals may affirm the trial court's summary judgment or reverse and render judgment on the non-prevailing party's motion. *Id.*

## TEXAS LABOR CODE SECTION 417.001

Section 417.001 of the Texas Labor Code, which governs a workers' compensation carrier's subrogation rights, provides in pertinent part as follows:

(a) An employee or legal beneficiary may seek damages from a third party who is or becomes liable to pay damages for an injury or death that is compensable under this subtitle and may also pursue a claim for workers' compensation benefits under this subtitle.

(b) If a benefit is claimed by an injured employee or a legal beneficiary of the employee, the insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the third party in the name of the injured employee or the legal beneficiary.

TEX. LAB.CODE ANN. § 417.001 (Vernon Supp.2001).

The Texas Labor Code was enacted as part of the state's continuing statutory revision program and was intended as a recodification only. *See* TEX. LAB.CODE ANN. § 1.001 (Vernon 1996); Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 6, 1993 Tex. Gen. Laws 1273. No substantive change in the law was intended by the **\*74** recodification. Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 6, 1993 Tex. Gen. Laws 1273. Prior to the recodification, the subrogation rights of a workers' compensation carrier were governed by section 8303–4.05 of the Texas Revised Civil Statutes, which provided in pertinent part:

SECTION 4.05. THIRD PARTY LIABILITY. (a) If a third party is or becomes liable to pay damages for an injury or death which is compensable under this Act, the employee or legal beneficiary may seek damages from the third party. An employee or legal beneficiary who seeks damages from a third party remains entitled to pursue a claim for workers' compensation benefits under this Act.

(b) If compensation is claimed under this Act by the injured employee or the employee's legal beneficiaries, the insurance carrier is subrogated to the rights of the injured employee and may enforce in the name of the injured employee or the legal beneficiaries the liability of that other person.

Act of December 11, 1989, 71st Leg., 2nd C.S., ch. 1, § 4.05, 1989 Tex. Gen. Laws 33, *repealed by* Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 5, 1993 Tex. Gen. Laws 1273.

## CASES INTERPRETING TEXAS LAW

### A. *Bogart v. Twin City Fire Ins. Co.*

In *Bogart v. Twin City Fire Ins. Co.,* the Fifth Circuit considered a workers' compensation carrier's subrogation rights with respect to UIM benefits under Texas law. 473 F.2d 619 (5th Cir.1973). In that case, the workers' compensation carrier, TransAmerica Insurance Company, argued that it had subrogation rights to the UIM benefits based on the subrogation statute "which in essence provide[d] that a workmen's compensation carrier has a right of subrogation in any recovery the employee may obtain against the third person who, because of the circumstances under which the accident occurred, has a legal liability to pay damages." 473 F.2d at 627. The district court rejected TransAmerica's argument relying on a clause in the UIM policy stating that "nothing should inure to the benefit of any workmen's compensation carrier" and on the court's conclusion that the right of subrogation existed only against a third party who was a tortfeasor. *Id.* at 627–28.

The Fifth Circuit noted that TransAmerica's argument hinged on two word choices in the statute. *Id.* at 628. TransAmerica argued that "the reference to a person with a 'legal liability' implie[d] a class larger than the tortfeasors themselves and include[d] uninsured motorist insurance carriers ... [bolstered by] the use of the word 'damages' which it asserted to be that which is paid by a carrier like [the UIM carrier] when an insured makes a claim after an accident caused by a negligent uninsured motorist." *Id.* The Fifth Circuit rejected TransAmerica's argument, noting that although TransAmerica's statutory construction superficially supported its position, "a reading of the statute as a whole and the applicable Texas law convinces us that the argument is not persuasive." *Id.* The Fifth Circuit cited a number of Texas cases which the Fifth Circuit construed as limiting the subrogation provision to actions against the actual tortfeasor. *Id.* at

628–29. The Fifth Circuit also discounted TransAmerica's fear of a double recovery because (1) the double recovery that the subrogation statute sought to prohibit was recovery from both the workers' compensation carrier and the tortfeasor; and (2) the plaintiffs had suffered damages in excess of the sum of the compensation benefits and the uninsured policy benefits. *Id.* at 629.

**\*75** B. *Employers Cas. Co. v. Dyess*

In *Employers Cas. Co. v. Dyess,* the Amarillo court rejected the Fifth Circuit's decision. 957 S.W.2d 884, 890 (Tex.App.-Amarillo 1997, pet. denied). The Amarillo court noted that the subrogation statute provided a compensation carrier subrogation rights against "some person other than the subscriber" who has a "legal liability" for the injury. *Id.* at 889. After examining the statutory language, the Amarillo court concluded that "the clear wording of the statute" did not support the UIM carrier's position that the workers' compensation carrier is only subrogated to the claimant's rights against third party tortfeasors. *Id.* In examining the Fifth Circuit's decision in *Bogart,* the Amarillo court noted that although the *Bogart* court cited several cases to support its conclusion that the carrier's subrogation rights were limited to actual tort-tortfeasors, the cited cases did not involve a question as to whether the rights were limited to actual tort-tortfeasors but rather considered whether the subrogation rights extended to the actual tort-tortfeasors. *Id.* at 890. The Amarillo court also acknowledged that the parties had cited cases from other jurisdictions in support of their position; however, the Amarillo court concluded that "because the issue before us turns on the construction of a Texas statute, the decisions of courts of other states applying different statutes are not relevant to the resolution of that question." *Id.* Parenthetically, the Amarillo court noted that although a double recovery possibility was not present in *Bogart,* it was present in the case before the court. *Id.* The Amarillo court then concluded that the policy provision providing that the policy shall not inure to the benefit of a workers' compensation carrier was invalid because it conflicted with the carrier's statutory right. *Id.* at 891. The Amarillo court held that the statutory right of subrogation applies to any parties liable for a claimant's injuries, regardless of whether that liability arose in tort or contract, and any contractual provision conflicting with that statutory right was invalid. *Id.*

C. *Texas Workers' Comp. Ins. Facility v. Aetna Cas. & Sur. Co.*

The Houston [1st] court followed the Amarillo court's decision in *Texas Workers' Comp. Ins. Facility v. Aetna Cas. & Sur. Co.,* 994 S.W.2d 923 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The Houston court noted that the subrogation statute did not expressly limit the workers' compensation carrier's right to claims against third party tortfeasors although "[c]learly it would have been easy to do so." *Id.* at 925. The Houston court also reasoned,

> The purpose of the subrogation statute favors reading 'third party' expansively. Section 417.001 was adopted to prevent over compensation to the employee and to reduce the burden of insurance to the employer and the public. Those purposes would be frustrated if, as here, the employee were permitted to retain both the compensation benefits and settlement proceeds based on the liability of the third party tortfeasor.

*Id.* at 926 (citations omitted).

D. *Texas Workers' Comp. Ins. Fund v. Knight*

The Amarillo court revisited its *Dyess* decision in *Texas Workers' Comp. Ins. Fund v. Knight,* 61 S.W.3d 91 (Tex.App.-Amarillo 2001, no pet.). The Amarillo court rejected the claimant's contention that its decision was contrary to the holding in *Members Mut. Ins. Co. v. Hermann Hosp.,* 664 S.W.2d 325 (Tex.1984), noting "*Hermann Hospital* is quite inapposite, however. This is so for the simple reason that the statute applicable in *Hermann* expressly prohibited the hospital from **\*76** claiming a lien on proceeds from any insurance policy issued in favor of the injured party, including an uninsured motorist policy. No such statutory prohibition limits the subrogation rights of the Fund *viz-a-viz* the uninsured policy at bar." *Knight,* 61 S.W.3d at 93. The Amarillo court further rejected the trial court's authority to invoke its

equitable rights to deny the subrogation because the statute expressly requires that the workers' compensation carrier be paid from the first funds; therefore, the claimant has no right to any funds until the carrier receives its payment in full. *Id.*

### OTHER JURISDICTIONS' INTERPRETATION OF CARRIER'S SUBROGATION RIGHTS

Most jurisdictions resolve the issue of whether a workers' compensation carrier's subrogation rights extend to UIM benefits against the carrier. *See* LEE R. RUSS & THOMAS F. SEGALLA, 16 COUCH ON INSURANCE § 225.198 (3d ed.2000); Jeffrey L. Cole, J.D., Annotation, *Right of Employer or Workers' Compensation Carrier to Lien Against, or Reimbursement Out of, Uninsured or Underinsured Motorist Proceeds Payable to Employee Injured by Third Party,* 33 A.L.R.5th 587, 1995 WL 900189 (1995). In *Dyess,* the Amarillo court refused to consider opinions from other jurisdictions in resolving the subrogation rights issue because the issue "turn[ed] on the construction of a Texas statute." *Dyess,* 957 S.W.2d at 890. However, in many instances the statutes considered by these other jurisdictions are similar to the Texas statute. Therefore, the cases from these other jurisdictions are instructive and illustrate a national trend in interpreting this type of statutory language. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 353 (Tex.1990)(noting construction of statutes by other jurisdictions with similar or identical language in analyzing proper interpretation of Texas statute).

In most jurisdictions, the subrogation statutes include some version of the following two provisions: (1) the first provision states that an injured employee may pursue an action for damages against the person or party who has a legal liability for the damages; and (2) the second provision states that the workers' compensation carrier either: (a) is subrogated to or has a lien against any recovery in such an action; (b) is entitled to a credit for the amount of such recovery; or (c) may pursue the claim against that person or party. *See, e.g., Silvera v. Employers Ins. Co. of Nevada,* 40 P.3d 429 (Nev.2002) (employee may recover damages from person with a legal liability and insurer can bring action against the person so liable to pay damages and is subrogated to rights of injured employee to recovery); *Jeneary v. Commonwealth,* 262 Va. 418, 551 S.E.2d 321 (2001) (Fund subrogated to any right to recover damages which injured employee has against any other party for such injury); *American Red Cross v. Workers' Comp. Appeal Bd.,* 745 A.2d 78 (Pa.Commw.Ct.2000) (employer subrogated to right of employee against third party where employee's compensable injury is caused by act or omission of a third party), *aff'd,* 564 Pa. 192, 766 A.2d 328 (2001); *Stewart v. Auto–Owners Ins. Co.,* 230 Ga.App. 265, 495 S.E.2d 882 (1998) (injured employee may pursue remedy against person legally liable for injury and employer or employer's insurer has subrogation lien against such recovery); *River Gas Corp. v. Sutton,* 701 So.2d 35 (Ala.Civ.App.1997) (employee may bring action against any party other than employer who has legal liability for damages and amount of damages recovered and collected are credited against employer's liability for compensation); *Dodd v. Middlesex Mut. Assur. Co.,* 242 Conn. 375, 698 A.2d 859 (1997) (either employee or employer may proceed at law **\*77** against third person with legal liability to pay damages for injury and damages are apportioned to give precedence to claim of employer); *Terry v. State Farm Mut. Automobile Ins. Co.,* 287 Ill.App.3d 8, 222 Ill.Dec. 485, 677 N.E.2d 1019 (1997) (employer entitled to receive compensation paid from amount employee receives from person who has legal liability to pay damages); *Yaakub v. Aetna Cas. & Sur. Co.,* 882 S.W.2d 743 (Mo.Ct.App.1994) (employer subrogated to rights of employee against third person liable for injury); *March v. Pekin Ins. Co.,* 465 N.W.2d 852, 853–54 (Iowa 1991) (employee may maintain action against third party who has legal liability to pay damages and employer or employer's insurer is indemnified out of recovery of damages); *Cossitt v. Nationwide Mut. Ins. Co.,* 551 So.2d 879 (Miss.1989) (employer or compensation insurer has right to maintain action against any other party responsible for injury to employee and may retain any amount recovered up to the amount paid in compensation); *State Comp. Ins. Fund v. Gulf Ins. Co.,* 628 P.2d 182, 183 (Colo.Ct.App.1981) (cause of action against third party whose negligence injured employee assigned to Fund); *Janzen v. Land O'Lakes, Inc.,* 278 N.W.2d 67 (Minn.1979) (employee may take legal proceedings against party with legal liability to recover damages and employer may deduct amount of judgment obtained and paid or settlement made from amount received by employee); *Allied Mut. Ins. Co. v. Larriva,* 19 Ariz.App. 385, 507 P.2d 997, 998–99 (1973) (employee may pursue remedy against person whose negligence or wrong caused injury and carrier is entitled to lien on amount collected from such other person); *Fireman's Fund Indemnity Co. v. Industrial Action Comm'in,* 226 Cal.App.2d 676, 38 Cal.Rptr.

336, 337 (1964) (employer entitled to credit for any recovery by employee for his injury). In rejecting the argument that a workers' compensation carrier has a subrogation right to UIM benefits, the various states have relied on different characteristics of UIM coverage to hold that the carrier is not subrogated to the claimant's rights to collect from an UIM carrier, primarily: "(1) the fact that the obligation of the UIM insurer is based on a contract rather than a tort, (2) the fact that the UIM insurer did not in any sense 'cause' the injuries, and (3) the fact that a UIM insurer is not a 'third party' in the usual sense of that term." *See* LEE R. RUSS & THOMAS F. SEGALLA, 16 COUCH ON INSURANCE § 225.198 (3d ed.2000). Finally, some courts have relied on fact that the workers' compensation claimant himself or herself paid for the benefits of the UIM policy as justification for denying the carrier a subrogation right to the UIM proceeds *Id.* Interestingly, in several states in which the courts have held that the carrier does not have a subrogation right to UIM proceeds under the general subrogation provision, the legislature has amended the statute to permit subrogation against UIM proceeds from a policy where the employer paid the premiums but not where the employee paid the premiums. *See Silvera v. Employers Ins. Co. of Nevada,* 40 P.3d at 431; *Chavez v. S.E.D. Laboratories,* 129 N.M. 794, 14 P.3d 532, 535 (2000); *Department of Labor & Indus. v. Cobb,* 59 Wash.App. 360, 797 P.2d 536, 538 (1990).

## ANALYSIS

**[1]** Section 417.001(b) of the Texas Labor Code defines a workers' compensation carrier's subrogation rights. TEX. LAB.CODE ANN. § 417.001(b) (Vernon Supp.2001). Under that provision, the carrier is entitled to enforce the liability of "the third party" in the name of the injured employee and is subrogated to the injured employee's rights. *Id.* The reference to "the third party" in section 417.001(b) necessarily **\*78** refers to the third party referenced in section 417.001(a). The fact that section 417.001(b) refers back to the "third party" in section 417.001(a) is clearer in the statutory language that existed prior to the recodification in which section 4.05(b) refers to the liability of "that other person," since the phrase "that other person" could only refer back to the person mentioned in section 4.05(a). Act of December 11, 1989, 71st Leg., 2nd C.S., ch. 1, § 4.05, 1989 Tex. Gen. Laws 33, *repealed by* Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 5, 1993 Tex. Gen. Laws 1273.

Although the term "third party" when read in isolation is not limited to tortfeasors, the term "third party" must be read in context. Section 417.001(a) modifies or limits the "third party" to a "third party who is or becomes liable to pay damages." Therefore, a carrier is only entitled to subrogation against damages paid to an injured employee by a third party who is or becomes liable to pay damages.

Kinser contends that the subrogation provision is not applicable because State Farm was liable for contractual benefits not damages. The Houston [1st] court dismissed this argument by stating that a UIM carrier is statutorily obligated to provide for the payment of sums the insured is legally entitled to recover as damages. *Texas Workers' Compensation Ins. Facility v. Aetna Cas. & Surety Co.,* 994 S.W.2d at 926. Kinser's policy states that State Farm will pay damages that a covered person is legally entitled to recover. However, Kinser maintains that this contractual right to receive benefits is distinguishable from the right to recover damages.

**[2]** **[3]** "Actual damages are those that are recoverable at common law." *Farrell v. Hunt,* 714 S.W.2d 298, 300 (Tex.1986). "An award of damages is defined as the sum of money the law awards as pecuniary compensation, recompense, or satisfaction for an injury done or a wrong sustained as a consequence of a breach of a contractual obligation or a tortious act." *City of Dallas v. Cox,* 793 S.W.2d 701, 733 (Tex.App.-Dallas 1990, no writ). In *Henson v. Southern Farm Bureau Cas. Ins. Co.,* 17 S.W.3d 652, 654 (Tex.2000), the Texas Supreme Court appeared to recognize a difference between damages awarded by a jury and benefits payable under a UIM policy. We agree with Kinser that the term "damages" as used in section 417.001(a) does not include UIM benefits but is limited to damages recovered from a third party who is liable to the injured employee because the third party breached a contract or committed a tortious act against the injured employee. Therefore, we hold that Liberty Mutual does not have a subrogation right

to benefits paid to Kinser by State Farm under Kinser's UIM coverage—a holding that is consistent with the view of a majority of other jurisdictions.

We also note that the decisions by the Amarillo court and the Houston court contain one distinguishing factor. In each of those decisions, the UIM policies were acquired and maintained by the claimant's employer, not by the claimant. In *Bogart* and in the present case, the policies were acquired and maintained by the claimant, meaning the claimant paid the premiums. As a result, we have two competing public policies. The policy behind the subrogation statute, which is to prevent over compensation to the employee and to reduce the burden of insurance to the employer and to the public, *Texas Workers' Comp. Ins. Facility v. Aetna Cas. & Sur. Co.,* 994 S.W.2d at 926, and the policy of requiring uninsured motorist coverage "to protect the conscientious and thoughtful motorist against losses caused by negligent financially irresponsible motorists." **\*79** *Francis v. Int'l Serv. Ins. Co.,* 546 S.W.2d 57, 60–61 (Tex.1976). In the absence of proof that Kinser's retention of the UIM benefits would overcompensate him, it is difficult to understand why the policy favoring his prudence should be trumped by the policy supporting the subrogation statute. [1] Any other interpretation simply results in the injured employee subsidizing the insurance company. Neither law nor equity would be satisfied by that result.

## CONVERSION

 **[4]** **[5]** **[6]**  Conversion is established by proving: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused plaintiff's demand for the return of the property. *Ojeda v. Wal–Mart Stores, Inc.,* 956 S.W.2d 704, 707 (Tex.App.-San Antonio 1997, pet. denied). An employee who is wrongfully paid money that belongs to a workers' compensation carrier is liable for conversion. *Autry v. Dearman,* 933 S.W.2d 182, 189 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *Employers Cas. Co. v. Henager,* 852 S.W.2d 655, 659 (Tex.App.-Dallas 1993, writ denied). Because we have concluded that Liberty Mutual did not have a subrogation right to the UIM benefits, Kinser cannot be liable for conversion.

## CONCLUSION

A workers' compensation carrier does not have a subrogation right to benefits paid an injured employee under the employee's UIM coverage. Because no subrogation right exists, an employee who retains UIM benefits is not liable for conversion. The trial court's judgment is affirmed.

**All Citations**

82 S.W.3d 71

Footnotes
1   We note with interest that the El Paso court concluded that a workers' compensation carrier does not have a subrogation right to an injured employee's personal UIM benefits in *Casualty Reciprocal Exchange v. Demock,* No. 08–00–00206–CV, 2002 WL 244821 (Tex.App.-El Paso Feb.21, 2002, no pet. h.) (not designated for publication); however, we do not rely on the El Paso court's decision as authority. *See* TEX.R.APP. P. 47.4.

**End of Document**                                                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

466 S.W.3d 113
Supreme Court of Texas.

RSUI Indemnity Company, Petitioner,

v.

The Lynd Company, Respondent

No. 13–0080
|
Argued September 18, 2014
|
Opinion delivered: May 8, 2015
|
Rehearing Denied September 11, 2015

**Synopsis**

**Background:** Apartment complex owner brought action against its excess property insurer to recover loss to apartment buildings as result of hurricane that exceeded primary insurer's limit of liability. The 407th Judicial District Court, Bexar County, Karen H. Pozza, J., rendered take-nothing judgment against owner, and it appealed. The San Antonio Court of Appeals, Sandee Bryan Marion, J., 399 S.W.3d 197, reversed and rendered. Insurer's petition for review was granted.

**Holdings:** The Supreme Court, Boyd, J., held that:

[1] scheduled limit of liability endorsement was ambiguous and limited insurer's liability on aggregate basis to "actual adjusted amount" of all losses, rather than item-by-item basis, and

[2] fact that policy required insured to file statement of values did not indicate that it limited liability on item-by-item basis.

Affirmed.

Hecht, C.J., dissented and filed opinion joined by Green and Brown, JJ.

West Headnotes (30)

[1]     **Insurance** 👈 Policies considered as contracts

        **Insurance** 👈 Application of rules of contract construction

        An insurance policy is a contract, generally governed by the same rules of construction as all other contracts.

        2 Cases that cite this headnote

[2]     **Contracts** 👈 Language of contract

Court's primary concern when construing a contract is to ascertain **intentions of** the **parties** as expressed in the document.

1 Cases that cite this headnote

**[3]** **Contracts** 👉 Language of contract

Courts begin analysis with language of the contract because it is the best representation of what the parties mutually intended.

Cases that cite this headnote

**[4]** **Insurance** 👉 Rules of Construction

**Insurance** 👉 Construction as a whole

**Insurance** 👉 Plain, ordinary or popular sense of language

Unless insurance policy dictates otherwise, courts give to words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage.

1 Cases that cite this headnote

**[5]** **Insurance** 👉 Construction as a whole

Courts strive to give effect to all words and provisions in insurance policy so that none is rendered meaningless.

Cases that cite this headnote

**[6]** **Contracts** 👉 Construction as a whole

No one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions.

Cases that cite this headnote

**[7]** **Insurance** 👉 Existing Law

When construing an insurance policy, courts are mindful of other courts' interpretations of policy language that is identical or very similar to the policy language at issue.

1 Cases that cite this headnote

**[8]** **Insurance** 👉 Existing Law

Courts usually strive for uniformity in construing insurance policy provisions, especially where the contract provisions at issue are identical across the jurisdictions.

1 Cases that cite this headnote

**[9]** **Insurance** 👉 Ambiguity in general

If only one party's construction of insurance policy is reasonable, the policy is unambiguous, and court will adopt that party's construction.

5 Cases that cite this headnote

**[10]**    **Insurance** 🔑 Ambiguity in general

**Insurance** 🔑 Ambiguity, Uncertainty or Conflict

If two constructions of insurance policy present reasonable interpretations of the policy's language, the policy is ambiguous, and court must resolve the uncertainty by adopting the construction that most favors the insured, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.

5 Cases that cite this headnote

**[11]**    **Insurance** 🔑 Ambiguity, Uncertainty or Conflict

**Insurance** 🔑 Status or bargaining power of insureds

Requirement to construe insurance policy ambiguity in favor of insured is an outgrowth of the general principle that uncertain contractual language is construed against the party selecting that language and is justified by the special relationship between insurers and insureds arising from the parties' unequal bargaining power.

Cases that cite this headnote

**[12]**    **Contracts** 🔑 Existence of ambiguity

In contract law, the terms "ambiguous" and "ambiguity" have a more specific meaning than merely denoting a lack of clarity in language.

1 Cases that cite this headnote

**[13]**    **Contracts** 🔑 Existence of ambiguity

An ambiguity does not arise simply because the parties offer conflicting interpretations of contract; rather, a contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.

8 Cases that cite this headnote

**[14]**    **Contracts** 🔑 Existence of ambiguity

A contract is ambiguous only if, after applying the rules of construction, it remains subject to two or more reasonable interpretations.

4 Cases that cite this headnote

**[15]**    **Insurance** 🔑 Scheduling;reporting clauses

Scheduled limit of liability endorsement to excess policy covering 15 properties damaged by hurricane was ambiguous and limited insurer's liability on aggregate basis to "actual adjusted amount" of all losses, rather than item-by-item basis to actual adjusted amount of losses to 13 buildings and "115% of the individually stated value" of two buildings with losses exceeding that limit; policy limited liability to "least of" "actual adjusted amount of the loss" less deductible or "115% of the individually stated value for each scheduled item" less

deductible and contained circuitous definitions of "loss," "occurrence," and "event," and premium was flat rate of reported value for all properties.

Cases that cite this headnote

[16]    **Contracts** 👉 Language of contract

**Customs and Usages** 👉 Explanation of Contract

When construing undefined contractual terms, courts may consider the terms' commonly accepted meanings within the relevant industry; however, those meanings are not necessarily determinative, and may not apply when the language and its context demonstrate that the parties intended a different meaning.

Cases that cite this headnote

[17]    **Contracts** 👉 Language of Instrument

Title, like every other portion of a contract, may be looked to in determining its meaning, because headings and titles provide context and can inform the meaning of the sections they label.

Cases that cite this headnote

[18]    **Contracts** 👉 Language of Instrument

Generally, courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them.

1 Cases that cite this headnote

[19]    **Contracts** 👉 Language of Instrument

Although courts may consider the title of a contract provision or section to interpret a contract, the greater weight must be given to the operative contractual clauses of the agreement.

1 Cases that cite this headnote

[20]    **Contracts** 👉 Language of Instrument

Contract titles and headings are not determinative, and when they are inconsistent with the plain meaning of the provision's operative language, courts afford greater weight to the operative language.

Cases that cite this headnote

[21]    **Insurance** 👉 Presumptions

Generally, the law recognizes a natural presumption that identical words used in different parts of insurance policy are intended to have the same meaning, but this presumption is not rigid and readily yields when the text uses the words in such various connections that it warrants the conclusion that they were employed in different parts of the act with different intent.

1 Cases that cite this headnote

[22]    **Insurance** 👉 Function of, and limitations on, courts, in general

Courts cannot add words to insurance policy language unless the context requires them to do so.

1 Cases that cite this headnote

**[23]     Insurance**  👉 Language of policies

Court's primary objective in construing an insurance policy is to ascertain and give effect to the parties' intent as expressed by the words they chose to effectuate their agreement.

Cases that cite this headnote

**[24]     Contracts**  👉 Language of Instrument

The law does not ask which party can identify the greatest number of ways the contract's structure or language supports its construction.

Cases that cite this headnote

**[25]     Contracts**  👉 Existence of ambiguity

The law does not deem a contractual provision ambiguous merely because both parties can point to words or phrases that, read in isolation, favor different constructions of the contract, or because both parties can identify language that, through the lens of hindsight, could have been more clearly stated.

2 Cases that cite this headnote

**[26]     Insurance**  👉 Ambiguity in general

Both interpretations must be a reasonable interpretation of the words chosen by the parties when read in the context of insurance policy as a whole in order to make the policy ambiguous.

3 Cases that cite this headnote

**[27]     Insurance**  👉 Scheduling;reporting clauses

When schedules are required and used to calculate an average or overall premium, to ensure compliance with a co-insurance requirement, or for some purpose other than to impose separate limits on each scheduled item, the use of a schedule is not at all inconsistent with blanket coverage, and a blanket policy may use a schedule for one of these purposes without becoming a scheduled policy.

Cases that cite this headnote

**[28]     Insurance**  👉 Scheduling;reporting clauses

Bare fact that excess property policy required insured to file statement of values did not indicate that it limited liability as a blanket policy on item-by-item basis; scheduled limit of liability endorsement expressly provided that "premium for this policy is based upon the Statement of Values."

Cases that cite this headnote

**[29]     Insurance**  👉 Intention

**Insurance**  👉 Plain, ordinary or popular sense of language

> In cases involving a standard form policy mandated by a state regulatory agency, the actual intent of the parties is not what counts, as they did not write it, but the ordinary, everyday meaning of the words to the general public counts.

Cases that cite this headnote

**[30]    Insurance** 🔑 Intention

> In cases involving a non-standard form, court's task is to determine and enforce the mutual intent of the parties to the insurance contract.

Cases that cite this headnote

**\*115** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

**Attorneys and Law Firms**

**\*116** Thomas R. Phillips, David F. Johnson, Jay W. Brown, Stephen R. Wedemeyer, Houston, Douglas W. Alexander, Austin, Bruce Wilkin, Houston, for Petitioner RSUI Indemnity Company.

Trey Gillespie, for Amicus Curiae Property and Casualty Insurers Association of America.

Brendan K. McBride, San Antonio, for Amicus Curiae Texas Hotel & Lodging Association, Texas Apartment Association, Inc.

Henry S. Platts Jr., Houston, for Amicus Curiae Axis Surplus Insurance Company.

R. David Fritsche, San Antonio, for Amicus Curiae San Antonio Apartment Association, Inc.

Edwin Todd Lipscomb, Ernest Martin Jr., Dallas, Robert W. Loree, San Antonio, Nina Cortell, Jeremy Daniel Kernodle, Dallas, Thomas H. Crofts Jr., San Antonio, Cassandra Pruski, for Respondent The Lynd Company.

Linda Marie Dedman, Dallas, for Amicus Curiae Texas Policyholder Coverage Lawyers.

Paul Thomas Martin, for Amicus Curiae National Association of Mutual Insurance Companies.

**Opinion**

Justice Boyd delivered the opinion of the Court, in which Justice Johnson, Justice Willett, Justice Guzman, Justice Lehrmann, and Justice Devine joined.

This appeal involves an excess insurance policy that covered multiple commercial properties and limited the coverage to "the least" of three alternative amounts. When fifteen of the covered properties were damaged in one occurrence, the insurer calculated "the least" of the three alternative limits separately for each covered item at each damaged property, on an item-by-item basis. The insured contends that "the least" of the three limits applies just once in any one occurrence to the total of all losses from all covered items at all of the damaged properties. The trial court agreed with the insurer, and a split court of appeals agreed with insured. We conclude that both constructions are reasonable and the policy is therefore ambiguous. Because we construe an insurance policy's ambiguous language in favor of coverage for the insured, we affirm.

# I.

## Background

The Lynd Company manages the insurance needs of more than 100 commercial properties located in eleven different states. In 2005, Lynd purchased two layers of insurance to cover the properties, which Lynd ultimately valued at a total of about $1 billion. The first layer, a primary policy from Westchester Fire Insurance Company, provided coverage up to $20 million per occurrence. The second layer, an excess policy from RSUI Indemnity Company, covered losses that exceeded $20 million, up to $480 million per occurrence. Instead of identifying the covered properties, the RSUI policy required Lynd to provide a list of the properties to RSUI before the policy became effective. The policy's "Scheduled Limit of Liability" endorsement referred to this list as the "Statement of Values." In addition to the properties' names, addresses, and other details, the Statement of Values included the values that Lynd or the properties' owners assigned to each of three types or "items" of coverage the policy provided at each location: (1) the building replacement value, (2) the value of the building's contents, and (3) the value of one year's rental income from the property.

The Scheduled Limit of Liability endorsement provided that the policy's premium would be based on the values that **\*117** Lynd reported in the Statement of Values. The policy also included a Reporting Endorsement, which identified the premium rate as $0.025 per $100 of reported value. The Reporting Endorsement required Lynd to update the Statement of Values quarterly, and sooner for any newly acquired properties that Lynd valued over $1 million. It also provided that RSUI would recalculate the premium every quarter by applying the same $0.025/$100 rate to all values reported for that quarter. Throughout the policy's term, as Lynd added additional properties or increased the values of properties it had previously reported, the parties added four separate endorsements to confirm quarterly increases in the reported values and premium.

The Scheduled Limit of Liability endorsement also provided that the policy would only cover losses "at the locations listed on the latest Statement of Values" and only if "a value is shown for [the] scheduled item." But the policy did not require Lynd to list any particular properties or report the values with any particular accuracy. As a result, Lynd effectively controlled the amount of the premium it paid through the values it reported in the Statement of Values. For its highest-valued property, Lynd listed about $18.2 million for building replacement, $10,000 for contents, just over $4 million for rental income, and a total insured value of about $22.3 million. It was thus at least possible that a single occurrence could cause losses at that property in excess of Westchester's primary policy's $20 million limit. None of the other listed properties had a total insured value exceeding $20 million. But with the exception of the one most valuable property, Westchester's $20 million primary policy was sufficient to cover all losses that a single occurrence could cause to any one property. In other words, only an occurrence that was catastrophic enough to damage more than one of the listed properties was likely to trigger coverage under RSUI's excess policy.

In September 2005, the Gulf Coast experienced such an occurrence: Hurricane Rita. The storm damaged fifteen of the properties that Lynd had listed in the Statement of Values. The parties agree that a single "occurrence" caused all of the damage and that the combined total of Lynd's resulting losses was just over $24.5 million. After Westchester paid its $20 million limit, RSUI refused to pay the remaining $4.5 million and instead paid Lynd about $750,000. In calculating this amount, RSUI included the actual adjusted amounts of the losses incurred at thirteen of the properties, because those amounts were less than 115% of the values Lynd had listed for those items in the Statement of Values. But one property, the Willow Bend apartment complex, incurred about $5 million in losses, which was about $2 million more than the total insured value that Lynd listed for that property, and another, the Le Chateau apartment complex, sustained about $11 million in losses, nearly $3.5 million more than Lynd's reported total value. For these two properties, RSUI paid 115% of the reported values, rather than the actual adjusted amount of the loss. The parties dispute whether the policy limited RSUI's liability in that manner.

Lynd filed this suit against RSUI to recover the difference between its $24.5 million in losses and the $20,750,000 that Westchester and RSUI had paid, plus statutory prompt-payment penalties, prejudgment interest, and attorney's fees. The parties stipulated to the amounts at issue: about $4.2 million in disputed coverage, $2.5 million in penalties, and $866,000 in interest and attorney's fees, totaling just over $7.5 million. On cross-motions for summary judgment, the trial court agreed **\*118** with RSUI's construction of the policy and ordered that Lynd recover nothing. The court of appeals agreed with Lynd's construction, reversed, and rendered judgment awarding Lynd the full $7.5 million. That court denied RSUI's motion for rehearing en banc, but three justices dissented, and one of the remaining four wrote separately to urge this Court to grant review and resolve the parties' dispute.

## II.

### Governing Legal Principles

 **[1]** **[2]** **[3]** **[4]** **[5]** **[6]** An insurance policy is a contract, generally governed by the same rules of construction as all other contracts. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 126 (Tex.2010). When construing a contract, our primary concern is to ascertain the intentions of the parties as expressed in the document. *Amedisys, Inc. v. Kingwood Home Health Care, LLC,* 437 S.W.3d 507, 514 (Tex.2014). We begin our analysis with the language of the contract because it is the best representation of what the parties mutually intended. *Gilbert Tex. Constr.,* 327 S.W.3d at 126; *see also Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.,* 352 S.W.3d 445, 451 (Tex.2011). Unless the policy dictates otherwise, we give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage. *See Gilbert Tex. Constr.,* 327 S.W.3d at 126; *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). We strive to give effect to all of the words and provisions so that none is rendered meaningless. *See Gilbert Tex. Constr.,* 327 S.W.3d at 126; *Forbau,* 876 S.W.2d at 133. "No one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Forbau,* 876 S.W.2d at 134 (quoting *Guardian Trust Co. v. Bauereisen,* 132 Tex. 396, 121 S.W.2d 579, 583 (1938)).

 **[7]** **[8]** When construing an insurance policy, we are mindful of other courts' interpretations of policy language that is identical or very similar to the policy language at issue. *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 824 (Tex.1997). "Courts usually strive for uniformity in construing insurance provisions, especially where ... the contract provisions at issue are identical across the jurisdictions." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 522 (Tex.1995); *see also Zurich Am. Ins. Co. v. Nokia, Inc.,* 268 S.W.3d 487, 496– 97 (Tex.2008) ("We have repeatedly stressed the importance of uniformity 'when identical insurance provisions will necessarily be interpreted in various jurisdictions.' ") (quoting *Cowan,* 945 S.W.2d at 824).

 **[9]** **[10]** **[11]** RSUI and Lynd offer conflicting constructions of the Scheduled Limit of Liability endorsement. If only one party's construction is reasonable, the policy is unambiguous and we will adopt that party's construction. *See Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 459 (Tex.1997). But if both constructions present reasonable interpretations of the policy's language, we must conclude that the policy is ambiguous. *See id.* at 458; *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998). In that event, "we must resolve the uncertainty by adopting the construction that most favors the insured," and because we are construing a limitation on coverage, we must do so "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). "This widely followed rule is an outgrowth of the general **\*119** principle that uncertain contractual language is construed against the party selecting that language," and is "justified by the special relationship between insurers and insureds arising from the parties' unequal bargaining power." *Balandran,* 972 S.W.2d at 741 n.1 (citing STEVEN PLITT, ET AL., 2 COUCH ON INSURANCE § 22.14 (3d ed. 1997); *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987)).

**[12]** **[13]** **[14]** In contract law, the terms "ambiguous" and "ambiguity" have a more specific meaning than merely denoting a lack of clarity in language. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951). "An ambiguity does not arise simply because the parties offer conflicting interpretations." *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). Instead, "a contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Daniel,* 243 S.W.2d at 157; *see Balandran,* 972 S.W.2d at 741. Thus, a contract is ambiguous only if, after applying the rules of construction, it remains "subject to two or more reasonable interpretations." *Balandran,* 972 S.W.2d at 741. Our task in this case is to determine whether Lynd's construction of the RSUI policy is reasonable. If it is, we must enforce that construction, even if RSUI's construction is also reasonable.

## III.

### Construing the Scheduled Limit of Liability Endorsement

**[15]** The Scheduled Limit of Liability endorsement provides in full:

*This Endorsement Changes The Policy. Please Read It Carefully.*

### *SCHEDULED LIMIT OF LIABILITY*

This endorsement modifies insurance provided under the following:

### ALL COVERAGE PARTS

It is understood and agreed that the following special terms and conditions apply to this policy:

1. In the event of loss hereunder, liability of the Company shall be limited to the least of the following in any one "occurrence":

    a. The actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits;

    b. 115% of the individually stated value for each scheduled item of property insured at the location which had the loss as shown on the latest Statement of Values on file with this Company, less applicable deductibles and primary and underlying excess limits. If no value is shown for a scheduled item then there is no coverage for that item; or

    c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy.

2. Coverage under this policy is provided only at the locations listed on the latest Statement of Values on file with this Company or as endorsed on to this policy.

3. The premium for this policy is based upon the Statement of Values on file with this Company or attached to this policy.

The term "occurrence", where used in this policy, shall mean any one loss, disaster, casualty or series of losses, disasters, or casualties arising from one event.

When the term "occurrence" applies to a loss or series of losses from the perils of tornado, cyclone, hurricane, windstorm, **\*120** hail, flood, earthquake, volcanic eruption, riot, riot attending a strike, civil commotion and vandalism and malicious mischief, one event shall be construed to be all losses arising during a continuous period of 72 hours. When filing a proof of loss the insured may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the first loss to occur at any covered location.

Paragraph 1 of this endorsement describes three alternative liability limits and provides that RSUI's liability "shall be limited to the least of the [three] in any one 'occurrence.' " The parties agree that all of the losses at issue resulted from one occurrence. The parties disagree, however, on how to compare and apply the three alternative limits when one occurrence causes losses at multiple locations. RSUI compared the three alternatives and applied "the least" of them, but it did so multiple times, once for each of the coverage items at each of the damaged locations. At thirteen properties, it applied the limit under Part 1a (the "actual adjusted amount of the loss"), because that amount was less than the amounts under Part 1b ("115% of the individually stated value for each scheduled item") and Part 1c ($480 million). But for Willow Bend and Le Chateau, it applied Part 1b's limit (115% of the stated values) because that amount was less than the limits under Part 1a and Part 1c. Lynd contends that RSUI must compare the three alternatives and apply "the least" of them only once, using the total amounts of the losses and stated values related to "any one 'occurrence,' " and should have applied the Part 1a limit here because that amount was less than the amounts under Parts 1b and 1c. So Lynd asserts that RSUI should have paid the $24.5 million—the "actual adjusted amount" of all losses at all of the properties, including Willow Bend and Le Chateau—less the policy's $25,000 deductible and the Westchester policy's $20 million limit.

The court of appeals agreed with Lynd, and RSUI petitioned for our review. RSUI contends that the court of appeals erred because (A) consistent with insurance industry practices, the "structure" of the policy confirms that it is a "scheduled" policy rather than a "blanket" policy or some "unknown hybrid" of the two; (B) the only reasonable construction of the plain language of the policy is that the alternative limits apply on an item-by-item basis; and (C) Lynd's construction conflicts with the vast majority of other courts' constructions of the same or similar language and makes Texas an outlier on this issue. We begin our analysis with the policy's language, and then address the remaining arguments in turn.

### A. The Language of the Endorsement

RSUI and Lynd both contend that the plain language of the Scheduled Limit of Liability endorsement, considered within the context of the policy as a whole, supports only their proposed construction. We have carefully considered the endorsement, including its title, its cautionary statements, Paragraph 1's introductory statement, the three alternative limits, and all of the language as a whole. Having done so, we conclude that the endorsement reasonably can be read to support either party's proposed construction and is therefore ambiguous.

### 1. The Title

[16] The endorsement is titled "*Scheduled* Limit of Liability." (Emphasis added.) The policy does not define the term "scheduled," but RSUI contends that it is widely accepted within the insurance industry that a "scheduled" policy provides "scheduled coverage," meaning coverage **\*121** that is limited on an item-by-item basis. This, RSUI contends, "is the 'hallmark' of a scheduled policy." Because this endorsement is titled "*Scheduled* Limit of Liability," RSUI asserts, it necessarily limits the coverage on an item-by-item basis. (Emphasis added.) Lynd agrees that "scheduled" is a term of art within the insurance industry, but disputes that "scheduled" policies necessarily *limit* coverage on an item-by-item basis when one occurrence damages multiple items. We will address this dispute about industry practices further below. [1] (Emphasis added.) For now, we focus on the policy's language.

[17] [18] We agree that the "title, like every other portion of a contract, may be looked to in determining its meaning," *E.H. Perry & Co. v. Langbehn,* 113 Tex. 72, 252 S.W. 472, 474 (1923), because headings and titles provide context and can inform the meaning of the sections they label. *See, e.g., Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 793 (Tex.2005) (declining to construe a provision as limited to one topic when "the title of the paragraph show[ed] that two different topics were addressed in it"); *see also Reliance Ins. Co. v. Orleans Parish Sch. Bd.,* 322 F.2d 803, 807 (5th Cir.1963) (noting "considerations which persuade us that the parties intended what the special form plainly stated—'School Form–Blanket' policy"). Generally, courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them.

**[19]** **[20]** Assuming that the word "scheduled" in the endorsement's title means "limited on an item-by-item basis," as RSUI contends, we agree that the title of the Scheduled Limit of Liability endorsement provides some support for RSUI's construction. Nevertheless, although "courts may consider the title of a contract provision or section to interpret a contract, 'the greater weight must be given to the operative contractual clauses of the agreement.' " *Enter. Leasing Co. of Hous. v. Barrios,* 156 S.W.3d 547, 549 (Tex.2004) (quoting *Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 600 (1959)). Thus, titles and headings are not determinative, and when they are inconsistent with the plain meaning of the provision's operative language, we afford greater weight to the operative language. So we must consider the endorsement's operative language, to which we afford the greater import, to determine whether it is consistent only with the meaning that RSUI attributes to the title. *See Barrios,* 156 S.W.3d at 549.

### 2. The Cautionary Language

The Scheduled Limit of Liability endorsement contains cautionary language immediately above and below the title: "This Endorsement Changes The Policy. Please Read It Carefully," and "This endorsement modifies insurance provided under ... ALL COVERAGE PARTS." The **\*122** parties agree that RSUI's excess policy is a "follow form" policy, meaning that it is generally subject to the terms and conditions of Westchester's primary policy except where RSUI's policy expressly modifies those terms.[2] *See, e.g., GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 809 n.3 (6th Cir.1999) (describing "follow form" excess policies); *KLN Steel Prods. Co. v. CNA Ins. Cos.,* 278 S.W.3d 429, 443 (Tex.App.–San Antonio 2008, pet. denied) (same). The parties also agree that Westchester's primary policy was not a "scheduled" policy. So the cautionary language could be read to mean that, even though Westchester's policy was not a scheduled policy, and even though RSUI's policy was a follow form policy, the endorsement confirms that the RSUI policy differs from the Westchester policy in the limits it imposes. We agree with this reading of the cautionary language, but it only begs the question of *how* the RSUI's policies' limits differ. Both parties agree that the Scheduled Limit of Liability endorsement imposes coverage limits that the Westchester policy does not impose, but they disagree on when and how those limits apply. The cautionary language does not address those questions, and therefore does not indicate which party's construction of the endorsement is correct.

### 3. Paragraph 1's Introductory Statement

The first sentence of Paragraph 1 of the Scheduled Limit of Liability endorsement imposes the three alternative coverage limits "in the event of loss" under the policy. The policy's Excess Physical Damage Coverage Form defines the term "loss" to mean "a loss *or* series of losses arising out of one event or occurrence." (Emphasis added.) The term loss in Paragraph 1 may thus refer to either "a loss" *or* to the entire "series of losses" that resulted from Hurricane Rita, which the parties agree was "one event or occurrence." In other words, we could read the phrase to mean that the alternative limits apply "in the event of [each loss]," as RSUI proposes, but we could also read it to mean that they apply "in the event of [the entire series of losses]," as Lynd proposes. Because the policy defines the term "loss" to mean "a loss" *or* a "series of losses," we conclude that the phrase "in the event of loss," standing alone, is equally consistent with both parties' constructions of the endorsement.

The remainder of Paragraph 1's introductory statement limits RSUI's liability to the least of the three alternative limits "in any one 'occurrence.' " The endorsement defines the term "occurrence" to "mean any one loss, disaster, casualty or series of losses, disasters, or casualties arising from one event." It then provides that when the occurrence is a hurricane or other significant peril, "one event" includes "*all* losses" arising during a 72–hour period. (Emphasis added.) Thus, at least for purposes of a significant peril, the policy defines the word "occurrence" essentially the same way it defines the word "loss," uses the word "occurrence" to define the word "loss," uses the word "loss" or "losses" to define both "occurrence" and **\*123** "event," and uses the word "event" to define both "loss" and "occurrence":

   **LOSS:** "a *loss* or series of *losses* arising out of one *event* or *occurrence*."

> **OCCURRENCE:** "any one *loss* ... or series of *losses* ... arising from one *event*."

> **EVENT:** "all *losses*" in a 72–hour period.

The circularity of these definitions complicates our attempt to construe the endorsement. Here, at least, the parties agree that all of the losses at issue arose from just one "event." But because the policy defines the term "occurrence" to include "any *one* loss" from that event, we could read the phrase "in any one 'occurrence' " to limit RSUI's liability to the least of the three alternatives based on the amount of each individual loss, consistent with RSUI's item-by-item approach. (Emphasis added.) But the endorsement defines "occurrence" to mean "any one loss ... *or series of losses,*" which would include all of the losses arising from the one event (which is defined for these purposes as "*all* losses" in a 72–hour period). (Emphasis added.) Under this definition, we could read the phrase "in any one 'occurrence' " to mean that RSUI's liability is limited to "the least" of the three alternatives "in" *all* losses—that is, the entire "series of losses"—consistent with Lynd's aggregate approach. (Emphasis added.) We thus conclude that the phrase "in any one 'occurrence,' " standing alone, is consistent with both parties' proposed constructions.

Reading the two key phrases of Paragraph 1's introductory sentence together does not change that result. Because the policy defines both "loss" and "occurrence" to mean either "a loss" or "a series of losses," we could construe the sentence to provide for either an item-by-item or an aggregate limit. The introductory sentence could mean that, "in the event of [*a* loss]," RSUI's liability is limited to one of the three alternatives "in any one [single] loss," as RSUI proposes. But it could also mean that, "in the event of [*a series of losses* ]," RSUI's liability is limited to one of the three alternatives "in any one [*series of losses* ]," as Lynd proposes. Here, the one event in fact caused not just "a loss" but "a series of losses," and we agree with Lynd that, "in the event of [a series of losses]," the introductory sentence can be construed to apply the alternative limits on an aggregate basis.

### 4. Part 1a's Limit

The first alternative limit, Part 1a of the endorsement, limits RSUI's liability to "[t]he actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits." Once again, this language refers to "*the* loss" in the singular, but because the policy defines that term to mean "a loss *or* series of losses," it could be read to refer either to each loss or to the entire series of losses at issue. (Emphasis added.) In this case, for example, it could refer to the amount of $11 million, which was the actual adjusted amount to repair or replace the buildings at Le Chateau, or it could refer to the amount of $24.5 million, which is the actual adjusted amount of the entire "series of losses" at issue. Lynd challenges the first construction by pointing out that the clause does not expressly refer to "*each* loss" or to "*individual* losses," and RSUI challenges the second construction by pointing out that it does not expressly refer to "the *total* " or "*aggregate* " of the series of losses. (Emphasis added.) But the definition of "loss" essentially provides those terms as two different alternatives. We agree with both RSUI and Lynd that the use of these or similar phrases could have provided some clarity as to the endorsement's meaning. But as written, **\*124** Part 1a of the endorsement refers only to "the loss," and the definition of that term is consistent with both parties' constructions.

### 5. Part 1b's Limit

The second alternative limit, Part 1b of the endorsement, limits RSUI's liability to "115% of the individually stated value for each scheduled item of property insured at the location which had the loss as shown on the latest Statement of Values ..., less applicable deductibles and primary and underlying excess limits." It is important to note that this alternative limit is based not on the amount of the "loss," but on the amount of the "stated value" at the location that "had the loss." RSUI contends that the reference to the "*individually* stated value for *each scheduled item* " insured "at *the* location" that had "the loss" refers to the specific amount that Lynd reported for each of the three coverage items (building replacement, contents, and rental income) at each of the property locations. (Emphasis added.) For the Le Chateau property, for example, Lynd listed "individually stated values" of about $7.6 million for building replacement

coverage, $10,000 for contents coverage, and $1.18 million for rental income coverage. According to RSUI, each of these amounts is an "individually stated value" for a unique "scheduled item" where loss occurred, and is thus a separate limit under Part 1b. And, according to RSUI, because the endorsement requires a determination of whether that amount or the amount under Part 1a is "the least," Part 1a must also require that the actual adjusted amount of the "loss" or "series of losses" for each item be determined on an item-by-item basis. We agree that this is a reasonable construction of this language, and that it is consistent with RSUI's construction of the endorsement.

By contrast, Lynd contends that the phrase "individually stated value for each scheduled item ... at the location which had the loss" refers to *the total* of all the stated values for all the items for which Lynd sustained a loss. We find several problems with this construction. First, it ignores the word "individually," which means "of, relating to, or associated with an individual" or "a single member of a category." MERRIAM–WEBSTER DICTIONARY AND THESAURUS 431 (2014) (defining "individual"). Lynd suggests that we should read "individually" to mean "collectively," but those words simply are not synonymous. *Id.* at 51 (defining "collective" to mean "of, relating to, or denoting a group of individuals considered as a whole"). Second, Lynd's construction requires us to read the phrase "each scheduled item" to mean "all scheduled items," yet "each" and "all" have essentially opposite common meanings. *Id.* at 259 (defining "each" to mean "every individual one" or "being one of the class named"); *id.* at 23 (defining "all" to mean "the whole number, quantity, or amount" or "the whole of"). We cannot construe these undefined words to mean things they do not ordinarily mean. *See, e.g., Anglo–Dutch Petroleum,* 352 S.W.3d at 451; *Forbau,* 876 S.W.2d at 133. [3] And finally, Lynd's approach requires us to add the words "the total of every" before the phrase "individually stated value," and we cannot add words to the policy's language. *Am. Mfrs. Mut. Ins.,* 124 S.W.3d at 162.

 **\*125** Third, while the phrase "at *the location* which had the loss" could support an aggregate approach to the endorsement's limits, it cannot support the aggregate approach that Lynd proposes. (Emphasis added.) Specifically, because the phrase "at the location which had the loss" modifies the phrase "individually stated value for each scheduled item," we could construe the sentence to require aggregating the individually stated values of each scheduled item at each of the fifteen damaged locations and then applying the limit on a location-by-location basis. But this would not support the occurrence-by-occurrence aggregation that Lynd proposes.

We thus conclude that, standing alone, the phrase "individually stated value for each scheduled item of property insured at the location which had the loss" supports RSUI's item-by-item construction of the endorsement, and does not support Lynd's aggregate approach.

But our analysis of Part 1b cannot end here, because the language of Part 1b does not end here. The dissenting opinion cleverly misstates our analysis when it asserts that we find that Part 1b, "the key passage, 'does not,' in the Court's own words, 'support Lynd's [construction]'." *Post* at 141. Simply put, we are not finding or "[c]onceding that, standing alone, element (b) does not support Lynd's position ...," *post* at 142; rather, we find that, standing alone, one phrase contained within part 1b does not support Lynd's position. All artifice aside, our conclusion is clear: "standing alone, the phrase 'individually stated value for each scheduled item of property insured at the location which had the loss' ... does not support Lynd's aggregate approach." But as we explain in the following section, that phrase does not stand alone in Part 1b, and we must construe it within its context, "giving effect to every word, clause, and sentence." *In re Office of Atty. Gen.,* 422 S.W.3d 623, 629 (Tex.2013). We reach our conclusion only after considering all of Part 1b, in context with all of the policy's provisions, and the conclusion that the dissent purports to find "baffling" is simply not our conclusion at all.

### 6. Subtracting the Deductible and Primary Policy Limit

There is more to both Part 1a and Part 1b than the phrases we have discussed thus far. In particular, to determine the amounts of the alternative limits that each part describes, each part requires subtraction of the amount of "applicable deductibles and primary and underlying excess limits." Both parties agree that Lynd had a deductible of $25,000 per occurrence and an underlying primary limit of $20 million per occurrence. [4] To calculate the amount of the limit

described in Part 1a, we must determine the "actual adjusted amount of the loss," and then subtract the deductible and primary limit from that amount. And to calculate the amount of the limit described in Part 1b, we must subtract the deductible and primary limit from the "individually stated value for each scheduled item of property insured at the location which had the loss."

The requirement of subtracting the deductible and primary limit from each of the amounts described in Parts 1a and 1b makes RSUI's item-by-item construction problematic, at best. As noted, the deductible and primary limit apply "per occurrence," and the policy defines "occurrence" to mean a "loss ... *or* series of losses." (Emphasis added.) RSUI construes the **\*126** word "occurrence," as it is used in Paragraph 1's introductory sentence, to mean "each loss," rather than the entire "series of losses." Yet even RSUI does not contend that the "per occurrence" deductible and "per occurrence" primary limit apply to "each loss." Indeed, if RSUI must subtract $20,025,000 from the actual adjusted amount of "each loss" for each covered item (under Part 1a) or from the "individually stated value of each item" (under Part 1b), there would be no coverage at all.

 **[21]**  One way to avoid this outcome while still accepting RSUI's item-by-item construction of the endorsement would be to interpret the word "occurrence" to mean "each loss" when it appears in Paragraph 1's introductory statement, but to mean "the series of losses" when it refers to the deductible and primary limit. Generally, the law recognizes "a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). But this presumption "is not rigid," and it "readily yields" when the text uses the words in such various connections that it "warrant[s] the conclusion that they were employed in different parts of the act with different intent." *Id.* So although we find RSUI's attempt to attribute two different definitions to the word "occurrence" to be at best a stretch, we do not completely dismiss the possibility that we could construe the language in that manner.

 **[22]**  A second way to avoid this outcome while still accepting RSUI's item-by-item construction of the endorsement is to construe Parts 1a and 1b to require subtraction of a *pro rata* portion of the deductible and primary limit from the amounts of "each loss" and the "individually stated value of each scheduled item." But this approach would require us to read words into the endorsement's language, to require subtraction of "[*a pro rata portion of* ] applicable deductibles and primary ... limits." As we have explained, we cannot add words to the policy's language unless the context requires us to do so. *Am. Mfrs. Mut. Ins.,* 124 S.W.3d at 162.

A third way to avoid this outcome while still accepting RSUI's item-by-item construction of the endorsement is to construe Parts 1a and 1b together to require subtraction of the deductible and primary limit only once, from the *aggregate* amount of "the least" of each alternative as to each individually covered item. An obvious problem with this approach is that it requires *some* aggregation—specifically, aggregation of all of the amounts resulting from the application of the alternative limits as to each separate covered item—before subtracting the amounts of the deductible and primary limits. To do this, we would have to construe the same words to permit an item-by-item approach for part of the calculation and require aggregation for the remainder. So again, we would have to ignore the "natural presumption" that the words were intended to have the same meaning. More importantly, this approach ignores the language and structure of the parts themselves. Part 1a plainly requires that we subtract the deductible and primary limit from the "actual adjusted amount of the loss." Separately, Part 1b requires that we subtract them from the "individually stated value of each scheduled item." And the introductory language requires that we apply "the least" of the two differences, after subtracting the deductible and primary coverage from each. This approach, in short, would require us to ignore the plain language and the structure of the two parts.

 **[23]**  The dissent nevertheless embraces this approach, finding our conclusion to be "twisted," "strange," "unrealistic," **\*127** "nonsensical," "untroubled by realities and consequences," "glaring[ly] peculiar[ ]," and "simply wrong." Beneath all this bluster, the dissenting opinion is wholly lacking in brawn. Avoiding any threat of ever being accused of "textual flyspecking" or of "pars[ing] every jot and tittle of policy text," the dissent makes no effort to analyze the policy's words

or structure at all. "Our primary objective in [construing an insurance policy] is to ascertain and give effect to the parties' intent as expressed by the words they chose to effectuate their agreement." *In re Deepwater Horizon,* —— S.W.3d ——, ——, 2015 WL 674744 (Tex. 2015). "[W]e look at the language of the policy because we presume parties intend what the words of their contract say." *Gilbert Tex. Constr.,* 327 S.W.3d at 126. Eluding these fundamental principles, the dissent accepts RSUI's argument, which "is simply that deductibles and other coverage come off the bottom line, as one would expect." *Post* at 141. The dissent "take[s] that as a given," *post* at 140 n.1, concluding:

The liability limitation quite naturally reads:

liability ... shall be limited to the least of ...

[t]he actual adjusted amount of the loss ... [or]

115% of the individually stated value for each scheduled item of property ...

less applicable deductibles and primary and underlying excess limits.

Post at 141. While this construction may seem "quite natural[ ]," and even a "given" in light of the dissent's view of what the policy ought to mean, it is simply not what the policy says.

Nevertheless, other language in the policy may provide some support for the third way to avoid this outcome while still accepting RSUI's item-by-item construction of the endorsement. Specifically, the policy's Excess Physical Damage Coverage Form independently provides that RSUI's liability "attaches ... only after the primary and underlying excess insurer(s) have paid or have admitted liability for the full amount of their respective ... liability." Thus, the policy requires subtraction of the primary limit even without the subtraction language in Parts 1a and 1b of the Scheduled Limit of Liability endorsement. RSUI may have added that language in Parts 1a and 1b just to confirm that the policy only covers amounts that exceed those that the primary insurance has paid, and that nothing in the Scheduled Limit of Liability endorsement changes that result. [5] But even if that's the case, it added the language separately, into each of the two parts, rather than provide for a single **\*128** deduction from the aggregate of all amounts derived from the least of the two parts. By separately requiring the subtraction of the deductibles and primary limit in both parts, the language of the endorsement makes RSUI's proposed item-by-item construction difficult at best.

By contrast, Lynd's approach more closely follows both the language and the structure of the parts and honors the "natural presumption" that the word "occurrence" has the same meaning throughout the endorsement. Under Lynd's approach, the endorsement requires RSUI to (1) determine the actual amount of the "series of losses" and subtract the deductible and primary limit from that amount, (2) determine "[the total of every] individually stated value of each scheduled item" and subtract the deductible and primary limit from that amount, and then (3) compare the two differences to determine which is "the least." Since, as we have found, the word "loss" in Part 1a can be construed to refer to the "series of losses," the first step of this process is not problematic. The second step is problematic, however, because, as explained above, the language of Part 1b, standing alone, cannot be construed to refer to "[*the total of every*] individually stated value" without writing language into the policy.

But that language in Part 1b does not stand alone. We must construe it within its context, which includes the requirement that RSUI subtract the deductible and primary limit from "the individually stated value of each scheduled item." We agree with Lynd's contention that this is one appropriate way to construe Part 1b, and that doing so supports Lynd's aggregate approach for applying the alternative limits.

### 7. The Part 1c Limit

Finally, Part 1c of the endorsement limits RSUI's liability to "[t]he Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy." The parties agree that the "Limit of Liability" refers to the policy's overall

or upper limit of $480 million. [6] Because the policy separately imposes this $480 million per occurrence limit, outside of the Scheduled Limit of Liability endorsement, we ultimately conclude that Part 1c is superfluous and neither supportive of nor inconsistent with each party's proposed construction.

Lynd contends that, like the primary policy's limit of $20 million per occurrence, Part 1c's $480 million overall limit necessarily applies to the *aggregate* of all losses arising out of any one occurrence, and not to each individual loss. Therefore, Lynd contends, we must also construe Parts 1a and 1b to produce aggregate limits because, otherwise, we could not compare the amounts that each part produces to determine which is "the least." We do not agree, however, that Part 1c's $480 million limit *necessarily* applies to the aggregate of all losses arising from an occurrence. It is at least possible to construe Part 1c to impose a $480 million limit on the coverage provided for "each loss" to "each scheduled item" resulting from an occurrence. Under the facts of this case, of course, it is highly unlikely that a $480 million limit on "each loss" would ever be necessary, because the highest value Lynd stated for **\*129** any one item was $18.2 million. Even if Lynd understated the true value of that item, it is highly improbable that damages to that item (or to any of the other, lesser-valued items) could ever be greater than $480 million.

In theory, however, it was at least possible that Lynd could have acquired a new property that was so valuable that it was capable of sustaining damages in excess of $480 million. In light of that possibility, Part 1c could be construed to limit the coverage to $480 million for that one item, regardless of its stated value or the amount of damages it sustained. Construed in this manner, the Part 1c limit of $480 million would not be an "overall" limit on the amount of coverage per occurrence, but would instead be a maximum limit on the amount of coverage for "each loss" incurred for "the individually stated value for each scheduled item." And it would not increase the overall limit to allow recovery of up to $480 million for every loss sustained in one occurrence because, as we've already noted, the policy separately imposes a $480 million "per occurrence" limit, separate and apart from the Scheduled Limit of Liability endorsement.

But even if the Part 1c limit does not *necessarily* apply to the aggregate of all losses from one concurrence, we do agree with Lynd that it can reasonably be construed in that manner. We find support for this construction in the fact that Part 1c does not say that its limit is "the amount of $480 million," or even "the amount of the Limit of Liability" under the policy. Instead, it expresses the Part 1c limit as "[t]he Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy." By incorporating "the Limit of Liability," rather than the amount of that Limit, Part 1c refers not just to an amount, but to the specific "per occurrence" amount that limits RSUI's overall liability under the policy. Thus, even RSUI agrees that, "if a single occurrence such as a hurricane damages more than one portfolio property, RSUI agreed [in Part 1c] to pay *the sum* of the individually scheduled and sub-limited losses up to the per-occurrence cap." (Emphasis added.) RSUI agrees, in other words, that Part 1c's limit applies once to the aggregate total of all losses resulting from a single occurrence, and not multiple times to each individual loss.

Ultimately, however, Part 1c is superfluous under either party's construction. Whether construed as a limit on the losses to each scheduled item from one occurrence or a limit on the total losses to all items collectively from one occurrence, Part 1c is superfluous because the overall Limit of Liability already limits the policy's coverage to $480 million per occurrence, regardless of whether the occurrence damages only one item or more than one. But the important thing about Part 1c is not its content but its contribution to the structure of the endorsement. Like the subtraction requirements in Parts 1a and 1b, RSUI may have added Part 1c to clarify that the endorsement's limits do not replace or negate the policy's overall per occurrence limit. [7] But whatever the reason, **\*130** RSUI added it as one of three alternatives that must be compared to each other to determine which is "the least." As a result, we must construe Part 1c in a manner that is consistent with, and comparable to, Parts 1a and 1b. Based on the actual language and structure of the endorsement, if we construe those two parts to provide for an item-by-item comparison, as RSUI urges, we must construe Part 1c to impose an item-by-item limit, even though the Limit of Liability would have the same effect. If we construe Parts 1a and 1b to provide for a comparison of the aggregates of all losses against all stated values, we must construe Part 1c to impose an aggregate cap. This is because each part must result in an amount that can be compared to the amounts of the other parts, so that "the least" can be determined. As we have said, we could construe Part 1c to impose either an

item-by-item or an aggregate limit. Ultimately, because of its reference to the "Limit of Liability," which both parties agree applies in the aggregate, we think it more readily supports Lynd's aggregate approach. Even if that were not the most likely construction, it is at least an appropriate construction, and thus Part 1c can be construed in a manner that supports Lynd's constructions of Parts 1a and 1b.

### 8. The Policy as a Whole

 [24]    [25]    [26]    Although we have discussed various provisions that inform the meaning of the Scheduled Limit of Liability endorsement's language, we are not conducting a balancing test. The law does not ask which party can identify the greatest number of ways the contract's structure or language supports its construction. Nor does the law deem a contractual provision ambiguous merely because both parties can point to words or phrases that, read in isolation, favor different constructions of the contract, or because both parties can identify language that, through the lens of hindsight, could have been more clearly stated. *See, e.g., Balandran,* 972 S.W.2d at 741; *Daniel,* 243 S.W.2d at 157. Few contracts could withstand that scrutiny. "An ambiguity does not arise simply because the parties offer conflicting interpretations." *Schaefer,* 124 S.W.3d at 157. To be ambiguous, both interpretations must be a reasonable interpretation of the words chosen by the parties when read in the context of the policy as a whole. *See Gilbert Tex. Constr.,* 327 S.W.3d at 126; *Forbau,* 876 S.W.2d at 133.

Thus, we must consider all of the endorsement's relevant terms, and construe them together. Doing so here, we conclude that the language supports both parties' constructions. Although some aspects of the endorsement are more consistent with Lynd's interpretation than RSUI's, nothing in the endorsement, when read as a whole within the context of all the policy's language, is irreconcilable with RSUI's interpretation. And although some aspects of the endorsement are more consistent with RSUI's interpretation than Lynd's, nothing in the endorsement, when read as a whole within the context of all the policy's language, is irreconcilable with Lynd's interpretation. We thus conclude that the policy's language  *131  could reasonably be construed to support them both.

### B. Is Lynd's Proposed Construction Reasonable?

RSUI contends that Lynd's proposed construction of the Scheduled Limit of Liability endorsement is unreasonable, and therefore does not establish ambiguity, because it ignores the common knowledge and practices of the insurance industry. Specifically, RSUI argues that the insurance industry recognizes two different types of commercial property policies: those that provide "scheduled" (or "specific") coverage, and those that provide "blanket" coverage. *See* Br. for Pet'r at 13, No. 13–0080, ––– S.W.3d ––––, 2013 WL 5785791 at *13 (citing DAVID RUSSELL, INSURING THE BOTTOM LINE: HOW TO PROTECT YOUR COMPANY FROM LIABILITIES, CATASTROPHES AND OTHER BUSINESS RISKS 50 (Silverlake 1st ed. 2004) for the proposition that commercial property policies insure property on either a specific, schedule, or blanket basis). According to RSUI, the "distinction between the two types of coverage is simple: blanket coverage aggregates all covered properties to provide one coverage limit applied collectively, while scheduled coverage provides scheduled limits for each property independently." *See id.* (citing STEVEN PLITT, ET AL., 12 COUCH ON INSURANCE §§ 175:90, 177:72 (3d ed.1997)).

RSUI explains that a scheduled policy "is a popular tool for insuring multiple properties, often located in multiple states, because it is cost efficient." This is because "the premium is based on the value of each item of property as declared (or 'scheduled') by the property owner," and the policy covers the actual loss for each item "only up to the scheduled amount." When a single occurrence damages multiple properties covered by a scheduled policy, "the insurer's total liability for these individually determined per-property losses is capped at an agreed-upon level." This item-by-item limitation of the insurer's liability, RSUI explains, "is the 'hallmark' of a scheduled policy." Using RSUI's vernacular, a "scheduled policy" is one that provides "scheduled coverage," meaning coverage that is limited on an item-by-item basis. And because the policy at issue here is a scheduled policy, RSUI contends, its liability limits apply on an item-by-item basis.

The court of appeals concluded that it "need not decide whether the RSUI policy provides for scheduled coverage or blanket coverage," but must instead decide what the policy's language means "without regard to how the policy or the coverage it provides is labeled." RSUI contends that, by "avoiding the question" of whether this is a scheduled or blanket policy, the court of appeals "judicially create[d] an entirely new type of policy that is unknown in the insurance industry, producing absurd results that put Texas at odds with other jurisdictions that have interpreted comparable policies." We agree with RSUI that we cannot "avoid the question" of whether this is a scheduled or blanket policy, if by those labels RSUI means we must decide whether the policy limits RSUI's liability on an item-by-item or an aggregate basis. But we agree with the court of appeals that we cannot simply label the policy as "scheduled" or "blanket" and then construe its language to reach that result.

In construing the policy's language, RSUI contends that we cannot simply look at the words themselves, but must also consider the policy's overall "structure," which confirms that it is a scheduled policy. Specifically, RSUI points out that the policy (1) covered multiple properties at multiple locations, (2) required Lynd to submit a schedule of the covered properties and their values, and (3) provided that **\*132** RSUI would rely on the reported values to assess its risks and determine the amount of the premium. [8] In addition, RSUI asserts that we must characterize the policy as a scheduled policy because, otherwise, the policy would have the absurd effect of encouraging Lynd to understate the properties' values. We conclude that none of these reasons individually, nor all of them together, is sufficient to establish that the policy must be a scheduled policy with item-by-item limits, or to render Lynd's proposed construction of the policy unreasonable.

### 1. Multiple Properties at Multiple Locations

RSUI explains that a scheduled policy "is a popular tool for insuring multiple properties, often located in multiple states, because it is cost efficient." But it also acknowledges that "[e]ither scheduled or blanket policies can be used to cover multiple properties at multiple locations—the kind of coverage that Lynd needs for its multistate portfolio." In fact, the parties agree that Westchester's primary policy, which covered the same properties, provided blanket coverage with limits applying to all aggregated losses arising from any one occurrence. The fact that the policy covered multiple properties at multiple locations is thus consistent with either a scheduled or a blanket policy, and does not indicate that it is one or the other.

### 2. Required List of Properties and Values

According to RSUI, "[u]nder a scheduled policy, before coverage is placed, the property owner submits to the insurer a 'Statement of Values" listing the value of each item of property to be insured." Because this policy required Lynd to provide a Statement of Values before coverage was placed, RSUI asserts, the policy provides scheduled coverage. RSUI cites to language in several cases to support this proposition. *See, e.g., Reliance Nat'l Indem. Co. v. Lexington Ins. Co.,* No. 01 C 3369, 2002 WL 31409576, at \*8 (N.D.Ill. Oct. 23, 2002) ("Because the Lexington Policy separately scheduled different items of property, it is a scheduled policy with specific limits for particular items and not a blanket coverage policy."); *Anderson Mattress Co. v. First State Ins. Co.,* 617 N.E.2d 932, 935 (Ind.Ct.App.1993) (finding policies were scheduled policies "because they separately scheduled values for individual pieces of property"); *Vernon Fire & Cas. Ins. Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173, 177 (1976) (holding policies were scheduled policies because "the property insured was separately scheduled and valued in the contracts"). [9]

 **[27]**  Several other courts, however, have recognized that insurance policies often "schedule" the covered properties and their values for reasons other than to impose individual limits. For example, "it is not uncommon to find a blanket policy with a separate, specific listing of individual pieces of property with values, the values of which are averaged to calculate the insurance premium." **\*133** *Aerosonic Corp. v. Liberty Mut. Fire Ins. Co.,* No. 8:09–CV–1355–T–26EAJ, 2009 WL 5068616, at \*8 (M.D.Fla. Dec. 17, 2009). When schedules are required and used to calculate an average or overall premium, or to ensure compliance with a co-insurance requirement, or for some purpose other than to impose

separate limits on each scheduled item, the use of a schedule "was not at all inconsistent" with blanket coverage. *Reliance Ins.,* 322 F.2d at 807. A blanket policy may use a schedule for one of these purposes, and "not to establish a scheduled policy." *Core–Mark Int'l Corp. v. Commonwealth Ins. Co.,* No. 05CIV0183WHP, 2006 WL 2501884, at \*6 (S.D.N.Y. Aug. 30, 2006). So "the bare fact that a schedule of values is used ... is not enough to establish that a policy is scheduled and not blanket as a matter of law." *ARM Props. Mgmt. Grp. v. RSUI Indem. Co.,* No. A–07–CA–718–SS, 2008 WL 5973220, at \*9 (W.D.Tex. Aug. 25, 2008) (citing *Reliance Ins. Co.,* 322 F.2d at 807).

 **[28]**   We agree with these courts. It is one thing to say that every scheduled policy (that is, every policy that limits liability on an item-by-item basis) includes or incorporates a schedule of covered items and their values, but it is quite another to say that every policy that includes a schedule of covered items and their values limits liability on an item-by-item basis. The Scheduled Limit of Liability endorsement at issue here expressly provided that "[t]he premium for this policy is based upon the Statement of Values." We thus conclude that the "bare fact" that this policy required Lynd to file a Statement of Values does not indicate that it limited liability on an item-by-item basis.

### 3. Reliance on Values to Determine Risk and Premium

RSUI acknowledges that an insurer may use a schedule for other purposes, and it admits that it used the Statement of Values in this case to evaluate its risks and determine the amount of the premium. But RSUI contends that even those purposes demonstrate that this was a scheduled policy that limited liability on an item-by-item basis. As we understand this argument, RSUI contends it evaluated its risks and determined the premium based on the stated values for each covered item, and this demonstrates that the policy was "structured" as a scheduled policy with item-by-item limits.

There is nothing in this policy, however, or even in this record, that explains how RSUI evaluated its risks and determined the premium, much less evidence that it did so on an "item-by-item" basis. To the contrary, the policy reflects that RSUI provided the coverage at an average or flat rate of $0.025 per $100 of reported value, and that this rate applied to all items at all properties at all locations in the Statement of Values. For purposes of setting the premium, in other words, RSUI did not distinguish between properties and assign different premiums to different properties based on their risk of sustaining a loss. Instead, RSUI essentially averaged all of the covered risks and based the premium on a flat rate that applied equally to the value of every scheduled item at every location. For a scheduled policy, the premium is usually determined based on the individual risks assigned to each individual covered property, while "[a]n average rate usually indicates a blanket policy." *Reliance Ins. Co.,* 322 F.2d at 806. The fact that RSUI based this policy's premium on an average rate for all scheduled items is thus more consistent with a blanket policy than a scheduled policy.

RSUI asserts that it would have charged a much higher rate—much more than $0.025 per $100 of value—if the policy's limits applied on an aggregate rather than item-by-item basis. In fact, RSUI and the  **\*134**  amici that support it [10] warn that, if they are unable to limit their liabilities on an item-by-item basis, many if not most insurers will simply stop writing policies to cover multiple properties at multiple locations. As a result, they contend, companies like Lynd, which need insurance for multiple properties, would lose the ability to obtain the insurance, at least at the significant discount that a scheduled policy offers.

Since, as this case demonstrates, applying the alternative limits on an aggregate basis may result in the insurer being liable for more in any one occurrence than if the limits applied on an item-by-item basis, it certainly makes sense that RSUI would charge a higher average rate for a policy that applies the limits on an aggregate basis. But there is nothing in this policy or this record to establish what the "appropriate" rate would be, much less that the $0.025/$100 rate is consistent only with item-by-item limits. And even if there were, we could not conclude that RSUI's decision to set the rate based on item-by-item limits necessarily establishes that the language of the policy actually imposes the limits on that basis.

Nor do we find RSUI's (and its amici's) warnings compelling. By finding the policy at issue in this case to be ambiguous, and thus construing it in favor of the insured, we are not holding that insurers cannot offer scheduled policies that limit

their liabilities on an item-by-item basis. We are simply holding that when they offer such policies they must use language that unambiguously confirms that they are doing so. They can avoid all of the calamities that RSUI and its amici contend today's decision will cause to the commercial property insurance market by writing their policies more clearly. We have no fear for the insurance market, because we have no doubt that RSUI and its competitors can do so.

In any event, because RSUI based the premium for Lynd's policy on an average rate applied to all scheduled items regardless of their relative risks, and in the absence of any evidence establishing that the rate it charged was consistent only with limits that apply on an item-by-item basis, we conclude that the fact that RSUI based the premium on Lynd's reported values does not establish that the policy was a scheduled policy with item-by-item limits.

### 4. Encouraging Understatement of Values

Finally, in discussing the policy's "structure," RSUI contends that unless we construe this policy to be a scheduled policy with item-by-item limits, we will cause the absurd result of encouraging insureds to understate the values of their covered items. As RSUI explains it, "[a] scheduled policy protects the insurer by limiting its liability to the amount of the insured's loss, but only up to the scheduled amount, upon which the premium was based." At the same time, RSUI contends:

> The structure of a scheduled policy protects the insured by providing full recovery whether the loss is partial or total, but only if the insured gave an accurate value when scheduling the property (because the scheduled value is intended to be the cost to replace the property in **\*135** the event of a total loss). However, if the insured undervalued the property either by mistake or to gain the benefit of a correspondingly lower premium, then—by its own doing—it will not be fully compensated in the event of a total loss.

RSUI's construction of its policy thus affords RSUI complete protection against Lynd underinsuring its properties by more than 15%. Put another way, under RSUI's construction, if Lynd understates the value of the insured properties and pays premiums based on the lower values, Lynd bears the risk (above the 15% cushion) associated with its decision to underinsure. [11] RSUI contends that Lynd's construction, by comparison, affords RSUI protection against undervaluation by Lynd only in limited circumstances that are not present here. RSUI and its amici argue that Lynd's construction encourages property owners to underinsure because they will frequently be able to recover more insurance than they purchased. Here, for example, Lynd seeks to recover about $11 million to replace the buildings at the Le Chateau, which is nearly $3.5 million more than the building replacement value of $7.6 million that Lynd reported on the Statement of Values, and on which the premiums were based.

Lynd responds that RSUI's concern is "unfounded" because under Lynd's construction, "[a]n insured would be harmed by undervaluing its properties in the vast majority of claims, which involve only isolated events at a single location." Thus, Lynd asserts, "[n]o reasonable insured would render its own excess policy largely illusory in order to save a little money in the unlikely event of a major catastrophe." [12] In addition, Lynd argues that "the only way an insured could come out ahead" by underreporting values "is if it knew ahead of time which properties would be completely destroyed and which would receive only mild damage, and then report the values accordingly—all to save a few thousand dollars in premiums."

Regardless of whether we agree with Lynd's response, the answer to RSUI's concerns is that the benefits or detriments of either approach (scheduled, blanket, or an "unknown hybrid") ultimately depend on how RSUI underwrites the risk and calculates the premiums. Certainly, if RSUI set the premium for Le Chateau based on the scheduled value of $7.6 million and on the assumption that RSUI would never have to pay more than 115% of that amount, then the amount of the premium would be insufficient if RSUI were required to pay more than the 115%. But this analysis overlooks the reality that the policy covered, and that Hurricane Rita damaged, more than just Le Chateau. Lynd does not contend that RSUI would have to pay more than 115% of the stated **\*136** value of Le Chateau if Le Chateau were the *only* property

damaged in any one occurrence. If an occurrence only damaged Le Chateau, and the amount of the loss exceeded 115% of the stated value of the scheduled items at that location, Part 1b would limit RSUI's liability to 115% of the stated value.

Similarly, under Lynd's proposed construction, if an occurrence damages property at *more than* one location, and the amount of the loss exceeded 115% of the total of the stated values of the scheduled items at those locations, Part 1b would still limit RSUI's liability to 115% of the total of the stated values, even if one or more of the properties incurred losses less than the total of the stated values at those locations. The only difference is that RSUI could be liable for more than 115% of the stated values at one or more locations, but only if the losses at that location exceeded 115% of those stated values and the total of all losses did not exceed 115% of the total of the stated values at all damaged locations. Here, for example, the total combined value that Lynd reported for all of the covered properties was just over $793 million, and RSUI charged a flat or average rate premium of $0.025/ $100 for all of that amount. As it turned out, Hurricane Rita damaged fifteen of the listed properties, for which Lynd had reported a total combined value of just over $154 million. The total amount of the adjusted loss for those fifteen properties was just under $25 million, (including the amounts that exceeded the reported values for the Le Chateau and Willow Bend complexes). Though it was merely fortuitous that two of the properties sustained losses beyond their stated values, it is just as fortuitous that the thirteen other properties did not sustain more losses. Ultimately, though, the extent of RSUI's risk was the same: 115% of the total of the stated values for the scheduled items at the locations that incurred a loss.

If Lynd had significantly understated the values of all of the scheduled items at all fifteen properties, it would have paid lower premiums but would have faced the risk that the coverage would be insufficient, particularly if all of the properties were seriously damaged. But neither Lynd nor RSUI could know in advance which of the properties would be seriously damaged, or even damaged at all. Ultimately, then, under Lynd's proposed construction, the insured is encouraged to accurately state the values because it cannot understate all of the values and it cannot know which properties to strategically undervalue in advance of an occurrence.

The dissent concludes that the "most serious" flaw in our analysis is the "glaring peculiarity of [our] interpretation—that the policy pays more of the losses for one property if others are damaged at the same time." *Post* at 142. But the dissent makes no effort to explain why this result is so "peculiar" when RSUI receives the exact same premium rate for all of the items at all of the properties, whether those properties are ever damaged or not, and its liability is always capped at 115% of the values stated for all of those identically treated properties, regardless of whether one, some, or all of them are damaged in a single occurrence. Ultimately, the dissent concludes only that, for the dissent, it is "difficult to imagine" that the parties could have intended such an arrangement. *Post* at 142. Fortunately, we need not attempt to imagine what the parties intended, and instead need only construe the "parties' intent as expressed by the words they chose to effectuate their agreement." *In re Deepwater Horizon,* —— S.W.3d at ——.

In the same vein, we cannot agree with RSUI's argument that Lynd's construction **\*137** of the endorsement permits Lynd to recover benefits for which it paid no consideration. Specifically, RSUI contends that, for Le Chateau and Willow Bend, Lynd seeks to recover amounts in excess of 115% of the stated values of the scheduled items at those locations, but it did not pay premiums for those excess amounts. But this argument ignores the fact that RSUI charged the same rate for Le Chateau and Willow Bend that it charged for the coverages at all of the other properties. And it ignores the fact that Lynd did pay the premium that RSUI set to cover up to 115% of the stated value of the scheduled items at all of the damaged locations, and all it is seeking is to recover up to that amount. Because not all of the properties sustained losses in excess of 115% of the stated values, Lynd is actually seeking far less than that amount. And in any event, if the $0.025/100 premium rate was insufficient to constitute adequate consideration for the coverage Lynd seeks, RSUI could have charged a higher rate. Or, as we have explained, RSUI could have drafted the policy to unambiguously apply the item-by-item limits it seeks to impose.

Ultimately, we agree with RSUI that the distinction between a scheduled policy and a blanket policy is critical to an insurer's determination of the risk that the policy shifts from the insured to the insurer, and thus the premiums it charges

for undertaking that risk. But we agree with Lynd that the language of this policy ultimately dictates how the policy operates, not the label the parties affix to it, and that parties can choose contract terms that are unusual or even ill advised. We are also mindful that, while we may decide "the meaning to which a certain term or phrase is most reasonably susceptible" in light of the meaning "regularly observed in the place, vocation, trade, or industry so 'as to justify an expectation that it will be observed with respect to a particular agreement,' " we may not consider extrinsic evidence to "contradict or vary the meaning of the explicit language of the parties' written agreement." *Nat'l Union Fire Ins., 907 S.W.2d at 521 & n.6* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 222(1)). For these reasons, we conclude that RSUI's arguments regarding the insurance industry and the "structure" of the Scheduled Limit of Liability endorsement are insufficient to render Lynd's proposed construction of the endorsement's language unreasonable.

### C. Other Courts' Decisions

The parties cite to several cases that demonstrate that RSUI's Scheduled Limit of Liability endorsement, like many other endorsements and insurance policy parts, is similar to forms that RSUI and other insurers have used in commercial property policies across the nation for decades. *See, e.g., LES Realty Trust "A", 977 N.E.2d at 570; Orleans Parish Sch. Bd. v. Lexington Ins. Co., 99 So.3d 723 (La.Ct.App.2012); RSUI Indem. Co. v. Benderson Dev. Co., No. 2:09–cv–88–FtM–29DNF, 2011 WL 32318 (M.D.Fla. Jan. 5, 2011); Axis Specialty Ins. Corp. v. Simborg Dev., Inc., No. 07–C–5906, 2009 WL 765298 (N.D.Ill. Mar. 20, 2009); Gulfport–Brittany, LLC v. RSUI Indem. Co., No. 1:07cv1036HSO-JMR, 2008 WL 4951468 (S.D.Miss. Nov. 7, 2008), aff'd, 339 Fed.Appx. 413 (5th Cir.2009)* (per curiam). When we construe insurance policies, we "usually strive for uniformity in construing insurance provisions, especially where ... the contract provisions at issue are identical across the jurisdictions." *Nat'l Union Fire Ins. Co. of Pittsburgh, 907 S.W.2d at 521–22; see also Zurich Am., 268 S.W.3d at 496–97* ("We have repeatedly stressed the importance of uniformity 'when identical insurance provisions will necessarily be interpreted in various jurisdictions.' ") **\*138** (quoting *Cowan, 945 S.W.2d at 824*). We do this to afford both insureds and insurers the heightened predictability of a body of interpretive case law.

RSUI and its amici argue that adopting Lynd's construction of this endorsement will place Texas out-of-line with all but one of the other jurisdictions that have addressed this issue and will preclude insurers from offering this sort of insurance for reasonable rates in Texas. [13] In response, Lynd asserts that its construction does not conflict with other jurisdictions' interpretations of the same or similar endorsements because the cases RSUI cites involve different language or damage at a single location, not at multiple locations like occurred here. Lynd contends that only one court has construed this same endorsement in a situation involving damage to multiple locations caused by a single occurrence, and that court rejected RSUI's interpretation. *See ARM Props. Mgmt., 2008 WL 5973220, at \*7–9.* Lynd also cites to the decisions of other jurisdictions that have found that similar policy language created an aggregate limit, or was at least ambiguous as to the limits it imposed. *See, e.g., Berkshire Refrigerated Warehousing LLC v. Commercial Underwriters Ins. Co., No. 05 C 1953, 2006 WL 862877, at \*2 (N.D.Ill. Mar. 27, 2006); Core–Mark Int'l, 2006 WL 2501884, at \*6; Reliance Ins., 322 F.2d at 807.*

Of course, Lynd attempts to distinguish RSUI's cases in a variety of ways, just as RSUI attempts to distinguish Lynd's. We agree that many of them, on both sides, are distinguishable for a number of reasons. In the end, however, we conclude that the national jurisprudence on this issue is insufficient to require us to ignore the ambiguity of this policy, for at least three reasons.

First, courts follow other jurisdictions' constructions of identical policy language to create uniformity among the jurisdictions, so that the parties can predict and rely on the language even if they are in different jurisdictions. This is particularly important when, as here, the exact same policy covers one insured's multiple properties located in numerous jurisdictions, and is similarly important when the same policy form, using identical language, covers different insureds in different locations. But as the cases the parties cite demonstrate, the various iterations of the allegedly "scheduled policies" that RSUI and other insurers have used throughout the years have not always used identical language, and there is no judicial uniformity even among those that do. In *Core–Mark International,* for example, the court addressed

a policy that contained language similar to the language at issue here, but with a key difference: Part 1b referenced the "*total* stated value *for the property involved,* as shown on the latest statement of values" rather than the "*individually* stated value of *each scheduled item* of property insured as shown on ... the Statement of Values." 2006 WL 2501884, at *2, *7 (emphasis added). The court held that the language of that policy was ambiguous as to whether it provided scheduled or blanket coverage. *Id.* at *6. In doing so, it expressly distinguished other cases construing the "individually stated value of each scheduled item" language present in this case, noting that those policies **\*139** "unambiguously established scheduled coverage." *Id.* at *7. Yet, prior to that court's decision, another court had construed a nearly identical "total stated value" provision as unambiguously creating item-by-item limits. *Anderson Mattress,* 617 N.E.2d at 935–37 (construing similar "total stated value" provision as creating item-specific rather than blanket coverage).

 **[29]** **[30]** Second, as Lynd points out, the commercial property policy at issue in this case is not a standard form policy, and the Scheduled Limit of Liability endorsement in particular is subject to revisions that RSUI may choose to make or accept in negotiations with each individual insured. [14] In cases "involving a standard form policy mandated by a state regulatory agency, ... the actual intent of the parties is not what counts (as they did not write it), but the ordinary, everyday meaning of the words to the general public." *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 746 (Tex.2006). Conversely, in cases involving a non-standard form, like the one at issue here, our task is to determine and enforce the mutual intent of the parties to the contract. In doing so, the decisions of other courts in cases involving other parties and other circumstances are not as compelling, particularly when those decisions are themselves less than uniform.

Finally, the numerous and varied decisions that the parties cite, which date back to as early as 1963 and continue until as recently as 2012, offer us no easy opportunity to establish uniformity and yet demonstrate an urgent need for clarity in this arena. The endorsement at issue here is not ambiguous simply because it includes the phrase "in any one 'occurrence' " in Paragraph 1's introductory statement or the disjunctive "or" between Parts 1b and 1c. Rather, as our effort to understand and explain the endorsement illustrates, the language presents many obstacles to easy interpretation, including the circuitous definitions of the words "loss," "occurrence," and "event," the varying usages of and confusing relationships between those words, and the complicating incorporations of the deductible, the primary policy limits, and the excess policy's overall limit into the calculations of the endorsement's three alternative limits. Because of these obstacles, we are convinced that the language is ambiguous, even if other jurisdictions are not.

We are also convinced that one more court decision will do little to meet the need for clarification. Instead, only RSUI, and other insurers who use the same or similar endorsements, can provide the clarity needed to resolve these issues by significantly revising the endorsement to say what the insurers really want it to mean. We do not mean to suggest that doing so will be easy, but it will be easier than trying to construe the current language or create uniformity among the current jurisprudence. For these reasons, we conclude that the numerous and divergent decisions **\*140** of other jurisdictions attempting to construe this and similar endorsements are insufficient to ignore the ambiguities we have identified.

## IV.

### Conclusion

We hold that the Scheduled Limit of Liability endorsement at issue in this case is reasonably subject to both parties' proposed constructions and that the endorsement is therefore ambiguous. Because our rules require us to construe an insurance policy's ambiguous coverage limitation in favor of coverage for the insured, we affirm the court of appeals' judgment adopting Lynd's proposed construction.

Chief Justice Hecht filed a dissenting opinion, in which Justice Green and Justice Brown joined.

Chief Justice Hecht, joined by Justice Green and Justice Brown, dissenting.
RSUI Indemnity Company sold The Lynd Company excess property insurance covering more than 100 commercial properties. One property, the Le Chateau apartments, sustained about $11.1 million in losses in Hurricane Rita. Had this property been the only one damaged in that storm, RSUI's policy would have paid only $8.8 million of the loss, 115% of $7.7 million value stated for the property by Lynd in its policy. [1] But because the total values of all 15 Lynd properties damaged in the same storm exceeded total losses, the Court concludes that Lynd should be paid the full $11.1 million loss for Le Chateau.

It's called a meterological policy. What you're paid depends on the weather.

The policy does not cover all losses to all Lynd's properties, as a blanket policy would. It covers only the properties Lynd lists with stated values. Lynd can state any values it chooses, but values chosen affect premiums and coverage. Premiums are 2.5¢/$100 of stated value. And RSUI's liability for any one occurrence is the least of (a) the adjusted loss, (b) "115% of the individually stated value for each scheduled item of property", or (c) policy limits. Policy limits are $480 million, far more than the $24.5 million total losses involved in this case, so (c) is not a limitation. When one property is damaged, RSUI's liability is simple: the policy pays the lesser of the adjusted loss or 115% of the stated value. The dispute is over how to apply (a) and (b) when multiple properties suffer losses in the same occurrence.

The following scenario for three properties damaged in the same occurrence illustrates the differences in the parties' interpretations of the liability limitation:

| Stated Value | (b)<br>115% | (a)<br>Adjusted Loss | Lesser of<br>(a) & (b) |
|---|---|---|---|
| Blackacre—15 | 17.25 | 20.00 | 17.25 |
| Brownacre—10 | 11.50 | 8.00 | 8.00 |
| Whiteacre—5 | 5.75 | 2.00 | 2.00 |
| Total | **X** 34.50 | **Y** 30.00 | **Z** 27.25 |

Lynd argues that the policy pays the lesser of X and Y; the total adjusted loss is **\*141** compared to 115% of the total stated values of the properties damaged. RSUI argues that the policy pays the lesser of Y and Z; each adjusted loss is compared to 115% of each stated value. Lynd argues the policy is like a blanket policy; RSUI argues it is a scheduled policy.
With a neurosurgeon's scalpel, the Court parses every jot and title of policy text. Five of the seven scrutinized fragments, it turns out, are unhelpful. The title of the liability limitation provision "provides some support for RSUI's construction" but not much, [2] and none for Lynd's. The "cautionary language" "does not indicate which party's construction ... is correct." [3] The "introductory statement" "is equally consistent with both parties' constructions". [4] Element (a) "is consistent with both parties' constructions." [5] And element (c), as already noted, "is superfluous under either party's construction." [6]

That leaves element (b) and the requirement that the amounts in both (a) and (b) be "less applicable deductibles and primary and underlying excess limits". Element (b) expressly requires that adjusted losses be compared to stated values for properties "individually" and thus, as the Court admits, "supports RSUI's ... construction ... and does not support Lynd's". [7] Because element (b) is clear, the Court seems to think that RSUI's position has to be that deductibles and other coverage must also be allocated separately to each property loss, something that is "difficult at best". [8] But RSUI's argument is simply that deductibles and other coverage come off the bottom line, as one would expect. The liability limitation quite naturally reads:

liability ... shall be limited to the least of ...

[t]he actual adjusted amount of the loss ... [or]

115% of the individually stated value for each scheduled item of property ...

less applicable deductibles and primary and underlying excess limits.

This reading does indeed "support[ ] Lynd's ... approach", as the Court concludes, [9] but it hardly "makes RSUI's ... construction difficult at best". [10] It *is* RSUI's construction.

Even if RSUI were somehow constrained to take a "difficult" individual-allocation view of the policy's treatment of deductibles and primary limits, the Court's ultimate conclusion—that the "policy's language could reasonably be construed to support ... both [RSUI's and Lynd's positions]" [11]—is, by its own analysis, simply wrong. The Court finds nothing in the policy that is inconsistent with RSUI's position, but element (b), the key passage, "does not", in the Court's own words, "support Lynd's [construction]". To this the Court responds that by quoting its opinion, **\*142** I have "cleverly misstate [d]" its analysis. Conceding that "standing alone," element (b) does not support Lynd's position, the Court nevertheless insists that taking element (b) in context with the entire policy, Lynd's position is as reasonable as RSUI's. How that can be, the Court cannot explain. How RSUI's interpretation of the policy, which is consistent with every provision, is as reasonable as Lynd's, which cannot be squared with the central provision at issue, is simply baffling. The Court's stated purpose of its excruciatingly detailed analysis of the policy text is to determine whose position is consistent with the text and whose is not. After stating that RSUI's is and Lynd's is not, the exercise turns out to have been a water haul.

But inconsistency is not the Court's only flaw, or even its most serious. So concentrated is the Court on textual flyspecking that it is all but oblivious to the glaring peculiarity of its interpretation—that the policy pays more of the losses for one property if others are damaged at the same time. The Court dismisses this result as "merely fortuitous". [12] But while the risk that loss will occur is a matter of chance, the result of the loss payment *calculation* should not be. (What's Loss 1? 2. What's Loss 2? 2. What's Loss 1 + Loss 2? Fortuitously, 5.) It is difficult to imagine an insured risking an uncovered loss when only one its properties is damaged, or an insurer paying more than it would otherwise because multiple properties are damaged in the same event.

A blanket policy covers all losses but costs more than a scheduled policy. A scheduled policy has advantages for both the insurer and the insured. The insured can state whatever value it chooses for a property and pay only for insurance to cover the loss of that value. The insurer's liability for loss to the property is capped at 115% of the stated value, in effect giving the insured a 15% margin of error in stating the values of properties. In the Court's view, Lynd paid for a scheduled policy but got a blanket policy when multiple properties are damaged in the same occurrence—a scheduled-but-sometimes-blanket hybrid.

And the Court's reaction to this twisted result is: *que sera sera.* If RSUI is dissatisfied with the result, it should change its underwriting procedures or its premium schedule, or better yet, write a clearer policy. Those are certainly *RSUI's*

options and none of our business. What is our business is whether an analysis that yields so strange a result might be incorrect. It is a question the Court does not consider.

The Court concludes that both Lynd's and RSUI's policy interpretations are reasonable—that is, it is possible for the words to have the meaning ascribed. The Court's approach gives no consideration to whether an unrealistic interpretation is reasonable. Rather, the reasonableness of an interpretation is measured by an advocate's or judge's linguistic ingenuity and absorption with minutiae, untroubled by realities and consequences.

I agree with the Court that Lynd's interpretation of the policy cannot be squared with element (b) of the liability limitation. I disagree that the interpretation is nevertheless reasonable, especially given the nonsensical consequences. Accordingly, I respectfully dissent.

**All Citations**

466 S.W.3d 113, 58 Tex. Sup. Ct. J. 854

Footnotes

1       When construing undefined contractual terms, courts may consider the terms' commonly accepted meanings within the relevant industry. *Cf. Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 122 (Tex.1996) (applying "commonly accepted meaning in the oil and gas industry" of phrase "market value at the well"). Those meanings are not necessarily determinative, however, and may not apply when the language and its context demonstrate that the parties intended a different meaning. Lynd agrees that Part 1b's limit imposed "scheduled limits" as one of the three alternatives, in the sense that the limit under that alternative was based on "the value for each scheduled item of property" listed on the Statement of Values, but Lynd contends that the language of the endorsement did not permit RSUI to impose that limit on an item-by-item basis. We discuss these arguments in more detail below.

2       The Excess Physical Damage Coverage Form states that the policy is "subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the policy(ies) of the primary Insurer(s) prior to the happening of a loss for which claim is made hereunder, and should any alteration be made in the premium for the policy(ies) of the primary Insurer(s), then the premium hereon shall be adjusted accordingly."

3       *See also Axis Specialty Ins. Corp. v. Simborg Dev., Inc.,* No. 07–C–5906, 2009 WL 765298, at *4 (N.D.Ill. Mar. 20, 2009) (rejecting insured's argument that term "each" in similar endorsement was analogous to "total" because "each" means "every one of the two or more individuals composing the whole, *considered separately from the rest*") (citing *Orr v. Edgar,* 283 Ill.App.3d 1088, 219 Ill.Dec. 355, 670 N.E.2d 1243, 1249 (1996)).

4       Because Lynd purchased only two layers of insurance, there was no "underlying excess" policy limit.

5       In *LES Realty Trust "A" v. Landmark American Insurance Co.,* a manager of apartment complexes, like Lynd, insured several apartment complexes under an excess policy containing a Scheduled Limit of Liability endorsement. 82 Mass.App.Ct. 694, 977 N.E.2d 566, 570 (2012). The endorsement in that case had very similar wording to the endorsement here, but Parts 1a and 1b did not contain the language requiring subtraction of primary and underlying excess limits. *Id.* Two of the covered apartment complexes were damaged by Hurricane Katrina. *Id.* at 568. Relying in part on the Scheduled Limit of Liability endorsement, the property manager sought to recover its losses up to the full stated value of each property from its excess insurer, without subtracting the amount of the underlying coverage limits, even though the underlying coverage had been paid out in full. *Id.* The Court rejected the argument, noting that the policy independently limited excess coverage to amounts in excess of the underlying policy limits. *Id.* at 568–69. RSUI might have added the subtraction language to Parts 1a and 1b in an effort to avoid facing this same argument.

6       The policy's Declarations page did not "show" a "Limit of Liability," but it did incorporate an "Excess Physical Damage Schedule," which listed the "Limit Insured" as $480 million per occurrence. The Excess Physical Damage Coverage Form and the Reporting Endorsement (both of which the Declarations page also incorporated) stated that "the limits of [RSUI's] liability shall be" $480 million per occurrence, and RSUI "will not pay more than" that amount.

7    *Gulfport–Brittany, LLC v. RSUI Indemnity Co.* involved an excess policy with a Scheduled Limit of Liability endorsement very similar to the one at issue here. 339 Fed.Appx. 413, 415 (5th Cir.2009) (per curiam). RSUI had issued the excess policy in that case, and the insured was an owner of two apartment complexes that were damaged by Hurricane Katrina. *Id.* at 414. The property owner argued that there was a conflict between the policy's Excess Physical Damage Schedule and Excess Physical Damage Coverage Form, which only referenced the overall limit on liability (the "Limit Insured"), and the limitations in the Scheduled Limit of Liability endorsement. *Id.* at 415. The property owner argued that the policy language was ambiguous as to whether both limits applied or whether only one or the other applied. *Id.* Including Part 1c in the Scheduled Limit of Liability endorsement helps to convey that the limits in Parts 1a, 1b, and 1c all apply to produce the "least" amount and that the Scheduled Limit of Liability does not displace the policy's upper limit stated elsewhere in the policy forms. *See id.* (holding that the policy unambiguously created "an overall $140 million per occurrence limit with scheduled sub-limits for individual properties").

8    RSUI also relies on Part 1b of the Scheduled Limit of Liability in this context. We have addressed Part 1b above.

9    *See also Gulfport–Brittany, LLC v. RSUI Indem. Co.,* No. 107CV1036HSO–JMR, 2008 WL 4951468, at *3 (S.D.Miss. Nov. 7, 2008) ("courts in other jurisdictions have determined that where a policy contains a scheduled limit of liability endorsement, and the description of the premises is listed as per schedule on file with the company, a scheduled-rather than blanket-policy is created, and the insurer's liability as to that particular property is limited to the value shown on the statement of values on file with the company"), *aff'd,* 339 Fed.Appx. 413 (5th Cir.2009) (per curiam).

10   We have received amicus filings in support of RSUI from the Property and Casualty Insurers Association of America; Axis Surplus Insurance Company and Axis Insurance Company; the National Association of Professional Surplus Lines Offices, and the National Association of Mutual Insurance Companies. We have also received amicus filings in support of Lynd from San Antonio Apartment Association, Inc.; Texas Apartment Association, Inc. and Texas Hotel & Lodging Association; and a group of Texas policyholder coverage lawyers.

11   We do not read RSUI's arguments as implying that the decision to underinsure is necessarily a nefarious one, only that the decision creates exposure, which is generally born by the decision maker. For example, a person may choose to purchase only $15,000 in coverage for damage to her car even though the car is worth more than that amount. In the event that the car is totaled, she may recover $15,000 from her insurer but will have to incur any additional costs for replacing or repairing the car.

12   We note that the decision to insure a piece of property for less than its full value does not render the insurance "largely illusory"—it simply allows the insured to pay lower premiums based on the lower insured value by retaining the risk of damage in excess of the insured value. The complaint made by RSUI and its amici is that Lynd's construction of the policy allows Lynd to pay lower premiums based on the lower insured value while still shifting most of the risk of damage in excess of the insured value to the insurance company.

13   RSUI cites to a number of cases, including *LES Realty Trust,* 977 N.E.2d at 570; *Orleans Parish School Board,* 99 So.3d at 726–27, 729; *Benderson Development,* 2011 WL 32318, at *5; *Axis Specialty Insurance,* 2009 WL 765298 at *3–4; *Gulfport–Brittany,* 339 Fed.Appx. at 415–16; *Reliance National Indemnity,* 2002 WL 31409576, at *8; *Fair Grounds Corp. v. Travelers Idem. Co.,* 742 So.2d 1069, 1071–72 (La.App.1999); *Anderson Mattress,* 617 N.E.2d at 935–37; and *Sharp,* 349 N.E.2d at 176–77.

14   RSUI acknowledges, in fact, that it accepted an altered version of the endorsement in a policy it issued for a different insured after it issued the Lynd policy, which omitted the phrase "in any one 'occurrence' " in the introductory statement in Paragraph 1 and omitted the disjunctive "or" between Parts 1b and 1c. Lynd argues in its brief that RSUI made these revisions to the endorsement to make it consistent "with the policy interpretation it argues for in this case." RSUI denies this accusation in its reply brief, and explains that the revised endorsement was actually "inserted by the broker (not by RSUI) for that particular insured, in the negotiation of that particular manuscript policy." Regardless of whether or why RSUI revised the endorsement for that particular insured, RSUI acknowledges that this is not a standard form policy, and its explanation confirms that it can make or accept revisions based its negotiations with each insured.

1    The losses covered by RSUI's excess policy are, of course, less primary coverage and deductibles, and I take that as a given without repeating it.

2    *Ante* at 121. The title is "Scheduled Limit of Liability".

3    *Ante* at 119. The language to which the Court refers states: "This Endorsement Changes The Policy. Please Read It Carefully.... This endorsement modifies insurance provided under ... ALL COVERAGE PARTS."

4    *Ante* at 122. The Court's reference is to the phrase, "in the event of loss".

5    *Ante* at 122.

6    *Ante* at 129.

7    *Ante* at 125.

8    *Ante* at 128.

9      *Ante* at 125.

10     *Ante* at 128.

11     *Ante* at 131.

12     *Ante* at 136.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1981424
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

RESOLUTION OVERSIGHT CORPORATION as Special

Receiver of Financial Insurance Company of America, Appellant

v.

Arturo GARZA, Appellee.

No. 03-08-00481-CV.
|
July 10, 2009.

West KeySummary

1     **Workers' Compensation**  🔑  Subrogation of or Assignment to Insurer

A trial court erred in failing to enforce subrogation rights of workers' compensation insurer against funds paid by an uninsured/underinsured (UIM) insurance carrier after an employee was hit by a car while working. A statute provided that carriers have a subrogation right to enforce and recover damages that an injured employee is owed from a third party who is or becomes liable to pay damages for the employee's injury. The UIM carrier was a third party, and the policy was purchased by the employer, not the employee. The UIM carrier was contractually liable for the employee's injuries and paid him damages, constituting compensation for the injuries he suffered in the accident. V.T.C.A., Labor Code § 417.001.

Cases that cite this headnote

From the District Court of Travis County, 261st Judicial District, No. D-1-GN-08-002508; Suzanne Covington, Judge Presiding.

**Attorneys and Law Firms**

Mary Searcy Marrero, Rachel Stroud, Stroud & Welch, PLLC, Austin, TX, for appellant.

Harry Bates, Hall & Bates, LLP, San Antonio, TX, for appellee.

Before Chief Justice JONES, Justices PURYEAR and HENSON.

*MEMORANDUM OPINION*

DIANE M. HENSON, Justice.

**\*1** Appellant Resolution Oversight Corporation ("Resolution"), as Special Receiver of Financial Insurance Company of America ("FIC") sought to enforce subrogation rights against funds paid by Home State County Mutual Insurance Company ("Home State") to appellee Arturo Garza. *See* Tex. Lab.Code Ann. § 417.001 (West 2006) (establishing subrogation rights for workers' compensation insurance carriers). The parties filed cross-motions for summary judgment, and the trial court granted Garza's motion and denied Resolution's. Resolution appeals, arguing that the trial court erred in granting summary judgment in favor of Garza. Because we hold that FIC has a valid subrogation lien against the funds Home State paid to Garza, we reverse the trial court's grant of summary judgment in favor of Garza, grant summary judgment in favor of Resolution as to the issue of FIC's subrogation rights, and remand the cause to the trial court for a determination of Garza's reasonable attorney's fees.

## BACKGROUND

In December 2004, Garza was injured in an automobile accident while operating a tow truck owned by Texas Towing Corporation. Garza had parked the truck on the shoulder of the road and was exiting the truck when he was struck by a vehicle driven by an uninsured driver. Garza sued the uninsured driver and Home State, Texas Towing's uninsured/underinsured motorist ("UIM") carrier. Home State eventually settled the suit and tendered its policy limit of $504,000. [1]

At the time of the accident, Garza was employed by Service Professionals of Texas, Inc. ("Serv Pro"), a staff-leasing company that had assigned Garza to Texas Towing. [2] Serv Pro's workers' compensation carrier, FIC, provided medical and temporary income benefits to Garza totaling $145,703.85. Resolution, on behalf of FIC, sought reimbursement for the full amount of benefits FIC paid to Garza out of the UIM benefits, citing to the subrogation provisions of the Texas Worker's Compensation Act. [3] *See* Tex. Lab.Code Ann. § 417.001.

Garza filed a motion for summary judgment, arguing that FIC's subrogation right does not extend to the UIM benefits at issue. In the alternative, Garza argued that, even if FIC did have a valid subrogation interest in the benefits, it could not exercise its subrogation rights because Garza had not been made whole. Finally, Garza argued that if FIC could exercise its subrogation rights, then FIC's share of the benefits should be reduced by one-third to cover Garza's reasonable attorney's fees. *See* Tex. Lab.Code Ann. § 417.003 (West 2006). Resolution also filed a motion for summary judgment, arguing that FIC has a subrogation interest in the UIM proceeds as a matter of law and that Garza had not established his entitlement to reasonable attorney's fees. The trial court granted Garza's motion for summary judgment and denied Resolution's.

Resolution raises six issues on appeal, which can be organized into three overarching questions: (1) whether FIC has a valid subrogation interest in the UIM benefits; if so, (2) whether Garza must be made whole before FIC can exercise its subrogation rights; and (3) whether Garza is entitled to reasonable attorney's fees out of FIC's share of the UIM benefits. [4]

## STANDARD OF REVIEW

**\*2** We review summary judgments de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). When, as here, both parties move for summary judgment on the same issues, and the trial court grants one motion and denies the other, the appellate court determines all questions presented and, if the reviewing court finds that the trial court erred, renders the judgment the trial court should have rendered. *Id.*

The questions presented on appeal turn on issues of statutory construction. Statutory construction is a legal question that we review de novo. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). In resolving an issue of statutory construction,

we first look to the plain language of the statute. *Tex. Health Ins. Risk Pool v. Southwest Serv. Life Ins. Co.,* 272 S.W.3d 797, 800-01 (Tex.App.-Austin 2008, no pet.); *General Motors Corp. v. Bray,* 243 S.W.3d 678, 685 (Tex.App.-Austin 2007, no pet.). We read the statute as a whole and give meaning to the language that is consistent with other provisions in the statute. *Dallas County Cmty. Coll. Dist. v. Bolton,* 185 S.W.3d 868, 872-73 (Tex.2005); *Texas Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004).

## DISCUSSION

*Does FIC have a valid subrogation interest in the UIM benefits?*

Subrogation entitles one party to enforce the rights and recover the remedies of another party. *See* Black's Law Dictionary 1467 (8th ed.2004) (defining "subrogation"). The legislature first subrogated workers' compensation insurance carriers to the rights of injured employees in 1917. Act of March 28, 1917, 35th Leg., R.S., ch. 103, 1917 Tex. Gen. Laws 268, 285. Under current law, carriers have a subrogation right to enforce and recover damages that an injured employee is owed "from a third party who is or becomes liable to pay damages" for the employee's injury. *See* Tex. Lab.Code Ann. § 417.001.[5] The question presented by this case is whether Home State is "a third party who is or becomes liable to pay damages." Garza argues that the statute only applies to third-party tortfeasors who are liable for damages as a result of some wrongdoing on their part and does not apply to UIM insurers, like Home State, whose liability is grounded in contract. Resolution counters that a "third party" under the statute is any party who is liable for the employee's injury, regardless of whether that liability arose in tort or contract.

This question is not one of first impression. Several of our sister courts have been presented with the question of whether the subrogation rights established by section 417.001 extend to UIM benefits. These cases fall into two categories: (1) those involving employer-purchased policies; and (2) those involving employee-purchased policies.

In each case involving employer-purchased policies, the courts have held that the workers' compensation carrier has a subrogation interest in the UIM benefits. *See Erivas v. State Farm Mut. Auto. Ins. Co.,* 141 S.W.3d 671, 676 (Tex.App.-El Paso 2004, no pet.); *Texas Workers' Comp. Ins. Fund v. Knight,* 61 S.W.3d 91, 93 (Tex.App.-Amarillo 2001, no pet.); *Texas Workers' Comp. Ins. Facility v. Aetna,* 994 S.W.2d 923, 926 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Employers Cas. Co. v. Dyess,* 957 S.W.2d 884, 886 (Tex.App.-Amarillo 1997, pet. denied). These cases are based on the maxim that, when statutory language is clear and unambiguous, the statute should be given its plain meaning; because the statute refers to "third parties," not "third-party tortfeasors," and to "liability," not "tort liability," the courts reasoned that a carrier's subrogation rights are not limited to claims grounded in tort law. *See Erivas,* 141 S.W.3d at 676 ("We find that the plain meaning of Section 417.001 creates a right of subrogation against a third party who is or becomes liable to pay damages, including an employer's UIM insurance carrier found liable to pay damages."); *Aetna,* 994 S.W.2d at 925 ("The language of the subrogation statute does not expressly limit [the carrier's] rights to claims against third-party tortfeasors. Clearly, it would have been easy to do so."); *Dyess,* 957 S.W.2d at 889 ("The statute does not limit the scope of persons with legal liability for the injury against whom a compensation carriers' subrogation interest is effective. That being true, the clear wording of the statute does not support [the UIM insurer's] position that [the carrier] is only subrogated to [the employee's] rights against third-party tortfeasors."); *see also National Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000) ("If possible, we must ascertain the legislature's intent from the language it used in the statute and not look to extraneous matters for an intent that the statute does not state.").

**\*3** In each case involving employee-purchased policies, however, the courts have held that the carrier does *not* have a subrogation interest in the benefits. *See City of Corpus Christi v. Gomez,* 141 S.W.3d 767, 773 (Tex.App.-Corpus Christi 2004, no pet.); *Casualty Reciprocal Exch. v. Demock,* 130 S.W.3d 74, 76 (Tex.App.-El Paso 2002, no pet.); *Liberty Mut. v. Kinser,* 82 S.W.3d 71, 78 (Tex.App.-San Antonio 2002, pet. withdrawn); *see also McLennan Cmty. Coll. v. State Farm Mut. Auto. Ins. Co.,* No. 10-02-00206-CV, 2004 Tex.App. LEXIS 2332, at *2 (Tex.App.-Waco Mar. 10, 2004, pet. denied) (mem.op.). The courts found the factual distinction between these cases and those involving employer-purchased policies

significant for two reasons. First, as the *Demock* court noted, when employee-purchased plans are involved, the courts must reconcile competing public policies:

> The Legislature declared it to be the public policy of this state to make uninsured motorist coverage a part of every liability insurance policy issued, with certain limited exceptions....
>
> We fail to see how Demock's prudence in maintaining UIM coverage, which insurers are statutorily required to provide for the insured's benefit and for which she has paid a premium, can be trumped by the subrogation provision. Indeed, construing the subrogation provision as if it stood alone would thwart the legislative intent and mandate that requires insurers to provide UIM motorist protection for persons such as Demock.

130 S.W.3d at 76 (citations omitted). Second, to allow subrogation rights against employee-purchased UIM policies would result in the injured employee subsidizing the workers' compensation carrier, a result which the courts found untenable. *See Kinser,* 82 S.W.3d at 79; *Gomez,* 141 S.W.3d at 772.

By the reasoning of both lines of cases, FIC's subrogation rights extend to the UIM policy purchased by Texas Towing. By its plain language, the statute applies to all third parties, not just tortfeasors, to all forms of liability, whether grounded in tort or contract, and to all damages, not just tort damages. *See* Tex. Lab.Code Ann. § 417.001. Home State is a third party, and the policy was purchased by Texas Towing, not by employee Garza. Home State was contractually liable for Garza's injuries and paid Garza damages-compensation for the injuries he suffered in the accident. [6] *See* Black's Law Dictionary 416 (8th ed.2004) (defining "damages").

Garza contends that Texas Towing was not his employer, and thus this case is more akin to those involving employee-purchased plans. We disagree. Unlike with employee-purchased plans, there is no competing public policy here. Texas Towing, which paid the premiums, is provided the same protection under its UIM policy whether or not FIC is granted subrogation rights. *See Demock,* 130 S.W.3d at 76. And since Garza did not pay for the policy, the injured employee is not being asked to subsidize the workers' compensation carrier. *See Kinser,* 82 S.W.3d at 79; *Gomez,* 141 S.W.3d at 772.

**\*4** For the foregoing reasons, we hold that FIC has a valid subrogation interest in the proceeds of the UIM policy purchased by Texas Towing. [7] We next consider whether Garza must be made whole before FIC can exercise its subrogation rights.

*Must Garza be made whole before FIC can exercise its subrogation rights?*

Garza argues that, even if FIC has a valid subrogation interest in the UIM benefits, the trial court properly granted his summary judgment motion because he presented sufficient summary judgment evidence to conclusively prove that he has not been made whole. Garza reasons that the purpose behind the statute is to prevent over-compensation to the employee, citing to *Kinser,* 82 S.W.3d at 78, and that therefore, for public policy reasons, FIC's subrogation rights should be denied and the UIM proceeds should be distributed solely to Garza.

The distribution of proceeds recovered from third parties is governed by section 417.002. *See* Tex. Lab.Code Ann. § 417.002 (West 2006). Under that provision, any money recovered goes first to the workers' compensation carrier, and "until [the] carrier is reimbursed in full, 'the employee or his representatives have no right to any of such funds.' " [8] *Texas Mut. Ins. Co. v. Ledbetter,* 251 S.W.3d 31, 36 (Tex.2008) (quoting *Capitol Aggregates, Inc. v. Great Am. Ins. Co.,* 408 S.W.2d 922, 923 (Tex.1966)); *see also Argonaut Ins. Co. v. Baker,* 87 S.W.3d 526, 530 (Tex.2002) ("Thus, rather than the employee owning the money and being forced to disgorge it, the carrier is first entitled to the money up to the total amount of benefits it has paid...."). After the carrier is fully reimbursed, then any additional money goes to the employee. *See* Tex. Lab.Code Ann. § 417.002(b). First-money reimbursement is crucial to the workers' compensation system because it reduces costs to the carrier, and thus to the employer and the public. *Ledbetter,* 251 S.W.3d at 35; *Performance Ins. Co. v. Frans,* 902 S.W.2d 582, 585 (Tex.App.-Houston [1st Dist.] 1995, writ denied).

The statute makes no provision for an analysis of whether the employee has been made whole. *See* Tex. Lab.Code Ann. § 417.002. Once a carrier pays or agrees to pay benefits to an injured employee, "[t]he carrier's right overrides that of the employee," and courts are not allowed to use their equitable powers to circumvent the carrier's right to first-money reimbursement. *See Hartford Cas. Ins. Co. v. Albertsons Grocery Stores,* 931 S.W.2d 729, 734 (Tex.App.-Fort Worth 1996, no writ); *see also Baker,* 87 S.W.3d at 535 (Hankinson, J., dissenting) (noting that first-money reimbursement rule "exists because we have a no-fault worker[s'] compensation system. And under that no-fault system, we permit the insurer to recoup what it has paid ahead of anyone else's interest, sometimes in derogation of the employee's right to be made whole, a right that would be superior under equitable subrogation principles."); [9] *Ledbetter,* 251 S.W.3d at 36 ("There is nothing discretionary about this statute; a carrier's right to reimbursement is mandatory."); *Knight,* 61 S.W.3d at 93 (holding that "the trial court could not invoke its equitable powers and, thereby, deny the [carrier] subrogation"); *Texas Workers' Comp. Ins. Fund v. Travis,* 912 S.W.2d 895, 898-99 (Tex.App.-Fort Worth 1995, no writ) (court cannot circumvent carrier's right to subrogation by apportioning large share of settlement proceeds to non-claimant); *Frans,* 902 S.W.2d at 585 ("The trial court had no discretion to ignore the wording of the statute and apportion the settlement funds between the claimants before reimbursing the carrier.").

 **\*5** Because FIC's subrogation right is not dependent on whether Garza has been made whole, we hold that the trial court erred in granting summary judgment in favor of Garza and in denying summary judgment in favor of Resolution as to the issue of FIC's subrogation rights. We turn next to the issue of Garza's claim for attorney's fees

### *Is Garza entitled to attorney's fees out of FIC's share of the UIM benefits?*

In his summary judgment motion and on appeal, Garza argues that FIC's subrogation interest should be reduced by one-third to cover his reasonable attorney's fees. Under the Texas Workers' Compensation Act, when the injured employee pursues the claim against the third party and the workers' compensation carrier is not actively represented by an attorney in that proceeding, the carrier is required to pay a fee to the employee's attorney. *See* Tex. Lab.Code Ann. § 417.003(a) (West 2006). [10] If the carrier and the employee's attorney cannot agree on a fee amount, then the court deducts a reasonable fee, not to exceed one-third of the carrier's subrogation interest, from the carrier's subrogation interest. *Id* .

Resolution argues that Garza is not entitled to recover attorney's fees in this case because (1) Garza and his counsel contested FIC's subrogation interest, forcing Resolution to sue to recover FIC's share of the UIM proceeds; and (2) any claim for attorney's fees is governed by the Texas Insurer Receivership Act, rather than the Texas Workers' Compensation Act. We will examine each argument in turn.

Resolution first contends that attorney's fees are only required under section 417.003 "when the attorney has represented the insurance company's interests," citing to the Dallas Court of Appeals' decision in *Baker v. Argonaut Ins. Co.,* 36 S.W.3d 587, 591 (Tex.App.-Dallas 2000), *rev'd on other grounds,* 87 S.W.3d 526 (Tex.2002). Because Garza contested FIC's right to subrogation, Resolution argues that Garza's attorney was working against FIC's interest and is therefore not entitled to attorney's fees. We disagree. *See New York Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 856 S.W.2d 194, 203 (Tex.App.-Dallas 1993, no writ) (rejecting similar argument); *see also Erivas,* 141 S.W.3d at 678 (granting attorney's fees where employee's attorney obtained UIM benefits, then fought against subrogation lien). The question is not whether Garza's attorney represented FIC's interest in the subrogation proceedings, but whether Garza's attorney represented FIC's interests in pursuing the claim against Home State. *Erivas,* 141 S.W.3d at 678; *New York Underwriters,* 856 S.W.2d at 203. FIC was not represented by an attorney in the settlement negotiations with Home State; instead, Garza's counsel was solely responsible for negotiating the settlement. *See* Tex. Lab.Code Ann. § 417.003(a) (mandating award of reasonable attorney's fees when carrier's "interest is not actively represented by an attorney *in a third-party action* " (emphasis added)). If Garza's attorney had not negotiated the settlement, FIC would not have recovered anything from Home State, so Garza's work during the settlement negotiations clearly advanced FIC's interests. Therefore, we

hold that Garza has met the statutory prerequisite and is, by law, entitled to recover reasonable attorney's fees. *See id.; Erivas,* 141 S.W.3d at 678; *New York Underwriters,* 856 S.W.2d at 203.

**\*6** Resolution next argues that, because FIC is in receivership, Garza must follow the claims procedure laid out in the Insurer Receivership Act in order to recover the fees he is owed. *See* Tex. Ins.Code Ann. §§ 443.001-.402 (West 2009). The Insurer Receivership Act provides "a comprehensive scheme for the receivership of insurers," including a process for asserting claims against the receivership estate, in order to "protect the interests of insureds, claimants, creditors, and the public." *See id.* § 443.001. Resolution maintains that, under the Workers' Compensation Act, the carrier is first awarded an amount equal to the full costs of the benefits it provided to the injured employee. Then, the carrier is separately forced to pay a fee to the employee's attorney. Under this reasoning, when FIC is first awarded the full costs of the benefits it provided Garza, the entire amount becomes the property of the FIC receivership estate. Therefore, Resolution reasons, Garza's request for attorney's fees is a claim against the receivership estate and can only be claimed and paid in accordance with the distribution scheme established in the Insurer Receiver Act. *See id.* §§ 443.251-.261 (establishing procedure for claims against estate), .301 (establishing priority of distributions from estate).

We disagree with Resolution's characterization of its award under the Workers' Compensation Act. The portion of the UIM proceeds representing Garza's attorney's fees is not and will never be the property of the FIC receivership estate. Rather, the attorney's fees are deducted from the third-party recovery before FIC is awarded anything. Section 417.002(a) provides that "[t]he net amount recovered by a claimant in a third-party action shall be used to reimburse the carrier." Tex. Lab.Code Ann. § 417.002(a). The "net amount recovered" has been interpreted to be "the third-party recovery less the employee's attorney's fees." *Texas Workers' Comp. Ins. Fund v. Alcorta,* 989 S.W.2d 849, 852 (Tex.App.-San Antonio 1999, no pet.). "That is, by statutory design, the 'first money' owed to the carrier-the net amount recovered under section 417.002(a)-is a sum which has been reduced by allowable attorney's fees under section 417.003." *Id.; see also Erivas,* 141 S.W.3d at 678 (applying reasoning of *Alcorta* ). Because the attorney's fees are deducted first, they are never the property of the receivership estate and thus the procedures in the Insurer Receivership Act that govern claims against the receivership estate do not apply.

For the foregoing reasons, we hold that Garza is entitled to reasonable attorney's fees to be deducted from the UIM proceeds before any award is made to FIC. However, because the trial court granted Garza's motion for summary judgment and denied FIC's right to subrogation, it did not reach the question of the amount of attorney's fees owed to Garza. Therefore, we are not in a position to alter the judgment by adding attorney's fees. *See Alcorta,* 989 S.W.2d at 852 (remanding for trial court to calculate attorney's fees under section 417.003). We remand the case to the trial court for a determination of reasonable attorney's fees.

## CONCLUSION

**\*7** Because we hold that FIC has a valid subrogation lien against the funds Home State paid to Garza, we reverse the trial court's grant of summary judgment in favor of Garza, grant summary judgment in favor of Resolution as to the issue of FIC's subrogation rights, and remand the cause to the trial court for a determination of Garza's reasonable attorney's fees.

**All Citations**

Not Reported in S.W.3d, 2009 WL 1981424

Footnotes

*See Garza v. Home State County Mut. Ins. Co.,* No.2005-CI-13024 (37th Dist. Ct., Bexar County, Tex.). Because of the dispute at issue here, Home State paid $150,000 into the registry of the Bexar County district court, and the balance was paid to Garza.

The parties dispute whether Garza was also an employee of Texas Towing.

Resolution sought to enforce FIC's subrogation interest through the receivership proceedings, which were brought in Travis County. *See State v. Financial Ins. Co. of Am.,* No. D-1-GV-05-00846 (353rd Dist. Ct., Travis County, Tex.). After the trial court granted Garza's motion for summary judgment, Resolution filed a motion to sever the subrogation dispute, which the trial court granted.

Resolution argues on appeal that the summary judgment in favor of Garza should be reversed and Resolution's motion for summary judgment should be granted, or, in the alternative, the cause should be remanded for trial because:

(1) the trial court erred in granting Garza's motion for summary judgment;

(2) FIC is entitled to recover its subrogation lien from the UIM benefits whether or not Texas Towing is Garza's employer;

(3) FIC is entitled to recover its subrogation lien from the UIM benefits because Texas Towing, which purchased the UIM policy, is Garza's employer;

(4) a fact issue exists as to whether Garza has been made whole;

(5) Garza's claim for attorney's fees is governed by the Texas Insurer Receivership Act, Tex. Ins.Code Ann. §§ 443.001-.402 (West 2009), rather than the Texas Workers' Compensation Act; and

(6) a fact issue exists as to the reasonable amount of attorney's fees and costs that should be awarded Garza.

Section 417.001 of the Texas Labor Code provides:

(a) An employee or legal beneficiary may seek damages from a third party who is or becomes liable to pay damages for an injury or death that is compensable under this subtitle and may also pursue a claim for workers' compensation benefits under this subtitle.

(b) If a benefit is claimed by an injured employee or a legal beneficiary of the employee, the insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the third party in the name of the injured employee or the legal beneficiary. The insurance carrier's subrogation interest is limited to the amount of the total benefits paid or assumed by the carrier to the employee or the legal beneficiary, less the amount by which the court reduces the judgment based on the percentage of responsibility determined by the trier of fact under Section 33.003, Civil Practice and Remedies Code, attributable to the employer. If the recovery is for an amount greater than the amount of the insurance carrier's subrogation interest, the insurance carrier shall:

(1) reimburse itself and pay the costs from the amounts recovered; and

(2) pay the remainder of the amount recovered to the injured employee or legal beneficiary.

Tex. Lab.Code Ann. § 417.001(a), (b) (West 2006).

Garza argues that there is a distinction between "monies paid under a contract," such as the UIM policy, and "damages." He points to *Liberty Mutual v. Kinser,* 82 S.W.3d 71 (Tex.App.-San Antonio 2002, pet. withdrawn), in which the San Antonio Court of Appeals appeared to suggest that a carrier's subrogation rights should never extend to UIM benefits-whether the policy was purchased by an employee, an employer, or someone else entirely-because the term "damages" as used in section 417.001(a) "is limited to damages recovered from a third party who is liable to the injured employee because the third party breached a contract or committed a tortious act against the injured employee." *Id.* at 78. We first note that the holding of the *Kinser* case is narrow and states only that "[a] workers' compensation carrier does not have a subrogation right to benefits paid an injured employee under the employee's UIM coverage." *Id.* at 79. Thus, any suggestion by the *Kinser* court that subrogation rights do not extend to benefits from a UIM policy purchased by someone other than the employee is mere dicta. Second, to the extent that the *Kinser* court suggests that the word "damages" is limited to money paid as a result of tortious conduct, we disagree. Black's Law Dictionary defines "damages" as "money claimed by, or ordered to be paid to, a person as compensation for loss or injury." *See* Black's Law Dictionary 416 (8th ed.2004). This definition, and thus the plain language of the statute, clearly encompasses the funds paid to Garza by Home State-funds that were undoubtedly meant to compensate Garza for the loss and injury he suffered in the accident.

Because we hold that the legal distinction is between plans purchased by the employee, in which carriers do not have a subrogation right, and plans purchased by someone other than the employee, in which carriers do have a subrogation right, we need not address FIC's third issue on appeal, in which it argued that Texas Towing was Garza's co-employer.

Section 417.002 provides:

(a) The net amount recovered by a claimant in a third-party action shall be used to reimburse the insurance carrier for benefits, including medical benefits, that have been paid for the compensable injury.

(b) Any amount recovered that exceeds the amount of the reimbursement required under Subsection (a) shall be treated as an advance against future benefits, including medical benefits, that the claimant is entitled to receive under this subtitle.

(c) If the advance under Subsection (b) is adequate to cover all future benefits, the insurance carrier is not required to resume the payment of benefits. If the advance is insufficient, the insurance carrier shall resume the payment of benefits when the advance is exhausted.

Tex. Lab.Code Ann. § 417.002 (West 2006).

The Texas Supreme Court has since discarded the superior status of equitable subrogation principles in favor of the freedom of contract. *See Fortis Benefits v. Cantu,* 234 S.W.3d 642, 649-50 (Tex.2007).

Section 417.003(a) provides:

An insurance carrier whose interest is not actively represented by an attorney in a third-party action shall pay a fee to an attorney representing the claimant in the amount agreed on between the attorney and the insurance carrier. In the absence of an agreement, the court shall award to the attorney payable out of the insurance carrier's recovery:

(1) a reasonable fee for recovery of the insurance carrier's interest that may not exceed one-third of the insurance carrier's recovery; and

(2) a proportionate share of expenses.

Tex. Lab.Code Ann. § 417.003(a) (West 2006).

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6575233
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT
LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,
Austin.

Violanda **Soledad**, Appellant
v.
Texas Farm Bureau Mutual Insurance Company, Appellee

NO. 03–16–00203–CV
|
Filed: November 2, 2016

**FROM THE COUNTY COURT AT LAW OF BURNET COUNTY, NO. C4358, HONORABLE LINDA M.
BAYLESS, JUDGE PRESIDING**

**Attorneys and Law Firms**

Chris Jackson, Attorney at Law, James Rodman, Austin, TX, for appellant.

Wade C. Crosnoe, Sara B. Churchin, Thompson, Coe, Cousins & Irons, LLP, David Daederick, Austin, TX, for appellee.

Before Justices Puryear, Pemberton, and Field

**OPINION**

Scott K. Field, Justice

 **\*1**  Violanda Soledad sued Texas Farm Bureau Mutual Insurance Company (Texas Farm Bureau) after it denied a claim she made under her uninsured/underinsured motorist insurance policy. Both parties moved for summary judgment, and the trial court signed an order denying Soledad's motion for summary judgment and granting summary judgment in favor of Texas Farm Bureau. In five issues, Soledad contends that the trial court erred in denying her motion and in granting Texas Farm Bureau's motion. Because we conclude that Soledad was not "legally entitled to recover from the owner or operator of an uninsured motor vehicle," as her policy required, we will affirm the trial court's order.

**BACKGROUND**

The parties do not dispute the material facts of this case. On September 5, 2012, Soledad was riding as a passenger in a motor vehicle owned or leased by her employer, Schneider National Carriers, when the vehicle was involved in a single-vehicle accident. Jeffrey Allan Noe, a fellow Schneider employee, was driving the vehicle. Both Soledad and Noe were acting in the course and scope of their employment with Schneider at the time of the accident. The accident, which was the result of Noe's negligence, caused Soledad bodily injuries.

Before the accident, Soledad had purchased a personal automobile policy from Texas Farm Bureau and paid the premiums with her own money. This policy provided uninsured/underinsured motorist (UM/UIM) coverage and was in effect at the time of the accident. At the time of the accident, Schneider had in place a policy of workers' compensation insurance and also had a policy of liability insurance covering its vehicles.

Soledad received workers' compensation benefits from Schneider's workers' compensation carrier as a result of the injuries she sustained during the accident. Soledad then filed a claim for UM/UIM benefits under her personal automobile policy, claiming that the damages she sustained during the accident exceeded the damages covered by Schneider's workers' compensation policy. Texas Farm Bureau denied her claim.

Soledad sued Texas Farm Bureau, seeking declaratory relief and damages exceeding $100,000. Both Soledad and Texas Farm Bureau moved for summary judgment. Texas Farm Bureau argued in its motion that, as a matter of law, Soledad was not entitled to UM/UIM benefits under her policy because: (1) Soledad was not "legally entitled to recover" damages from the owner or operator of the vehicle involved in the accident because such recovery is barred by the exclusive-remedy provision of the Texas Workers' Compensation Act (TWCA), *see* [Tex. Lab. Code § 408.001(a)](), and (2) neither Noe nor Schneider was uninsured or underinsured as defined by the policy. The trial court denied Soledad's motion and granted summary judgment in favor of Texas Farm Bureau without giving a reason for its decision. This appeal followed.

## STANDARD OF REVIEW

Summary judgment is proper if the movant establishes that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. [Tex. R. Civ. P. 166a(c)](). We review a trial court's ruling on motions for summary judgment de novo. *[Southwestern Bell Tel., L.P. v. Emmett](),* [459 S.W.3d 578, 583 (Tex. 2015)](); *[Valence Operating Co. v. Dorsett](),* [164 S.W.3d 656, 661 (Tex. 2005)](). When the parties file competing motions for summary judgment on overlapping issues and the trial court grants one party's motion and denies the other, we consider all of the summary-judgment evidence and issues presented, and, if the trial court erred, we render the judgment the trial court should have rendered. *[Dorsett](),* [164 S.W.3d at 661]().

**\*2** We also review de novo the trial court's interpretation of a statute or an unambiguous contract. *See [Kachina Pipeline Co., Inc. v. Lillis](),* [471 S.W.3d 445, 449 (Tex. 2015)]() (construction of unambiguous contract is reviewed de novo); *[First Am. Title Ins. Co. v. Combs](),* [258 S.W.3d 627, 631 (Tex. 2008)]() (construction of statute is reviewed de novo). When, as here, the trial court does not specify the ground or grounds for summary judgment, we must affirm the summary judgment if any of the grounds presented to the trial court and preserved for appeal are meritorious. *See [Provident Life & Acc. Ins. Co. v. Knott](),* [128 S.W.3d 211, 216 (Tex. 2003)]().

## DISCUSSION

In her first issue, Soledad contends that her recovery of workers' compensation benefits does not preclude recovery under her UM/UIM policy.

Soledad's policy with Texas Farm Bureau includes the following provision:

> [Texas Farm Bureau] will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by a covered person, or property damage, caused by an accident.

For purposes of this discussion, we will assume, without deciding, that the vehicle in which Soledad was riding during the accident was "an uninsured motor vehicle" and will focus our analysis on whether Soledad was "legally entitled to recover" damages from the "owner" of the vehicle (Schneider) or the "operator" of the vehicle (Noe).

Texas Farm Bureau does not dispute the fact that Noe's negligence caused Soledad's injuries or that Schneider owned or leased the vehicle at the time of the accident. Instead, Texas Farm Bureau argues that Soledad is not "legally entitled to recover" damages from either Schneider or Noe because such recovery is barred by the TWCA, which provides, "Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee." Tex. Lab. Code § 408.001(a). Under this exclusive-remedy provision, an employer that subscribes to workers' compensation insurance receives immunity from the tort claims of its employees. *See Kershner v. Samsung Austin Semiconductor, LLC*, No. 03–15–00529–CV, 2016 WL 3974783, at \*1 (Tex. App.–Austin July 22, 2016, no pet.) (mem. op.). Texas Farm Bureau further argues that, because the TWCA's exclusive-remedy provision bars Soledad from recovering damages from Schneider (her employer) or Noe (an employee of her employer), she is not "legally entitled to recover" from either Schneider or Noe. Therefore, argues Texas Farm Bureau, Soledad does not satisfy the policy's requirements and may not recover UM/UIM benefits.

We are aware of only one other Texas appellate court that has considered this specific issue. In *Valentine v. Safeco Lloyds Insurance Co.*, the First Court of Appeals had to decide "whether an employee's UIM coverage is available to an employee injured through the negligence of her employer while occupying the employer's vehicle in the course and scope of her employment, after the employee collects worker's compensation benefits." 928 S.W.2d 639, 642 (Tex. App.–Houston [1st Dist.] 1996, writ denied). The court held that "Valentine is not 'legally entitled to recover' from [her employer]; she is limited to collecting worker's compensation benefits. Therefore, coverage under Safeco's policy is not available." *Id.* at 644. Our research indicates that the majority of courts in other jurisdictions have also held that an employee who receives workers' compensation benefits is not "legally entitled to recover" from her employer or co-employee and is therefore not entitled to UM/UIM benefits. [1]

 **\*3** Consistent with these authorities, we agree with Texas Farm Bureau that Soledad may not recover UM/UIM benefits after receiving workers' compensation benefits. The TWCA's exclusive-remedy provision bars Soledad from recovering any damages from Schneider or Noe for the injuries Soledad received because of Noe's negligence. *See* Tex. Lab. Code § 408.001(a). Therefore, Soledad is not "legally entitled to recover" damages from the owner or operator of the vehicle that caused her injuries, and she has therefore failed to satisfy her policy's unambiguous requirements to obtain UM/UIM benefits.

Soledad points out that her policy also includes the following provision: "In order to avoid insurance benefits payments in excess of actual damages sustained ... we will pay all covered damages not paid or payable under any workers' compensation law ...." She argues "that this policy language clearly indicates that an insured person should be able to collect UM/UIM benefits after first receiving workers' compensation benefits." However, the purpose of this provision is merely to prevent a covered person from recovering twice for the same injuries—once from her employer's workers' compensation insurance carrier and once from her UM/UIM insurance carrier. Moreover, as Texas Farm Bureau concedes, in some instances a covered person *could* recover workers' compensation benefits and then recover UM/UIM benefits. If Soledad's injuries had been caused by the negligence of an uninsured motorist other than her employer or co-employee, she might have recovered workers' compensation benefits, and, if those benefits did not cover all of her injuries, she might have recovered UM/UIM benefits, because she would be "legally entitled to recover" damages from the negligent party. However, when, as here, the negligent party was the covered person's employer or co-employee, the TWCA's exclusive-remedy provision applies, and the covered person is not entitled to UM/UIM benefits. [2]

Having concluded that Soledad did not satisfy the policy's requirements to recover UM/UIM benefits, we hold that the trial court did not err in granting summary judgment in favor of Texas Farm Bureau. [3] Accordingly, we overrule Soledad's first issue. Because we may affirm the trial court's summary judgment on this ground alone, we need not address Soledad's remaining issues. *See Knott*, 128 S.W.3d at 216 ("[W]e must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious.").

## CONCLUSION

**\*4** We affirm the trial court's summary judgment.

## All Citations

--- S.W.3d ----, 2016 WL 6575233

Footnotes

1    *See Valentine v. Safeco Lloyds Ins. Co.*, 928 S.W.2d 639, 642 n.4 (Tex. App.–Houston [1st Dist.] 1996, writ denied) (collecting cases); *see also Ex parte Carlton*, 867 So.2d 332, 338 (Ala. 2003) ("The workers' compensation benefits Carlton received are his only remedy against his employer. Therefore, Carlton is not 'legally entitled to recover damages from the owner or operator of an uninsured vehicle' as the plain language of ... his mother's State Farm policy require[s].") (citation omitted); *Continental Divide Ins. Co. v. Dickinson*, 179 P.3d 202, 204 (Colo. App. 2007) ("The majority of jurisdictions that have addressed this issue hold that an insured is not 'legally entitled to recover' under the uninsured motorist provisions of an insurance policy if the exclusivity provisions of the workers' compensation statute would bar an action against the tortfeasor .... We consider the majority view well reasoned, perceive it as consistent with Colorado statutes, and reject Dickinson's invitation to adopt a different approach.") (internal quotation marks omitted); *Allstate Ins. Co. v. Boynton*, 486 So.2d 552, 555 (Fla. 1986) ("[T]he policy endorsement [requires] the policyholder be 'legally entitled to recover' from the owner or operator of the uninsured vehicle. The plain meaning of the requirement would appear to be that the insured must have a claim against the tortfeasor which could be reduced to judgment in a court of law."); *Williams v. Thomas*, 187 Ga.App. 527, 370 S.E.2d 773, 775 (1988) ("Accordingly, as appellant is barred by the exclusive rights and remedies provision of OCGA § 34–9–11 from obtaining judgment either against his employer or the co-employee who injured him, he cannot satisfy the condition precedent to an action against his insurer for recovery under the uninsured motorist provisions of his policy."); *State Farm Mut. Auto. Ins. Co. v. Royston*, 72 Haw. 338, 817 P.2d 118, 119 (1991) ("As a condition precedent to recovery of uninsured motorist benefits under HRS § 431–448(a), a person must show that he or she is 'legally entitled to recover damages' from the uninsured tortfeasor. However, when the uninsured tortfeasor is the employer of such person, the requirement of HRS §–431–448(a) cannot be met since the 'exclusive remedy' provision of the workers' compensation statute would preclude a tort claim against the employer."); *Atlantic Mut. Ins. Co. v. Payton*, 289 Ill.App.3d 866, 225 Ill.Dec. 67, 682 N.E.2d 1144, 1148 (1997) ("Atlantic Mutual, the employer's insurance carrier, stands in the shoes of both the driver and the owner of the uninsured motor vehicle. The accident took place during the course of employment. Payton has received workers' compensation benefits, and therefore he is barred from bringing a civil action for the same injuries against his co-employee, employer, and the insurer."); *Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 31 (Iowa 2005) ("We conclude Otterberg is not 'legally entitled to recover' damages from the owner or operator of the ambulance in which he was injured (i.e., his employer or co-employee) within the meaning of his uninsured motorist insurance policy .... This is because the exclusivity provision of the workers' compensation statute provides a substantive bar to any legal claim against his employer and co-employee for injuries covered by workers' compensation."); *State Farm Mut. Auto. Ins. Co. v. Slusher*, 325 S.W.3d 318, 321–22 (Ky. 2010) ("State Farm argues that the plain language of the policy, the exclusive remedy provisions of the Workers' Compensation Act, and applicable case authorities compel the conclusion that it has no liability under either the UM and UIM provision. [W]e agree."); *Hebert v. Clarendon Am. Ins. Co.*, 984 So.2d 952, 956 (La. App. 2008) ("Thus, it is well settled in our jurisprudence that where there is no underlying uninsured or underinsured person from whom the plaintiff is legally entitled to recover, due to the immunity provision of [Louisiana's workers' compensation law], the plaintiff's UM insurer is not legally liable to him."); *Hopkins v. Auto–Owners Ins. Co.*, 41 Mich.App. 635, 200 N.W.2d 784, 786 (1972) (per curiam) ("Because of the exclusiveness of the

workmen's compensation coverage, plaintiff never had a remedy against the tortfeasor. He was never entitled to damages from the negligent motorist."); *Medders v. United States Fid. & Guar. Co.*, 623 So.2d 979, 989 (Miss. 1993) ("We hold that the clear meaning of the phrase *legally entitled to recover* found in the Mississippi UM statute limits the scope of the coverage mandated by the statute to those instances in which the insured would be entitled at the time of injury to recover through legal action. There is no statutory mandate to provide coverage in instances where the alleged tortfeasor is immune from liability.") (citations omitted); *Kesterson v. Wallut*, 157 S.W.3d 675, 686 (Mo. App. 2004) ("Ms. Kesterson is barred from suing Mr. Wallut due to his immunity under workers' compensation law, which is a substantive limitation on her right to sue him. So ... she was not 'legally entitled to collect' from Mr. Wallut under the State Farm uninsured motorist policies."); *Okuly v. USF & G Ins. Co.*, 318 Mont. 88, 78 P.3d 877, 880 (2003) ("Here, Okuly is barred from bringing suit and ultimately recovering from Adams or Gasomat, since Adams was Mary Lyn's co-employee and Gasomat was her employer. As such, under [Montana's workers' compensation law's exclusive-remedy provision] ... Okuly's exclusive remedy is that which he already received—the workers' compensation benefits. [O]kuly is not 'legally entitled to recover damages' from USF & G."); *Matarese v. New Hampshire Mun. Ass'n Prop. Liab. Ins. Trust, Inc.*, 147 N.H. 396, 791 A.2d 175, 182 (2002) ("As we have noted, New Hampshire's uninsured motorist statute is designed to compensate people injured in automobile accidents whose losses would otherwise be uncompensated because the tortfeasor lacked liability coverage or because the tortfeasor's identity was unknown. The underlying purpose of the statute is to provide coverage only where there is a lack of liability insurance on the part of the tortfeasor and the tortfeasor would be legally liable to the injured driver in a tort action; it does not provide coverage in all situations that might go uncompensated. The insurance policy and the statute do not apply where the substantive laws of New Hampshire, such as the fireman's rule and the workers' compensation bar, render the tortfeasor immune from liability.") (citation omitted); *Kough v. New Jersey Auto. Full Ins. Underwriting Ass'n*, 237 N.J.Super. 460, 568 A.2d 127, 132 (N.J. Super. Ct. App. Div. 1990) ("Under normal rules of liability plaintiff cannot recover here. Because Fefferman was a coemployee, plaintiff could not 'prove an automobile liability case against the uninsured,' a prerequisite for recovery. In other words, because of the workers' compensation bar, plaintiff is not 'legally entitled to recover damages' from her coemployee.") (citation omitted); *Stuhlmiller v. Nodak Mut. Ins. Co.*, 475 N.W.2d 136, 139 (N.D. 1991) ("Because Mark is statutorily immune under the exclusive remedy provisions of the Workers Compensation Act, we conclude that Arthur is not 'legally entitled to recover' damages from Mark, Mark is not 'legally liable to pay' damages, and accordingly Arthur is not entitled to recover under either policy."); *Snyder v. American Family Ins. Co.*, 114 Ohio St.3d 239, 871 N.E.2d 574, 583 (2007) ("[W]e hold that [Ohio's UM/UIM statute] does not prohibit an uninsured- or underinsured-motorist policy from limiting uninsured-motorist benefits to amounts that the insured is 'legally entitled to recover' from the tortfeasor and that such a provision is valid even when it precludes uninsured-motorist benefits for injuries caused by tortfeasors immune under [Ohio's workers' compensation law's exclusive-remedy provision]."); *Cope v. West Am. Ins. Co. of Ohio Cas. Grp.*, 309 Or. 232, 785 P.2d 1050, 1053 (1990) ("If plaintiff's injury arose out of and in the course of employment, she would be entitled to workers' compensation benefits. Because of the exclusivity of this remedy, she would, therefore, not be 'legally entitled' to recover from her co-worker in such circumstance. Accordingly, if plaintiff's injury is compensable under the workers' compensation provisions, she may not recover against defendants."); *Erie Ins. Exch. v. Conley*, 29 A.3d 389, 392–93 (Pa. Super. Ct. 2011) ("[T]he Workers' Compensation Act precludes Appellant from recovering damages from Mr. Olander. Thus, pursuant to the plain language of the policy, Appellant [sic] is not required to provide to Appellant UM or UIM coverage.") (citation omitted); *Lieber v. ITT Hartford Ins. Ctr., Inc.*, 15 P.3d 1030, 1035 (Utah 2000) ("From the foregoing analysis of the exclusive remedy provision of the WCA, it is clear that uninsured coverage is not available when the uninsured driver is the employer, or an officer, agent, or employee of the employer because the WCA precludes the employee from having a viable tort claim outside its parameters."); *Welch v. Miller & Long Co. of Md., Inc.*, 258 Va. 447, 521 S.E.2d 767, 770 (1999) ( "Accordingly, because the Act afforded the exclusive remedy against the decedent's statutory employer ... and a fellow servant ... the decedent's statutory beneficiaries under the wrongful death statutes are not legally entitled to recover damages against them. Thus, a condition precedent to the insurers' liability under the uninsured motorist statute was not met."); *Romanick v. Aetna Cas. & Sur. Co.*, 59 Wash.App. 53, 795 P.2d 728, 730 (1990) ("Romanick cannot recover UIM benefits. Romanick cannot show that he is legally entitled to recover damages from Shaffer because Shaffer is a fellow employee under the workers' compensation act, and [Washington's workers' compensation law's exclusive-remedy provision] abolishes claims against fellow servants for injuries incurred during the course of hazardous employment."); 7A Am. Jur. 2d *Automobile Insurance* § 482 n.1 (2016); John P. Ludington, "Automobile uninsured motorist coverage: 'legally entitled to recover' clause as barring claim compensable under workers' compensation statute," 82 A.L.R.4th 1096, § 6[a] (Originally published in 1990); Steven Plitt, et al., "Particular circumstances as affecting legal right to recover—Tortfeasor's immunity from suit," 9 Couch on Ins. § 123:19 n.7 (3d ed.); *but see Southern Farm Bureau Cas. Ins. Co. v. Pettie*, 54 Ark. App. 79, 924 S.W.2d 828, 832 (1996) ( "Therefore, in regard to appellee's UIM insurance coverage, we do not believe that the exclusive remedy provisions of the workers' compensation

law bars the appellee from being 'legally entitled to recover' against the owner or operator of the vehicle in which the appellee was riding at the time he received the injuries for which he was granted judgment in this case."); *Torres v. Kansas City Fire & Marine Ins. Co.*, 849 P.2d 407, 413 (Okla. 1993) ("No affirmative acts or prejudicial conduct on the part of the insured tending to destroy appellant's subrogation rights is involved here. The immunity of the workers' compensation laws which would bar any subrogation rights is not the result of any conduct on the part of the insured and affords no basis to deny recovery ...."); *Jenkins v. City of Elkins*, 230 W.Va. 335, 738 S.E.2d 1, 14 (2012) ("[We] hold that the phrase 'legally entitled to recover'... is construed to mean that an insured is entitled to uninsured coverage merely by establishing fault on the part of the tortfeasor and the amount of the insured's damages. Under this definition, the fact that a tortfeasor is immune from liability will not preclude recovery of uninsured motorist benefits.").

Soledad relies on *Resolution Oversight Corp. v. Garza*, No. 03–08–00481–CV, 2009 WL 1981424 (Tex. App.–Austin July 10, 2009, no pet.) (mem. op.), for the proposition that an employee who recovers workers' compensation benefits may also be entitled to UM/UIM benefits. In *Garza*, the workers' compensation insurance carrier of the plaintiff's employer sought to enforce subrogation rights against funds paid to the plaintiff by a UM/UIM insurance carrier. *Id.* at *1. This Court held that the workers' compensation insurance carrier was entitled to subrogation. *Id.* at *5. However, in *Garza*, the plaintiff was injured by an uninsured motorist who was not his employer or co-employee. *Id.* at *1. As we explained above, the recovery of workers' compensation benefits does not always prevent an injured worker from recovering UM/UIM benefits—it only does so when, as here, the uninsured motorist is the plaintiff's employer or co-employee. Because Soledad was injured by her co-employee's negligence, unlike the plaintiff in *Garza*, the TWCA's exclusive-remedy provision applies, and Soledad is not "legally entitled to recover" damages from the owner or operator of the uninsured motor vehicle as her UM/UIM policy requires.

Our holding is limited to situations in which the insured is not legally entitled to recover damages from the tortfeasor because of the workers' compensation exclusive-remedy provision. We express no opinion regarding situations in which an insured may be unable to recover damages from the tortfeasor for other reasons, such as a statute of limitations.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

529 S.W.2d 618
Court of Civil Appeals of Texas,
Tyler.

SOUTHERN COUNTY MUTUAL INSURANCE COMPANY, Appellant,

v.

Wayne SMITH, Appellee.

No. 854.
|
Oct. 30, 1975.

Suit was filed against fire insurance company for loss sustained when mobile home was destroyed by fire. The District Court, San Augustine County, O'Neal Bacon, J., overruled defendant insurer's plea of privilege and insurer appealed. The Court of Civil Appeals, McKay, J., held that venue of suit was either in county of residence of fire insurance company, which was not shown to be a life, health or accident insurance company, or in county in which the mobile home had been permanently situated and suit could not be maintained in third county in which mobile home owner resided; and that portion of venue statute relating to suits against insurance companies and authorizing venue in county of policyholder's residence applies only to suits involving life, health or accident insurance companies and not to suits against fire insurance companies on fire loss claims.

Reversed and cause transferred.

West Headnotes (6)

**[1]**    **Appeal and Error**  ☛ Effect

In absence of appellee filing brief on appeal, Court of Civil Appeals could accept as correct statements contained in appellant's brief relating to facts and record. Rules of Civil Procedure, rule 419.

Cases that cite this headnote

**[2]**    **Insurance**  ☛ Venue

Venue of suit on fire policy for loss resulting from destruction of mobile home by fire was either in county of residence of fire insurance company, which was not shown to be a life, health or accident insurance company, or in county in which the mobile home had been permanently situated and suit could not be maintained in third county in which mobile home owner resided. Vernon's Ann.Civ.St. art. 1995, subd. 28.

Cases that cite this headnote

**[3]**    **Insurance**  ☛ Venue

Venue of suit against fire insurance company for fire loss is limited to either county of defendant's residence, under general venue rule, or county where property was situated at time it was destroyed by fire. Vernon's Ann.Civ.St. art. 1995, subd. 28; Rules of Civil Procedure, rule 419.

Cases that cite this headnote

**[4]**  **Insurance** 🔑 Pleading

Venue facts which must be pleaded and proved in order to sustain venue under exception to the venue statute permitting suits against fire insurance companies to be brought in county in which insured property was situated are that suit be against fire insurance company and that the insured property be situated in county where the suit was filed. Vernon's Ann.Civ.St. art. 1995, subd. 28; Rules of Civil Procedure, rule 419.

Cases that cite this headnote

**[5]**  **Venue** 🔑 Privileges of Defendants

Exceptions to venue statute must be strictly construed and clearly established before defendant can be deprived of right to be sued in county of his residence.

Cases that cite this headnote

**[6]**  **Insurance** 🔑 Venue

Portion of venue statute relating to suits against insurance companies and authorizing venue in county of policyholder's residence applies only to suits involving life, health, or accident insurance companies and not to suits against fire insurance companies on fire loss claims. Vernon's Ann.Civ.St. art. 1995, subd. 28.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*619**  Michael R. McGown, Weller, Wheelus & Green, Beaumont, for appellant.

James A. Doherty, San Augustine, for appellee.

**Opinion**

McKAY, Justice.

 **[1]**   Appellant, Southern County Mutual Insurance Company, brings this appeal from an order of the district court of San Augustine County overruling its plea of privilege. Appellee, Wayne Smith, has not filed a brief on appeal. Therefore, we may accept as correct the statements contained in appellant's brief relating to the facts and the record. Rule 419, T.R.C.P.; Gonzales v. Gonzales, 224 S.W.2d 520 (Tex.Civ.App.—San Antonio, 1949, writ ref'd).

Appellant's brief states that appellee is the insured under a policy of fire insurance issued by appellant covering a mobile home owned by appellee and located in Orange County, Texas. In 1974 the mobile home was destroyed by fire within the terms of the policy, and appellant paid $4,000 to one Louis Nelson who had a first lien on the mobile home. Subsequently, appellee filed this suit in the district court of San Augustine County, the county of appellee's residence, seeking to recover from appellant an additional $800.00 allegedly due under the policy.

Appellant filed a plea of privilege to be sued in Dallas County, the county where its home office and principal place of business is located and, therefore, the county of appellant's residence. Appellee filed a controverting plea alleging solely that venue was maintainable in San Augustine County under sec. 28 of Art. 1995, V.A.T.S. After hearing evidence and argument of counsel, the district court ordered appellant's plea of privilege overruled, and it is from this order that appellant appeals.

Sec. 28 of Art. 1995, V.A.T.S., is as follows:

'No person who is an inhabitant of this State shall be sued out of the county in which he has his domicile except in the following cases:

28. Insurance.—Suits against Fire, marine or inland insurance companies may also be commenced In any county in which the insured property was situated. Suits on policies may be brought against any life insurance company, or accident insurance company, or life and accident, or health and accident, or life, health and accident insurance company in the county where the home office of such company is located, or in the county where loss has occurred or where the policyholder or beneficiary instituting such suit resides.' (emphasis added)

Appellant contends in his first point of error that the district court erred in overruling his plea of privilege because '. . . subdivision 28 does not apply herein because this is a fire loss and the property was not situated in San Augustine County, but in Orange County, and the provisions of subdivision 28 applicable to accident insurance claims do not apply as a matter of law to this fire loss claim.' We agree with this contention.

 **[2]**    Although not required to do so under Rule 419, T.R.C.P., we have examined the record and have found the evidence to be undisputed that this is a suit on a fire insurance policy on a claim for loss caused by fire. There is no allegation in appellee's **\*620** petition or controverting plea and no evidence that appellant is a life, health, or accident insurance company. Further, the evidence is undisputed that the mobile home was destroyed by fire in Orange County, the county where it had been permanently situated.

 **[3]**    **[4]**    **[5]**    **[6]**    In our opinion, venue of a suit against a fire insurance company for a fire loss is limited to either the county of a defendant's residence under the general venue rule or in the county where the property was situated at the time it was destroyed by fire under sec. 28. The venue facts which must be pleaded and proved in order to sustain venue under the exception found in the first sentence of sec. 28 relating to suits against fire insurance companies are: (1) that the suit is against a fire insurance company, and (2) that the alleged insured property was situated in the county where the suit is filed. Commercial Standard Insurance Company v. Caylor, 333 S.W.2d 161 (Tex.Civ.App.—Austin, 1960, no writ); McKinney v. Calvert Fire Ins. Co., 257 S.W.2d 452 (Tex.Civ.App.—Eastland, 1953, mand. overr.). Exceptions to the venue statute must be strictly construed and clearly established before a defendant can be deprived of the right to be sued in the county of his domicile. National Life Co. v. Rice, 140 Tex. 315, 167 S.W.2d 1021 (1943, opinion adopted). Further, under the statutory rule of construction, Expressio unius est exclusio alterius, it has been held that the express mention or enumeration of one thing or class is tantamount to an express exclusion of all others, Peterson v. Calvert, 473 S.W.2d 314 (Tex.Civ.App.—Austin, 1971, writ ref'd); and that a provision limiting a thing to be done in a particular form or manner implies that it shall not be done otherwise. Steakley v. Braden, 322 S.W.2d 363 (Tex.Civ.App.—Austin, 1959, writ ref'd, n.r.e.). Therefore, that portion of sec. 28 authorizing venue in the county of the policyholder's residence applies only to suits involving life, health, or accident insurance companies, and not to suits against fire insurance companies on fire loss claims. We hold as a matter of law, on the record before us, that under sec. 28 of Art. 1995, V.A.T.S., venue in this case cannot be sustained in San Augustine County, the county of appellee's residence.

Our decision of appellant's first point of error renders consideration of appellant's remaining points unnecessary.

The order of the trial court denying appellant's plea of privilege is reversed and the cause is ordered transferred to a district court of Dallas County, Texas.

**All Citations**

529 S.W.2d 618

                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

928 S.W.2d 639
Partial Publication
Court of Appeals of Texas,
Houston (1st Dist.).

Jennifer A. VALENTINE and Michael J. Valentine, Appellants,

v.

SAFECO LLOYDS INSURANCE COMPANY, Appellee.

No. 01–95–01443–CV.
|
July 18, 1996.
|
Rehearing Overruled Sept. 4, 1996.
|
Published in Part Pursuant to Tex.R.App.P. 90.

Employee who was injured through negligence of her employer while occupying employer's vehicle in the course of her employment and who collected workers' compensation benefits brought action against employer's automobile liability insurer and her own uninsured motorist carrier. The 165th District Court, Harris County, Elizabeth Ray, J., entered summary judgment in favor of both insurers, and employee appealed. The Court of Appeals, Taft, J., held that, as a matter of first impression, employee could not recover uninsured/underinsured motorist (UM/UIM) benefits under her policy providing that insurer will pay damages which a covered person is "legally entitled to recover" from owner of uninsured motor vehicle because employee was not "legally entitled to recover" from employer.

Affirmed.

West Headnotes (9)

[1] **Appeal and Error** 🔑 Nature and Scope of Decision

To be a final, appealable summary judgment, the order granting the motion must dispose of all parties and all issues before court; if order does not dispose of all issues and all parties, it is interlocutory and, therefore, not appealable absent a severance.

Cases that cite this headnote

[2] **Appeal and Error** 🔑 Nature and Scope of Decision
 **Appeal and Error** 🔑 Grounds for Dismissal
 **Appeal and Error** 🔑 Judgment or Order

If summary judgment order appears to be final, as evidenced by the inclusion of Mother Hubbard language (purporting to dispose of all claims or parties), judgment should be treated as final for purposes of appeal; if judgment grants more relief than requested, it should be reversed and remanded, but not dismissed.

Cases that cite this headnote

**[3]**     **Appeal and Error** 👉 Judgment

Because plaintiff moved for final judgment without alerting trial court to her outstanding claims, she waived her right to complain about them on appeal. Rules App.Proc., Rule 52(a).

2 Cases that cite this headnote

**[4]**     **Judgment** 👉 Absence of Issue of Fact

Summary judgment is proper only when movant establishes that there is no genuine issue of material fact and that she is entitled to judgment as a matter of law.

Cases that cite this headnote

**[5]**     **Appeal and Error** 👉 Judgment

In reviewing summary judgment, court must indulge every reasonable inference in favor of nonmovant and resolve any doubts in its favor.

Cases that cite this headnote

**[6]**     **Appeal and Error** 👉 Scope and Theory of Case

Because trial court's order did not state the grounds on which summary judgment was granted, appellate court would affirm the summary judgment if any of the theories advanced are meritorious.

Cases that cite this headnote

**[7]**     **Insurance** 👉 Necessity of Tort Liability

Employee who was injured through negligence of her employer while occupying employer's vehicle in the course of her employment and who collected workers' compensation benefits could not recover under her own uninsured/underinsured motorist (UM/UIM) policy providing that insurer will pay damages which a covered person is "legally entitled to recover" from owner or operator of uninsured motor vehicle; employee was limited to collecting workers' compensation benefits and she was not "legally entitled to recover" from employer. V.A.T.S. Insurance Code, art. 5.06–1(1); V.T.C.A., Labor Code § 408.001.

2 Cases that cite this headnote

**[8]**     **Insurance** 👉 Necessity of Tort Liability

Insurance statute requiring that insured be legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles manifests legislature's intent to require, as a prerequisite to uninsured/ underinsured motorist (UM/UIM) coverage, that insured be entitled to sue tort-feasor for damages. V.A.T.S. Insurance Code, art. 5.06–1(1).

1 Cases that cite this headnote

**[9]**     **Insurance** 👉 Uninsured Motorists or Vehicles

Employer who maintained automobile liability insurance that met statutory requirements and who provided workers' compensation insurance was not a "financially irresponsible motorist" for purposes of claim brought by employee who was injured through negligence of employer while occupying employer's vehicle in course of

her employment and who sought to recover uninsured/underinsured motorist (UM/UIM) benefits from her own insurer.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*641** Howard M. Kahn, Houston, for Appellants.

Sally T. Miller, David L. Miller, Houston, for Appellee.

Before HUSTON–DUNN, O'CONNOR and TAFT, JJ.

## OPINION

TAFT, Justice.

Appellants, Jennifer A. Valentine and Michael J. Valentine, appeal from a summary judgment granted in favor of appellee, Safeco Lloyds Insurance Company (Safeco). This case requires us to decide: (1) whether the summary judgment is final despite not dealing with all of appellants' causes of action; and (2) whether an employee who sues her employer for negligence may recover from her uninsured/underinsured motorist (UIM) coverage for injuries beyond the coverage of worker's compensation. We affirm.

## Background

Jennifer Valentine was employed as a driver for United Parcel Services (UPS). As Valentine was loading her UPS truck one day, she fell off the back bumper and was injured. She alleged the accident was caused by UPS's negligence in failing to properly repair the bumper. For her injuries, Valentine recovered $30,000 in worker's compensation benefits. Valentine sued UPS's automobile liability insurer, Liberty Mutual Insurance Company, and her own uninsured motorist carrier, Safeco Lloyds Insurance (Safeco). The trial court granted summary judgment in favor of both insurers and denied a motion for summary judgment by Valentine. Valentine appeals only the summary judgment granted in favor of Safeco.

## Whether All Causes of Action Addressed

 **[1]** **[2]** In point of error three, Valentine argues the trial court erred in granting Safeco's motion for summary judgment because Safeco's motion addressed only Valentine's contract claims under the insurance policy, but did not address her claims under the Deceptive Trade Practices Act (DTPA). [1] To be a final, appealable summary judgment, the order granting the motion must dispose of all parties and all issues before the court. *Mafrige v. Ross,* 866 S.W.2d 590, 591 (Tex.1993). If the order does not dispose of all issues and all parties, it is interlocutory and therefore not appealable absent a severance. *Id.* If a summary judgment order appears to be final, as evidenced by the inclusion of Mother Hubbard language (purporting to dispose of all claims or parties), the judgment should be treated as final for purposes of appeal. *Id.* at 592. If the judgment grants more relief than requested, it should be reversed and remanded, but not dismissed. *Id.*

In this case, the trial court granted a partial summary judgment in favor of Safeco on April 11, 1995. On September 21, 1995, Valentine filed a motion for the trial court to enter final judgment "with all deliberate speed." The trial court signed

a final judgment on October 4, 1995. The final judgment dismissed Valentine's claims against several other parties and ordered that Valentine take nothing from Safeco "as described in this court's Interlocutory Partial Summary Judgment in favor of defendant Safeco Lloyd's Insurance Company." The final judgment also contained a Mother Hubbard clause.

 **[3]**    The record does not show that Valentine complained to the trial court about her outstanding DTPA claims. In fact, she requested the trial court to enter a final judgment even though her DTPA claims had not been addressed by Safeco. Because Valentine moved for final judgment without alerting the trial court to her outstanding DTPA claims, she has waived her right to complain about them on appeal. TEX.R.APP.P. 52(a).

We overrule point of error three.

### *642  Scope of UIM Coverage

In points of error one, six, seven, and eight, Valentine contends the trial court erred by granting Safeco's motion for summary judgment. Specifically, Valentine contends the trial court erred by not concluding that UPS was underinsured as a matter of law, or that Valentine had raised a fact issue about UPS's underinsurance.

### A. Standard of Review

 **[4]**    **[5]**    Summary judgment is proper only when a movant establishes there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Bangert v. Baylor College of Medicine,* 881 S.W.2d 564, 566 (Tex.App.—Houston [1st Dist.] 1994, writ denied). In reviewing the summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Johnson,* 891 S.W.2d at 644; *Bangert,* 881 S.W.2d at 565–66.

 **[6]**    In its motion for summary judgment, Safeco contended: (1) the incident complained of by Valentine was not within the scope of the UIM coverage provided to Valentine; (2) the "regular use" exclusion precluded coverage; and (3) coverage was excluded because the vehicle was being used to carry goods for a fee. [2] Because the trial court's order does not state the grounds on which summary judgment was granted, we will affirm the summary judgment if any of the theories advanced is meritorious. *State Farm Fire & Casualty Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993); *Jones v. Legal Copy, Inc.,* 846 S.W.2d 922, 924 (Tex.App.—Houston [1st Dist.] 1993, no writ).

### B. Analysis

In its motion, Safeco argued that Valentine's UIM coverage was not triggered in this situation because UPS was not a "negligent, financially irresponsible motorist." [3] In support of this position, Safeco introduced proof that UPS carried liability insurance on the truck as well as worker's compensation insurance for its employees. Valentine responds by arguing that even though UPS carried liability insurance, she was unable to collect under its policy because her sole remedy against the negligence of her employer is worker's compensation benefits. The $30,000 Valentine received in worker's compensation benefits was insufficient to cover her actual damages. Valentine argues UPS was thus underinsured and she should be allowed to collect the difference from her own UIM carrier.

The issue we must decide is whether an employee's UIM coverage is available to an employee injured through the negligence of her employer while occupying the employer's vehicle in the course and scope of her employment, after the employee collects worker's compensation benefits. No Texas case discusses an employee's ability to access her own UIM coverage to supplement her worker's compensation benefits when the employee is injured through the fault of the employer while occupying the employer's vehicle. However, the overwhelming majority position nationwide is to preclude coverage under the employee's UIM policy. [4]

**\*643**  In *Dodson,* 367 S.E.2d at 506–08, the plaintiff was struck and killed by a truck belonging to his employer and driven by a co-employee. Plaintiff's widow recovered worker's compensation benefits and then sued the plaintiff's UIM carrier, whose coverage provided that it would "pay ... all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle." *Id.* at 506–07. The Virginia Supreme Court held that even though the employer had auto liability insurance, worker's compensation law prohibited recovery under that policy. *Id.* at 507–08. Because worker's compensation law barred a legal recovery from the employer, the employee's widow was not entitled to invoke the coverage of the employee's UIM coverage. *Id.*

In *Cormier,* 445 N.W.2d at 645, the plaintiff was injured when the vehicle in which she was riding, while driven by a co-worker, collided with a truck. The plaintiff settled with the driver of the truck, and was precluded from suing her co-worker under worker's compensation law. *Id.* She collected worker's compensation benefits, and then attempted to collect under her UIM coverage, which provided, "We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle." *Id.* The North Dakota Supreme Court held that because the plaintiff was statutorily precluded from recovering damages from her co-employee, she could not recover UIM benefits. *Id.* at 646–47. The plaintiff was not "legally entitled to recover" from her co-employee, and worker's compensation benefits were her exclusive remedy. *Id.*

In *Kough,* 568 A.2d at 129–30, the plaintiff was injured in a car owned by her employer and operated by a co-worker. The plaintiff collected worker's compensation benefits and attempted to collect additional benefits under her own UIM coverage. *Id.* The New Jersey Superior Court held that no UIM benefits were available and gave two reasons. First, the court noted that the legislature intended for UIM coverage to fill a "gap" so as to compensate innocent automobile accident victims who are injured by drivers who violate the statutory requirement of carrying liability coverage. *Id.* at 131. There was no intent to allow the victim of an uninsured motorist to receive compensation that he could not receive even if the negligent driver was in compliance with mandatory liability requirements. *Id.* Second, the court noted that the plaintiff was not "legally entitled" to recover from her co-employee because of New Jersey's worker's compensation law. *Id.* at 132–33.

Valentine argues that she is legally entitled to recover from UPS and cites *Boris v. Liberty Mut. Ins. Co.,* 356 Pa.Super. 532, 515 A.2d 21, 22 (1986), which we find distinguishable. In *Boris,* the plaintiff was driving his employer's vehicle when he was run off the road by an uninsured motorist. *Id.* The plaintiff collected worker's compensation benefits and then attempted to collect under his employer's UIM coverage. *Id.* at 22, 23 n. 1. The court held that worker's compensation law precluded the employee from collecting under his employer's automobile liability policy because such a claim would require litigating the fault of the insurer. *Id.* at 24. However, the court allowed the employee to collect under his employer's UIM coverage because that would involve litigating the fault of a third-party tortfeasor. *Id.* at 24–25.

The key difference between *Boris* and the present case is that *Boris* involved a third-party tortfeasor, whereas in this case the alleged tortfeasor is the employer. The plaintiff in *Boris* was legally entitled to recover damages from the third-party tortfeasor; however, Valentine is not legally entitled to recover damages from UPS.

Finally, Valentine relies on *Hamaker v. American States Ins. Co.,* 493 S.W.2d 893, 895–97 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.), in which this Court invalidated a clause that allowed a UIM carrier **\*644** to offset the damages it paid the insured by the amount the insured had recovered through worker's compensation. However, *Hamaker* does not address the issue presented by this case. In *Hamaker,* the *existence* of UIM coverage was not in question, only the amount of benefits recoverable. The case at bar presents a more fundamental issue: Is the insured entitled to invoke her UIM coverage at all if she is precluded from suing her employer?

[7]  The insurance policy in the present case, like the policies in *Dodson, Cormier,* and *Kough,* provides that Safeco will "pay *damages* which a covered person is *legally entitled to recover* from the owner or operator of an uninsured

motor vehicle." (Emphasis added.) Under TEX.LAB.CODE ANN. art. 408.001 (Vernon 1996), Valentine is not "legally entitled to recover" from UPS; she is limited to collecting worker's compensation benefits. Therefore, coverage under Safeco's policy is not available.

 **[8]**   Article 5.06–1 of the Insurance Code also requires that the insured be "*legally entitled to recover damages* from owners or operators of uninsured or underinsured motor vehicles." TEX.INS.CODE ANN. art. 5.06–1(1) (Vernon 1981) (emphasis added). We believe this manifests the legislature's intent to require, as a prerequisite to UIM coverage, that the insured be entitled to sue the tortfeasor for damages. We do not believe the legislature intended UIM benefits to be available under these facts.

 **[9]**   We also agree that UPS is not a "financially irresponsible motorist." On the contrary, UPS maintained automobile liability insurance that met the statutory requirements and provided worker's compensation insurance. The law requires nothing more.

Finally, we note that article 5.06–1 expressly provides that the UIM carrier will be subrogated to its insured's rights against the tortfeasor once it pays UIM benefits. TEX.INS.CODE ANN. art. 5.06–1(6) (Vernon 1981). To allow an employee to collect from his UIM carrier under these circumstances would destroy the insurer's right of subrogation against the tortfeasor. Because Valentine has no right to recover damages from UPS, Safeco would not be able to recover from UPS, through subrogation, after it paid Valentine.

We hold that Valentine's claims do not fall within the scope of the UIM coverage provided by Safeco's policy as a matter of law. Therefore, the trial court did not err by granting Safeco's motion for summary judgment.

We overrule points of error one, six, seven, and eight.

The remainder of this opinion does not meet the standards for publication pursuant to TEX.R.APP.P. 90(c) and thus is ordered not published.

### Conclusion

Because the trial court properly granted summary judgment on one of the grounds asserted by Safeco, we need not address Valentine's remaining points of error, [5] and decline to do so.

We affirm the trial court's judgment.

### Unpublished Text Follows

### Sufficiency of Summary Judgment Proof

In point of error two, Valentine complains that the affidavit of David Miller, Safeco's attorney, is insufficient summary judgment proof. When Safeco filed its motion for summary judgment, it attached a copy of the insurance policy at issue in this case. David Miller filed an affidavit in which he stated, "Attached is a true and correct copy of the automobile insurance policy applicable in the above-referenced suit." Valentine contends the affidavit is not based on personal knowledge and states a legal conclusion.

A party must object to the form of summary judgment evidence and place the objections before the trial court, or its objections will be waived. *Grand Prairie Indep. Sch. Dist. v. Vaughan,* 792 S.W.2d 944, 945 (Tex.1990); *Waddy v. City of*

*Houston,* 834 S.W.2d 97, 101 (Tex.App.—Houston [1st Dist.] 1992, writ denied). The objecting party must also secure a ruling on its objections from the trial court to preserve any error for appellate review. *Roberts v. Friendswood,* 886 S.W.2d 363, 365 (Tex.App.—Houston [1st Dist.] 1994, writ denied); *Fox Elec. Co. v. Tone Guard Sec., Inc.,* 861 S.W.2d 79, 81 (Tex.App.—Fort Worth 1993, no writ). Because Valentine did not object to Safeco's summary judgment evidence or obtain a ruling from the trial court, her complaint is waived.

Furthermore, we note Valentine attached the pertinent portions of her Safeco policy as part of her summary judgment evidence. The material was thus properly before the trial court.

We overrule point of error two.

#### Valentine's Motion for Summary Judgment

In point of error nine, Valentine contends the trial court erred in failing to grant her motion for summary judgment. Safeco says Valentine waived any complaint regarding denial of her motion for summary judgment by limiting her appeal to the order granting Safeco's motion for summary judgment.

Valentine's notice of appeal is expressly limited to Safeco's motion for summary judgment. It would have been possible for Valentine to appeal both rulings. *See Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). However, by giving limited notice of appeal, Valentine confined herself to appealing only the trial court's granting of Safeco's motion for summary judgment.

We overrule point or error nine.

We affirm the trial court's judgment.

End of Unpublished Text

**All Citations**

928 S.W.2d 639

Footnotes

1    TEX.BUS. & COM.CODE ANN. § 17.41 (Vernon 1987).

2    Safeco waives this third ground on appeal.

3    In discussing the purpose of requiring UIM coverage, the supreme court stated the legislature's intent was to protect conscientious motorists from financial loss caused by negligent, financially irresponsible motorists. *See Francis v. International Serv. Ins. Co.,* 546 S.W.2d 57, 61 (Tex.1976).

4    *See Federal Kemper Ins. Co. v. Wales,* 430 Pa.Super. 208, 633 A.2d 1212, 1214 (1993); *State Farm Mut. Auto. Ins. Co. v. Royston,* 72 Haw. 338, 817 P.2d 118, 119 (1991); *State Farm Mut. Auto. Ins. Co. v. Webb,* 54 Ohio St.3d 61, 562 N.E.2d 132, 133 (1990); *Cormier v. National Farmers Union Prop. & Casualty Co.,* 445 N.W.2d 644, 647–48 (N.D.1989); *Aetna Casualty & Sur. Co. v. Dodson,* 235 Va. 346, 349–52, 367 S.E.2d 505, 506–08 (Va.1988); *Allstate Ins. Co. v. Boynton,* 486 So.2d 552, 556–59 (Fla.1986); *Peterson v. Kludt,* 317 N.W.2d 43, 48–49 (Minn.1982); *Kough v. New Jersey Auto. Full Ins. Underwriting Ass'n.,* 237 N.J.Super. 460, 466–71, 568 A.2d 127, 130–34 (N.J.Super.Cr.App.Div.1990); *Williams v. Thomas,* 187 Ga.App. 527, 528–29, 370 S.E.2d 773, 774–75 (Ga.Ct.App.1988); *Lee v. Allstate Ins. Co.,* 467 So.2d 44, 47 (La.Ct.App.1985); *Mayfield v. Casualty Reciprocal Exch.,* 442 So.2d 894, 896–97 (La.Ct.App.1983); *Williams v. Country Mut. Ins. Co.,* 28 Ill.App.3rd 274, 275–77, 328 N.E.2d 117, 118–20 (Ill.App.Ct.1975); *Hopkins v. Auto–Owners Ins. Co,* 41 Mich.App. 635, 638, 200 N.W.2d 784, 786 (Mich.Ct.App.1972). *But see Torres v. Kansas City Fire & Marine Ins. Co.,* 849 P.2d 407, 411 (Okla.1993) (the uninsured motorist carrier does not stand in the tortfeasor's shoes so that coverage is allowed even if the insured would not be legally entitled to recover from the uninsured motorist because of exclusivity of worker's compensation).

The points of error we do not address attack the trial court's granting summary judgment: by applying the "regular use" exclusion (points four and five); by concluding appellant is not a "covered person" (points 10 and 11); and by concluding a "hit" or "collision" is necessary for UIM coverage (point 12).

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

950 S.W.2d 185
Court of Appeals of Texas,
Austin.

WESTERN INDEMNITY INSURANCE COMPANY and American
International Surplus Lines Insurance Company, Appellants,

v.

AMERICAN PHYSICIANS INSURANCE EXCHANGE, Appellee.

No. 03–96–00335–CV.
|
July 24, 1997.
|
Rehearing Overruled Aug. 28, 1997.

Medical malpractice insurer for physician brought suit for declaratory judgment that malpractice insurer for hospital was obligated to share costs of defending physician. The District Court of Travis County, Peter M. Lowry, J., granted summary judgment for plaintiff insurer, and defendant insurer appealed. The Court of Appeals, Jones, J., held that physician was an additional named insured, not an additional insured, within meaning of "other insurance" clause of hospital's policy.

Reversed and remanded.

West Headnotes (7)

**[1]    Contracts**  👉 Ambiguity in General

When controversy concerns construction of unambiguous written instrument, construction is matter of law for the court.

1 Cases that cite this headnote

**[2]    Insurance**  👉 Plain, Ordinary or Popular Sense of Language

**Insurance**  👉 Exclusions, Exceptions or Limitations

When language of insurance policy is susceptible to more than one construction, policy should be construed in favor of insured to avoid exclusion of coverage; conversely, if there is no ambiguity, it is the court's duty to give words of policy their generally accepted meaning unless policy shows words were meant in technical or different sense.

3 Cases that cite this headnote

**[3]    Insurance**  👉 Construction as a Whole

Courts should not construe insurance policies piecemeal; when construing particular provision in insurance policy, all policy provisions should be given effect, and the whole contract considered, with each clause being used to help interpret the others.

3 Cases that cite this headnote

[4]     **Insurance**  ☞  Persons Covered

"Additional insured" is a party protected under insurance policy, but who is not named within policy.

7 Cases that cite this headnote

[5]     **Insurance**  ☞  Persons Covered

"Additional named insured" is a person or entity specifically named in policy as insured subsequent to issuance of original policy; party typically becomes additional named insured pursuant to agreement obligating named insured to add additional named insured to named insured's preexisting insurance policy.

7 Cases that cite this headnote

[6]     **Insurance**  ☞  Medicine and Health

Under hospital's malpractice policy defining additional named insured as "[a]ny physician, nurse, assistant, or technician, while providing Medical Professional Services under a contract of employment or service contract with the Named Insured, but only while acting within the scope of any contract or employment with the Named Insured," physician working at hospital was "additional named insured," and not "additional insured;" physician was specifically added by name to policy as scheduled medical professional through general change endorsement after he signed his employment contract.

3 Cases that cite this headnote

[7]     **Appeal and Error**  ☞  Ordering New Trial, and Directing Further Proceedings in Lower Court

Appellant raised no point of error with regard to trial court's denial of its summary judgment motion, and thus, upon reversal of summary judgment in favor of appellee, case could only be remanded to trial court for further proceedings.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*186**  Pamela J. Touchstone, Schell, Beene & Vaughan, L.L.P., Dallas, for appellants.

Brian McElroy, Davis & Wilkerson, P.C., Austin, for appellee.

Before POWERS, JONES and KIDD, JJ.

**Opinion**

JONES, Justice.

This appeal arises out of a dispute between two insurance companies. American Physicians Insurance Exchange ("APIE"), appellee, sued American International Surplus Lines Insurance Company ("AISLIC"),[1] appellant, seeking a declaratory judgment that AISLIC was obligated to share the costs of defending their common insured, Dr. David

L. Martin, in a malpractice action. On cross-motions for summary judgment, the trial court concluded that the liability of the carriers was concurrent and granted summary judgment in favor of APIE. In a single point of error, AISLIC contends the trial court erred in granting summary judgment because the AISLIC policy provided only excess coverage vis-à-vis the APIE policy. We will reverse the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On June 13, 1990, Dr. David L. Martin signed an employment contract with Pro Med Minor Emergency Center ("Pro Med"). The contract required Dr. Martin to provide professional medical services on behalf of Pro Med and obligated Pro Med, as part of Dr. Martin's compensation, to provide him with professional liability insurance. [2] Pro Med **\*187** was insured under a medical professional liability policy of insurance issued by AISLIC. The AISLIC policy was amended by endorsement dated May 30, 1992 to include Dr. Martin as a covered "Scheduled Medical Professional." [3] In addition to the AISLIC policy, Dr. Martin was also covered by an individual professional liability insurance policy issued by APIE.

On October 30, 1992, Dr. Martin was sued for medical negligence. He made a demand for coverage under the APIE policy, and APIE assumed Dr. Martin's defense. Thereafter, he made a demand on AISLIC to join as a "co-primary" insurer. Initially, AISLIC tendered a defense, agreed to act as co-primary insurer, and agreed to reimburse APIE for one-half of Dr. Martin's defense costs. In October 1993, however, AISLIC concluded that its policy provided only excess coverage over the APIE policy and refused to further contribute toward the costs of Dr. Martin's defense. The malpractice lawsuit was eventually tried to a verdict in favor of Dr. Martin.

Both parties focus their arguments on the "Other Insurance" clause of AISLIC's policy, which states:

> This insurance is excess over any other valid and collectible insurance available to each Insured, with respect to a Loss Event covered by this policy, whether such other insurance is stated to be primary, contributing, contingent or otherwise, *except this insurance is not excess over any other valid and collectible insurance available to those Additional Insureds to which the Named Insured may be obligated by virtue of a written contract to provide insurance such as is afforded by his policy;* but only with respect to Medical Professional Services performed by or on behalf of the Named Insured and/or Additional Named Insured as provided by this policy....

(Emphasis added.) The dispute revolves around whether Dr. Martin was an "Additional Insured" under the policy, thus allowing APIE to take advantage of the exception to the policy's "Other Insurance" clause.

The AISLIC policy defines "Named Insured," "Additional Named Insured," and "Additional Insured" as follows:

Each of the following is an insured under this policy to the extent set forth below:

A. *Named Insured.* The Named Insured and any member, partner, officer, director, or shareholder thereof while acting within the scope of their duties in providing Medical Professional Services for the Named Insured.

B. *Additional Named Insured.* Any physician, nurse, assistant, or technician, while providing Medical Professional Services under a contract of employment or service contract with the Named Insured, but only while acting within the scope of any contract or employment with the Named Insured and under the control of or of direct benefit to the Named Insured at the time of a Loss Event. Employees of a hospital are not Additional Named Insureds under this policy.

C. *Additional Insured.* Any hospital, person or organization to whom or to which the Named Insured is obligated by virtue of a written contract to provide insurance or indemnity such as is afforded by this policy, but only with respect to Medical Professional Services performed by the Named Insured or an Additional Named Insured.

APIE filed this action seeking a declaration that the APIE and AISLIC policies provided co-primary indemnity coverage to Dr. Martin, entitling APIE to recover from AISLIC one-half of all attorney's fees, expenses, and costs APIE incurred in defending Dr. Martin in the underlying malpractice suit. Both APIE and AISLIC filed motions for summary judgment. By granting APIE's motion and denying AISLIC's, the trial court apparently ruled that Dr. Martin was, as a matter of law, an "Additional Insured" under **\*188** the AISLIC policy. [4] AISLIC perfected this appeal.

## DISCUSSION

 **[1]**    The standards for reviewing a summary judgment are well established: (1) the movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law; (2) in deciding whether there is a disputed fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). When the controversy concerns the construction of an unambiguous written instrument, the construction is a matter of law for the court. *Jones v. El Paso Natural Gas Prods. Co.,* 391 S.W.2d 748, 754 (Tex.Civ.App.—Austin 1965, writ ref'd n.r.e.).

In its only point of error, AISLIC contends the trial court erroneously held that the AISLIC policy provided co-primary insurance on behalf of Dr. Martin. Specifically, AISLIC argues that Dr. Martin is an Additional Named Insured, rather than an Additional Insured, under the AISLIC policy and thus is provided only excess coverage over the APIE policy. APIE, on the other hand, argues that Dr. Martin is an Additional Insured under the AISLIC policy, rendering the excess clause inapplicable and the APIE and AISLIC policies co-primary. In light of the technical meanings of "additional insured" and "additional named insured" and the language of the AISLIC policy as a whole, we conclude that the only reasonable construction is that the parties intended Dr. Martin be an Additional Named Insured, not an Additional Insured. Accordingly, on the record before us, APIE has not conclusively shown the policies to be co-primary.

 **[2]**    **[3]**    The general rules of contract construction govern insurance policy interpretation. *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). When the language of an insurance policy is susceptible to more than one construction, the policy should be construed in favor of the insured to avoid exclusion of coverage. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex.1987). Conversely, if there is no ambiguity, it is the court's duty to give the words of the policy their generally accepted meaning unless the policy shows the words were meant in a technical or different sense. *Security Mut. Cas. Co. v. Johnson,* 584 S.W.2d 703, 704 (Tex.1979); *Guardian Life Ins. Co. v. Scott,* 405 S.W.2d 64, 65 (Tex.1966). Moreover, courts should not construe insurance polices piecemeal. *American Nat. Ins. Co. v. Paul,* 927 S.W.2d 239, 243 (Tex.App.—Austin 1996, writ denied). When construing a particular provision in an insurance policy, all of the policy's provisions should be given effect, and the whole contract considered, with each clause being used to help interpret the others. *Decorative Ctr. v. Employers Casualty Co.,* 833 S.W.2d 257, 260 (Tex.App.—Corpus Christi 1992, writ denied).

 **[4]**    **[5]**    Both the terms "additional insured" and "additional named insured" have clear technical meanings. An additional insured is a party protected under an insurance policy, but who is not named within the policy. [5] *See* **\*189** *Mark Pomerantz, Note, Recognizing the Unique Status of Additional Named Insureds,* 53 Fordham L.Rev. 117, 118 (1984); *see, e.g., Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exchange,* 444 S.W.2d 583, 589–90 (Tex.1969). A common example of an additional insured is a person who, although not specifically named, is covered under a liability policy by a definition of "insured" that extends protection to interests, strictly according to a status, such as employees or common

members of a household. *See* Pomerantz, *supra,* at 118 n. 6; *see, e.g., State Farm Mut. Auto. Ins. Co. v. Walker,* 334 S.W.2d 458, 460 (Tex.Civ.App.—Fort Worth 1960, writ ref'd n.r.e.). On the other hand, an additional named insured is a person or entity specifically named in the policy as an insured subsequent to the issuance of the original policy. Pomerantz, *supra,* at 119. A party typically becomes an additional named insured pursuant to an agreement obligating the named insured to add the additional named insured to the named insured's pre-existing insurance policy. *Id.; see, e.g., Landry v. Oceanic Contractors, Inc.,* 731 F.2d 299, 303 (5th Cir.1984).

 **[6]**    Under the technical definition and the definitions in the AISLIC policy, Dr. Martin is clearly an Additional Named Insured. As stated above, to be an Additional Named Insured under the AISLIC policy, a person must be a physician, nurse, assistant, or technician providing medical professional services under an employment contract with the named insured (Pro Med), and who was acting in the course and scope of the contract at the time of the underlying loss. [6] Dr. Martin was indisputably a "physician ... providing medical professional services under a contract of employment ... with the named insured [Pro Med]"; nor do the parties dispute that he was acting within the scope of his employment contract, and for Pro Med's benefit, at the time of the events that led to the underlying malpractice action.

Most importantly, after signing his employment contract with Pro Med, Dr. Martin was specifically added, by name, to the AISLIC policy through a general change endorsement that stated the following:

Effective May 30, 1992, this endorsement is attached to Certificate No. 7704486–55–147, issued to Pro Med Minor Emergency Centers et al, [*sic* ] and modifies the policy as follows:

It is hereby understood and agreed that the list of Named Insureds and Medical Professionals are as follows:

| Named Insureds | Retroactive Date |
|---|---|
| Pro Med Minor Emergency Center 183 | 08/10/90 |

* * *

| Scheduled Medical Professionals | Retroactive Date |
|---|---|

* * *

| David L. Martin, M.D. | 07/01/90 |

Nonetheless, APIE argues that Dr. Martin was not an Additional Named Insured because the AISLIC policy does not specifically refer to him as such, but instead merely lists him as a "Scheduled Medical Professional." We reject this strained reading of the AISLIC policy. The listing of "Scheduled Medical Professionals" contained in the May 30, 1992 endorsement was, without question, intended to designate the listed individuals as persons being provided coverage under the policy. The endorsement's distinction between "Scheduled Medical Professionals" and "Named Insureds" eliminates the possibility that Dr. Martin was being designated as a "Named Insured." Given the definition of Additional Named Insured as "[a]ny physician, nurse, assistant or technician, while providing Medical Professional Services," we conclude that the list of "Scheduled Medical Professionals" in the endorsement was intended to be a listing of Additional Named Insureds. The fact that the policy did not explicitly refer to Dr. Martin as an "Additional **\*190** Named Insured" is immaterial. It is enough that he was specifically named as a person for whom coverage was provided by the policy.

APIE next contends that even if Dr. Martin is an Additional Named Insured within the meaning of the AISLIC policy, he also falls within the definition of Additional Insured under that policy, thereby entitling him to primary coverage under the policy. We disagree. First and foremost, Dr. Martin *was specifically named* in the endorsement as a covered person. The essence of the distinction between an additional named insured and an additional insured is that the former is comprised of insureds who are specifically named in the policy and the latter is comprised of insureds who are not so named. A person is either specifically named in the policy as an insured or not. Here Dr. Martin was so named and, therefore, cannot logically fall into the category of "additional insureds."

Moreover, construing the AISLIC policy as a whole, the coverage provided to Additional Insureds under the policy is only for liability resulting from an obligation of the Named Insured to indemnify or provide insurance to a third party who meets the policy's definition of an Additional Insured. The underlying case involved a direct claim against Dr. Martin for his alleged negligence. A reading of the AISLIC policy shows that it does not contemplate direct liability of an Additional Insured. Rather, the definition of Additional Insured appears to be limited to third parties to which Pro Med, as the Named Insured, is obligated to provide contractual indemnity. This is demonstrated by the provision of the policy entitled "When a Claim is to be Considered First Made." [7] This provision governs the determination of whether a claim is made within the policy period, a prerequisite for determining coverage. The policy does not contemplate a direct claim being made against an Additional Insured, because it does not contain a procedure for determining when a claim is made against an Additional Insured. Rather, the policy contemplates claims being made only against Named Insureds and Additional Named Insureds. If direct liability of Additional Insureds was intended to be covered by the AISLIC policy, reference to Additional Insureds would necessarily be included in this provision.

The AISLIC policy does not recognize claims received directly by an additional insured as determining whether a claim falls within the policy's coverage period. Because a claim for contractual indemnity would be a claim against a Named Insured or an Additional Named Insured, thereby triggering the claims-made section of the policy, it would be unnecessary to include Additional Insureds in the notice provisions of the policy. The only reasonable interpretation of the policy is that the definition of Additional Insured was not intended to include persons or entities whose direct liability is within the scope of coverage; thus, the policy must be limited in application to circumstances involving an indemnity obligation to a third party. Under the present facts, Dr. Martin does not fall within the category of Additional Insureds.

APIE argues, however, that the AISLIC policy requires an Additional Insured to notify the insurer in the event of a claim, thus not limiting Additional Insureds to third party beneficiaries to a contract. We disagree. While an Additional Insured is apparently under a duty to report a claim to the insurer, it would be unreasonable to construe the policy to allow an Additional Insured to give notice to the insurer, yet not trigger the determination of whether the claim was made within the applicable coverage period. *See Decorative Ctr.,* 833 S.W.2d at 260 (each clause of insurance contract used to interpret the other). Under APIE's construction, when an Additional Insured reported a claim it would be impossible to determine whether the claim was made during the applicable coverage period. Such a construction is not **\*191** reasonable. We sustain AISLIC's point of error.

 **[7]** In the present case, AISLIC raises only one point of error complaining of the trial court's *granting* of APIE's motion for summary judgment and does not raise a point of error with regard to the trial court's denial of its own motion for summary judgment. Therefore, we may only remand this cause to the trial court for further proceedings. [8] *See Copeland v. Tarrant Appraisal Dist.,* 906 S.W.2d 148, 152 (Tex.App.—Fort Worth 1995, writ denied); *Pine v. Salzer,* 824 S.W.2d 779, 780 (Tex.App.—Houston [1st Dist.] 1992, no writ).

**CONCLUSION**

Having sustained AISLIC's point of error, we reverse the trial court's judgment and remand the cause to that court for further proceedings.

**All Citations**

950 S.W.2d 185

Footnotes

1    Western Indemnity Insurance Company was named a party to this suit as manager of AISLIC's defense under its policy. Western appears in this appeal jointly with AISLIC on behalf of AISLIC. For convenience, we will refer to both appellants collectively as "AISLIC."

2    Specifically, Dr. Martin's employment contract stated:

2. DUTIES OF EMERGENCY SERVICE PHYSICIAN: MEC PHYSICIAN agrees to provide professional medical services in accordance with paragraph five (5) of this contract.

* * * * * *

5. COMPENSATION:

* * * * * *

(b) Malpractice insurance, providing this may be Obtained [*sic* ] at a premium similar to other MEC PHYSICIANS and has not been greatly increased as a result of malpractice claims, will be provided.

3    Another endorsement, issued the same day, provided that the policy's "Insuring Clause" did not apply to "[a]ny medical professional not scheduled hereon."

4    Originally, APIE sought a partial summary judgment declaring that the APIE and AISLIC policies provided co-primary indemnity coverage to Dr. Martin. After the rendition of partial summary judgment in its favor, however, APIE filed its First Amended Petition for Declaratory Judgment, which added a request for interest on any indemnity payments, expenses, and attorney's fees from the underlying malpractice lawsuit as well as interest on its attorney's fees incurred in connection with this declaratory judgment action. APIE again moved for summary judgment regarding the additional relief, which was granted with the exception of the recovery of pre-judgment interest on the attorney's fees, costs, and expenses incurred in this declaratory judgment action. Thereafter, APIE filed its Third Motion for Partial Summary Judgment on the issue of attorney's fees for an appeal of this action, which was granted by the trial court.

5    Black's Law Dictionary defines "additional insured" as follows:

Person(s) covered by policy in addition to the named insured; *e.g.* in an automobile liability policy, the "named insured" is usually the purchaser or the owner of the insurance policy, while an "additional insured" or an "insured" is one *who is not specifically identified by name in the policy,* but enjoys status of an insured under the named insured policy, for example, as a result of being the operator of the named insured's automobile.

Black's Law Dictionary 38 (6th ed.1990) (emphasis added).

6    The policy defines "medical professional services" as "services directly related to the profession of the practice of medicine."

7    The "Claims Made" section of the policy states:

For the purposes of this policy, a Claim against an Insured is first made when the Named Insured or an Additional Named Insured receives during the Policy Period (i) a written demand for money or services from the claimant or claimant's attorney or (ii) a service of process in a suit or other proceeding seeking Damages or services, as a result of an alleged Loss Event to which this policy applies.

8    In any event, we note that the APIE policy is not in evidence, and it may contain an "other insurance" clause that conflicts with the clause in the AISLIC policy, which could render the policies co-primary. *See Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exchange,* 444 S.W.2d 583, 589–90 (Tex.1969) (when "other insurance" provisions in two primary insurance policies conflict, both provisions are ignored and insured will be covered by both policies).

---

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.